## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **DELOISE PRICE,** | \| |
| | \| |
| **PLAINTIFF** | \| |
| | \| |
| **VS.** | \|    **CASE NO. 2:06-CV-721-MHT** |
| | \| |
| **WAL-MART STORES, INC.,** | \| |
| **et al.,** | \| |
| | \| |
| **DEFENDANTS** | \| |

## DEFENDANTS' MOTION TO DISMISS FOR ATTEMPTS TO PERPETRATE FRAUD UPON THE COURT

Come now the Defendants and move this honorable court pursuant to Federal Rules of Civil Procedure 11, 26(g)(2)(B), 37(b) and/or 41(b) to dismiss the claims of the Plaintiff as sanction for committing perjury or otherwise attempting to commit fraud upon this court. As grounds for this motion defendants would state as follows:

1.    Federal courts possess plenary authority to manage their own affairs so as to achieve the orderly and expedition disposition of cases and have the power to defend their integrity against "unscrupulous marauders". Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1119 (1st Cir. 1989). The United States Supreme Court has recognized a court's inherent power to impose the sanction of dismissal in response to abusive litigation practices. Link v. Wabash Railroad Co., 370 U.S. 626, 632, 8

L. Ed. 2d 734, 82 S. Ct. 1386 (1962); <u>Roadway Express, Inc. v. Piper</u>, 447 U.S. 752, 765, 65 L. Ed. 2d 488, 100 S. Ct. 2455 (1980) (dismissal of a lawsuit is within a court's discretion); *see also* <u>Vargas v. Peltz</u>, 901 F. Supp. 1572, 1579 (S.D. Fla. 1995) ("Federal district courts of this nation possess the inherent power to regulate litigation and to sanction citing <u>Link v. Wabash Railroad Co.</u>, 370 U.S. 626, 630-631 (1962).

2.      "In addition to the inherent power to sanction fraudulent litigation practices by dismissal, courts have found dismissal appropriate pursuant to Federal Rule of Civil Procedure 41(b). For example, the court in <u>Pope v. Federal Express Corp.</u> stated that "dishonest conduct by a party has been recognized as grounds for dismissal with prejudice under Rule 41(b)." 138 F.R.D. 675, 682 (W.D. Mo. 1990), *aff'd in part, vacated in part on other grounds*, 974 F.2d 982 (8th Cir. 1992) (citation omitted). It stated further that "dismissal under Rule 41(b) has been held appropriate where plaintiff has engaged in bad faith or egregious conduct, or where plaintiff's conduct threatens the very integrity of the judicial process." *Id.* (citation omitted)." <u>McDowell v. Seaboard Farms of Athens, Inc.</u>, 1996 U.S. Dist. LEXIS 19558; 10 Fla. L. Weekly D 355 (M.D. Fla. 1996).

3.      "[F]alse testimony in a formal proceeding is intolerable. We must neither reward nor condone such a flagrant 'affront' to the truth-seeking function

of adversary proceedings." <u>ABF Freight Sys., Inc. v. NLRB</u>, 510 U.S. 317, 323 (1994).

4.    Plaintiff Deloise Price has given false testimony in an attempt to commit fraud on this court.  She is, in this case, attempting to claim damages using the same complaints she used in a personal injury lawsuit in Wilcox County in 2001 while claiming she was essentially in excellent health prior to the accident in this case.

5.    Plaintiff's deposition was taken in this case in Montgomery, Alabama, on January 19, 2007. *See* Exhibit A (January 2007 Deposition of Deloise Price). Her claim was that while using a new exercise machine manufactured, assembled and sold by defendants the left handle came loose causing her to fall.  [Exhibit A, pgs. 82-84. The accident allegedly happened June 24, 2004.  [Complaint Doc. 1-B] The "major" problems she described as being caused by the fall were: "Start in my neck, my shoulder, and my back and my knee and other places too; sex. Yes." [Exhibit A, pg. 113, line 20]  She gave her deposition in a wheelchair.  *Id.*, line 23. She was wearing a brace around her back "24/7".  *Id.,* pg. 125, line 8

6.    During the deposition taken in January 2007 [Exhibit A] she made the following statements about her condition *before* the June 2004 incident:

    a.  She had never fallen previously. [Pg. 19, line 16]

b. "Before this happened I was playing ball and doing my household, you know, and going anywhere that I wanted, you know, to go and do, driving, playing with the grandchildren 24/7 and having sex with my husband when I wanted." [Pg. 24, line 7]

c. "I had a garden. I had all kinds of fruit trees and pecans and stuff. [Pg. 128, line 16]

d. Before the accident "[m]e and my husband used to have sex just about every night that it was and then sometimes two and three times. We was really sexual. We would love one another and stuff like that." [Pg. 30, line 9] They had no marital problems before the accident. [Pg. 31, line 1] Before the accident she said they were having sex almost every night and sometimes more than once or twice. [Pg. 31, line 10]. She said he was faithful to her before the accident. [Pg. 31, line 6]

e. Before the event she played volleyball and baseball in the back yard. [Pg. 25, linen 17]

f. Before the event she did the cleaning, cooking, caring for her husband, washing and ironing. She said she would paint walls, hang wallpaper, mop, and "all that kind of stuff." [Pg. 26, line 4] In other words, before the accident there were no household chores she could

not do. [Pg. 26, line 14]. Before this incident she was under no restrictions of any kind in my ability to move or do things. [Pg. 26, line 20]

g. Before the accident she was able to travel to Boston, Detroit, Greenwood MS and Florida. She said she could drive herself in an SUV or RV for three hours at a time. [Pg. 27]

7. During the deposition taken in January 2007 [Exhibit A] she made the following statements about her condition *after* the June 2004 incident:

a. "My husband had left me since I've been sick and stuff. My husband had walk out on me. He have came back and I know there are other women he was going with. And during the time before then, I never had any problems with him." [Pg. 29, line 18] "And just sometimes we want to have sex and stuff, he understand that I can't have sex because we tried it one time and it hurt me so bad he had to stop. It's pitiful." [Pg. 30, line 1] Since the accident her husband had left her twice. [Pg. 31, linen 14]

b. "And I get very depressed because it hurt me. I can't go and do the things I like to do. I look at myself in the mirror. Sometime I say I'm not even worth living and I have somebody stay around me all the time. I kill myself because I a'int used to this." [Pg. 127, line 1]

    c.  "Like Christmas and things that I used to enjoy with the grandchildren, I couldn't do it.  And you just don't know how outgoing I was.  I had all kinds of fruit trees and pecans and stuff.  I can't get none of them.  People down there on my place getting them all. That bother me.  I can't do it.  I feel like life ain't living for."  [Pg. 128, line 12]  "Honest to God I say sometime I wish I wouldn't be on this earth." [Pg. 129, line 1]

8.    During the deposition in 2007, Mrs. Price was asked about any prior lawsuits and she mentioned a claim against Bill's Dollar Store in Camden which she said was settled. [Exhibit A, pg. 23, line 13]  She said a clerk dropped a hammer, tacks, detergent and candles on her left foot. *Id.* pg. 21, line 1.  When asked about the type of injury she said: "Just bruises. My ligament, you know, had problems with my ligament." *Id.* pg. 21, line 17.  It was directly following that testimony that she was asked about her condition before the 2004 accident in question when she said:

```
10      A.   Oh, before this happened, I
11   was -- I was playing ball and doing my
12   household, you know, and going anywhere
13   that I wanted, you know, to go and do,
14   driving, playing with the grandchildren
15   24/7 and having sex with my husband when
16   I wanted.
```

*Id*. pg. 24, line 10.

6

9.     Subsequent to the deposition defendants propounded additional interrogatories to Plaintiff.   On April 9, 2007, Price responded to those interrogatories. *See* Exhibit B (Response to Extreme Performance Second Interrogatories) and Exhibit C (Response to Wal-Mart's Second Interrogatories). In her responses she provided the following testimony:

24.     Prior to the accident, had Plaintiff experienced any back problems?  If so, describe the back problems, the cause of the back problems and the onset date of the back problems.

RESPONSE:     I had no back problems prior to the accident.

Exhibit B.

25.    Had Plaintiff ever used a cane and/or wheelchair to assist in ambulation or mobility prior to the accident?  If so, state the reason or cause of the need for such assistance and the inclusive dates of use of such assistance.

RESPONSE:     No.

Exhibit B.

27.    Prior to the accident had Plaintiff and her husband Willie Price ever separated due to marital difficulties?  If so, state the inclusive dates of each such separation and the reason therefore.

RESPONSE:     No.

Exhibit B.

25.    Prior to the accident, had Plaintiff experienced any leg or hip problems?  If so, describe the leg or hip problems, the cause of the leg or hip problems and the onset date of the leg or hip problems.

**RESPONSE:**       **I do not recall any problems with my legs or hips prior to the accident.**

Exhibit C.

26.    When and why did Plaintiff move to Montgomery from Camden?

**RESPONSE:**       **My house burned in Camden, so I moved to Montgomery to be closer to my family.  I believe it occurred in 2001.**

Exhibit C.

27.    Has Plaintiff ever required assistance in daily living activities due to injuries sustained prior to the accident?  If so, state the reason or cause of the need for such assistance and the inclusive dates of use of such assistance.

**RESPONSE:**       **No.**

Exhibit C.

10.    After the January 2007 deposition, Defendant's counsel obtained a copy of a deposition given by Deloise Price on December 18, 2001 in connection with the personal injury case she had filed against Bill's Dollar Store in Camden, AL.  *See* Exhibit D (Deposition of Delose Price taken December 18, 2001).  In that

deposition she claimed that a clerk caused items to fall on one of her feet in November 1998. [Exhibit D, pg. 27, line 20 & pg. 35, line 12].

11.     During the deposition taken in December 2001 [Exhibit D] she made the following statements about her condition *before* the November 1998 incident at Bill's Dollar Store:

    a.  "Before this accident…I had a whole half an acre of vegetables and potatoes and stuff where I could work and run my tiller plow and gather my vegetables and sell.  I don't have any of that. Because I love to do that type stuff." [Pg. 75, line 10]

    b.  Her husband and she had no problems before the accident. [Pg. 70, line 5]

12.     During the deposition taken in December 2001 [Exhibit D] she made the following statements about her condition *after* the November 1998 incident at Bill's Dollar Store:

    a.  Her doctor prescribed a walking stick because her leg kept giving out on her and she kept falling.  [Pg. 71, line 21]

    b.  I have pain "[a]ll the way from my toe. The pain run from the top of my feet down through my toe and up my hip constantly.  And it caused us [her husband and she] to have to separate."  [Pg. 68, line 23]

c.  "I can't wear heels and things like other peoples.  I have to wear flat, soft shoes all the time, and I'm constantly in pain all the time.  And it's caused so much conflict between me and my husband, sex and whatnot.  I can't even have sex and stuff like that. It's so painful, my hip and leg."  [Pg. 68, line 13]  [My husband left] "maybe into the prime of the two years of the accident.  And he kept coming back and leaving, coming back and leaving.  We were fussing and fighting and going on and stuff because he wanted to have sex and stuff, and we'd start and I couldn't perform like I used to." [Pg. 72, line 3]

d.  She could not drive to Montgomery or Selma from Camden. [Pg. 74]

e.  "The pain and the pressure and stuff on me has just got to me, I don't even feel like it's worth living for. I really don't. If I got to go through life like the, I promise you I don't feel like it's worth living for.  I can't associate with peoples." [Pg. 10, line 16] [I can't associate with people because of] "[t]he pain, pain, the pain, the pain and the anger that it makes me.  If I got to go on like this, it ain't worth living for because I thought maybe surgery or something could replace it and get me back to normal." [Pg. 70, line 23]

f.  "No surgery ain't going to help me.   I can't play with my grandchildren, run and play with them like I used to.  Like, I'm

walking with the stick and stuff.  What man wants somebody with a stick. It just ain't life." [Pg. 71, line 10]

g.  I "[c]ouldn't do the chores around the house and keep the house and stuff.  I was just like a baby that you got to nurse and give the bottle all the time.  He [her husband] told me them words." [Pg. 73, line 1]

h.  "Then I called my children and I talked to them and they said Mom you cannot stay down there by yourself, you have got to come to Montgomery." [Pg. 73, line 6] She was living with daughters in Montgomery because of her condition she cannot take care of herself. [Pg. 79, line 3] "I can't stand on my leg long enough to prepare a meal, get in the tub. It gave out on me several times.  Sweeping, vacuuming, I've tried all that. That make the pain worse." [Pg. 79, line 10]

13.    A summary comparison of her 2001 and 2007 depositions is attached as Exhibit E.

14.    On April 3, 2007, defense expert Dr. Tai O. Chung issued a report on the medical records of Deloise Price showing that:

"A review of her records shows that she had diagnosis of pseudotumor cerebri in 1975 with a VP shunt placement.  The records also indicate she had back pain dating back to, at least, January 6, 2000.  She had multiple epidural injections in the lumbar spine in 2001 by Dr. Singh.

11

> The reports of the diagnostic studies of the lumbar spine including x-rays and MRI scan before and after June 26, 2004, showed, essentially, no difference. Essentially it was found that there were mild degenerative changes in the lumbar spine and the presence of a VP shunt at the lower lumbar level."

Exhibit F, pg. 2.

15.    Shortly after April 9, 2007, counsel for the Defendants provided a copy of the December 2001 deposition of Deloise Price [Exhibit D] and Dr. Chung's report [Exhibit F] to counsel for Plaintiff. Counsel for Plaintiff has had over 60 days to consider the contents thereof.

16.    Counsel for Plaintiff has missed the court imposed deadline for disclosing expert witnesses since being provided a copy of said 2001 deposition. No expert witnesses have been identified by Plaintiff. There is no indication that Plaintiff's counsel will take any action to voluntarily dismiss this action after the 2001 deposition and medical records review expert witness report was provided.

17.    Counsel for Plaintiff has been advised a motion to dismiss relating to the Plaintiff's conduct would be forthcoming.

18.    The testimony given by Mrs. Price in January 2007 and her answers to discovery in April 2007 are clearly and unequivocally contrary to the testimony she gave in 2001 and her medical records. The answers reveal that she committed perjury in one or both of those depositions. She cannot honestly claim she was healthy prior to the injury in this case without admitting she committed perjury in

her 2001 deposition or her 2007 deposition.  She cannot say she had no marital difficulties prior to this incident without admitting she committed perjury in her 2001 deposition or her 2007 deposition.

19.    Furthermore, her testimony of her pain and suffering is almost identical in both the 2001 and 2007 depositions which indicate she is very adept at using the legal system to maximize her potential recovery.  She has already apparently received one settlement through a civil case in which she made the same claims of damage and injury and marital infidelity caused by the injury.  She should not have another bite at the apple.

WHEREFORE, this court should exercise its inherent power to sanction attempts to commit fraud upon this court by dismissing Plaintiff's claims with prejudice. *Cf.* Stern, UNTANGLING A TANGLED WEB WITHOUT TRIAL: USING THE COURT'S INHERENT POWERS AND RULES TO DENY A PERJURING LITIGANT HIS DAY IN COURT, 66 J. Air. L. & Com. 1251 (2001).

_S/Dennis R. Bailey_____
Dennis R. Bailey
Attorney for Defendants

Of counsel:
RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.
184 Commerce Street
Post Office Box 270
Montgomery, Alabama   36101-0270
(334) 206-3234 (phone)
(334) 481-0031 (fax)
drb@rsjg.com (e-mail)

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have served a copy of the foregoing document upon the following counsel of record by placing a copy of same in the United States Mail, first class postage prepaid, on this the 3rd day of August, 2007.

> Jock M. Smith
> Brian P. Strength
> Valerie Rucker Russell
> Cochran, Cherry, Givens, Smith, Lane & Taylor
> Post Office Box 830419
> Tuskegee, Alabama   36083


> __*S/Dennis R. Bailey*_____
> Of counsel

EXHIBIT A

Page 1

1    IN THE UNITED STATES DISTRICT COURT FOR

2         THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

5    CASE NUMBER:  CV:2:06-CV-721

6

7    DELOISE PRICE,

8         Plaintiff,

9         vs.

10

11   WAL-MART STORES, INC., et al.,

12        Defendants.

13

14       S T I P U L A T I O N

15        IT IS STIPULATED AND AGREED by

16   and between the parties through their

17   respective counsel, that the deposition

18   of DELOISE PRICE may be taken before

19   Leslie K. Hartsfield, at the offices of

20   Rushton, Stakely, Johnston & Garrett,

21   184 Commerce Street, Montgomery,

22   Alabama, 36104,

23            DEPOSITION OF DELOISE PRICE

FREEDOM COURT REPORTING

Page 2

1  taken on the 19th day of January, 2007.
2       IT IS FURTHER STIPULATED AND
3  AGREED that the signature to and the
4  reading of the deposition by the witness
5  is waived, the deposition to have the
6  same force and effect as if full
7  compliance had been had with all laws
8  and rules of Court relating to the
9  taking of the deposition.
10      IT IS FURTHER STIPULATED AND
11  AGREED that it shall not be necessary
12  for any objections to be made by counsel
13  to any questions except as to the form
14  or leading questions, and that counsel
15  for the parties may make objections and
16  assign grounds at the time of the trial,
17  or at the time said deposition is
18  offered in evidence, or prior thereto.
19      IT IS FURTHER STIPULATED AND
20  AGREED that the notice of filing of the
21  deposition by the Commissioner is
22  waived.
23

Page 3

1              INDEX
2  EXAMINATION BY:       PAGE NUMBER:
3  Mr. Bailey           6
4
5
6
7
8  DEFENDANTS' EXHIBITS:
9  1 - Handwritten papers     38
10  2 - Pages from manual      45
11  3 - Drawing            71
12  4 - Photographs        76
13  5 - Photographs        80
14  6 - Drawing            84
15  7 - Pri-Med records        98
16
17
18
19
20
21
22
23

Page 4

1     IN THE UNITED STATES DISTRICT COURT
2      FOR THE MIDDLE DISTRICT OF ALABAMA
3            NORTHERN DIVISION
4
5  CASE NUMBER:  CV:2:06-CV-721
6
7  DELOISE PRICE,
8       Plaintiff,
9       vs.
10
11  WAL-MART STORES, INC., et al.,
12       Defendants.
13
14  BEFORE:
15       LESLIE K. HARTSFIELD,
16       Commissioner.
17
18  APPEARANCES:
19       COCHRAN, CHERRY, GIVENS & SMITH,
20  P.C., by Mr. Brian P. Strength, 306
21  North Main Street, Tuskegee, Alabama,
22  36083, appearing on behalf of the
23  Plaintiff.

Page 5

1     RUSHTON, STAKELY, JOHNSTON &
2  GARRETT, by Mr. Dennis R. Bailey, 184
3  Commerce Street, Montgomery, Alabama,
4  36104, appearing on behalf of the
5  Defendants.
6
7          ********
8
9     I, LESLIE K. HARTSFIELD, a Court
10  Reporter of Prattville, Alabama, acting
11  as Commissioner, certify that on this
12  date, as provided by the Federal Rules
13  of Civil Procedure and the foregoing
14  stipulation of counsel, there came
15  before me at the offices of Rushton,
16  Stakely, Johnston & Garrett, 184
17  Commerce Street, Montgomery, Alabama,
18  36104, beginning at 10:45 a.m., DELOISE
19  PRICE, witness in the above cause, for
20  oral examination, whereupon the
21  following proceedings were had:
22
23

2 (Pages 2 to 5)

Page 6

1      DELOISE PRICE
2   being first, duly sworn, was examined
3      and testified as follows:
4
5      THE REPORTER:  Usual
6   stipulations?
7      MR. STRENGTH:  Sure.
8      MR. BAILEY:  Yes.
9
10  EXAMINATION BY MR. BAILEY:
11     Q.    Your full name, please.
12     A.    Deloise Price.  Deloise G.
13  Price.  Sorry.
14     Q.    Deloise, what does the "G"
15  stand for?
16     A.    Geanese.
17     Q.    Would you spell it?
18     A.    I think my mother spelled it
19  G-E-A-N-E-S-E.
20     Q.    Deloise, my name is Dennis
21  Bailey.  I represent the defendants in
22  the case that you have filed here in
23  Montgomery federal court.  And I'm going

Page 7

1   to be asking you questions today about
2   that case, about your injuries, about
3   your past medical conditions, et cetera,
4   for the purpose of trying to get as much
5   information as I can about what has
6   happened and things of that nature.  So
7   it's very important that the information
8   you give me be as accurate as you can
9   possibly make it.
10     A.    Yes, sir.
11     Q.    And along those lines, if
12  you for any reason can't understand my
13  question or don't understand my
14  question, I'll be happy to rephrase it.
15  All you have to do is tell me, okay?
16     A.    Yes, sir.
17     Q.    But if you answer the
18  questions, you know, I may be able to
19  use the answers later --
20     A.    Yes, sir.
21     Q.    -- if you change your
22  testimony.  So that's why it's important
23  to let me know if you don't understand.

Page 8

1   Also, this is not supposed to be a
2   physical ordeal.  So if you need to take
3   a break to go to the restroom, to get
4   some water, just walk around --
5      A.    Yes.
6      Q.    -- all you do is ask me and
7   we'll take a break.
8      A.    Yes, sir.
9      Q.    Do you understand what I've
10  just said?
11     A.    Yes, I do.
12     Q.    Great.  Are you currently on
13  any medications that would affect your
14  ability to understand questions and give
15  truthful answers?
16     A.    Not that I know of.
17     Q.    I know you're probably on
18  some medication.  What are the
19  medications you are on for other
20  reasons?
21     A.    I'm on -- it's two pain
22  medications.  Oh, I can't think of the
23  name.

Page 9

1      Q.    Do you have the bottles with
2   you?
3      A.    My sister have one of the
4   bottles out there.  They know -- she
5   know exactly what it is.  I can't --
6   it's right on the tip of my tongue and I
7   can't recall it.
8      Q.    Well, I'm going to go over
9   your medical records and there's
10  references to medicines and then
11  probably we'll get to it that way.  But
12  you're taking some pain medication
13  today?
14     A.    Yes, sir.
15     Q.    But it won't affect your
16  ability to answer my questions?
17     A.    No, sir.
18     Q.    What is your address?
19     A.    5850 Carriage Brook Road,
20  Montgomery, Alabama, 36116.
21     Q.    And how long have you
22  resided there?
23     A.    About seven years.

3 (Pages 6 to 9)

FREEDOM COURT REPORTING

Page 10

1       Q.   Are you the owner of that
2  property?
3       A.   Yes, sir.
4       Q.   Does anyone else own it with
5  you?
6       A.   My daughter and I.
7       Q.   How long have you and your
8  daughter owned that property?
9       A.   Seven years.
10      Q.   Tell me again the names of
11  the individuals who reside there.  Your
12  sister's name; for example, is?
13      A.   Is Martha Mac.
14      Q.   M-A-C?
15      A.   M-A-C.
16      Q.   And her last name is
17  Price?
18      A.   Mack.
19      Q.   Oh, M-A-C-K?
20      A.   Right.  Right.  Yeah,
21  Mack.
22      Q.   She's your sister?
23      A.   Yes.

Page 11

1       Q.   Who else lives there?
2       A.   She doesn't live there
3  now.
4       Q.   Okay.  I want to know who
5  lives at that house.
6       A.   My husband Willie J. Price
7  and my stepsister Irene Rich.
8       Q.   Anyone else live there?
9       A.   No, sir.
10      Q.   How long have you and Willie
11  J. been married?
12      A.   Over 20 some odd years.
13      Q.   20 plus years?
14      A.   Yes, sir.
15      Q.   What is your anniversary?
16      A.   December the 17th.
17      Q.   Your date of birth?
18      A.   10/24/50.
19      Q.   And you are currently how
20  old?
21      A.   I am 56.
22      Q.   When were you last
23  employed?

Page 12

1       A.   Been years.
2       Q.   When did you go on
3  disability?
4       A.   In 1975.
5       Q.   And were you rated to be a
6  hundred percent disabled for some reason
7  back then?
8       A.   Nobody never told me that.
9       Q.   But you applied for
10  disability through Social Security?
11      A.   Yes, sir.
12      Q.   And they granted that to you
13  sometime in '75 as far as you can
14  recall?
15      A.   Yes, sir.
16      Q.   What was the reason, if you
17  know, that they determined you to be
18  disabled?
19      A.   I was being bothered with
20  headaches.
21      Q.   Headaches?
22      A.   Yes, sir.
23      Q.   Were there any other

Page 13

1  problems that you recall telling them
2  about that might have affected their
3  decision to grant you disability
4  status?
5       A.   Yes, sir.  It was my -- I
6  had incranium pressure on the brain.
7       Q.   Intracranium --
8       A.   Yes, sir.
9       Q.   -- pressure?
10      A.   On the brain.
11      Q.   What was causing -- that was
12  causing headaches?
13      A.   Yes, sir.
14      Q.   What was causing that, if
15  you know?
16      A.   I don't know that.
17      Q.   Were there any other
18  physical or mental conditions that
19  contributed to your being granted
20  disability in 1975?
21      A.   Not that I know of.
22      Q.   What kind of problems did
23  this intracranium pressure on your brain

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 14

1 cause you in addition to headaches, if
2 anything?
3     A.   A lot of fluid.
4     Q.   Fluid on the head?
5     A.   Yes, sir.
6     Q.   What doctor would know the
7 most about your physical condition
8 concerning your -- the pressure in your
9 head?
10     A.   Well, Dr. Roseanne Cook.
11 She has all my medical records.
12     Q.   Roseanne Cushy?
13     A.   Cook, C-O-O-K.
14     Q.   Cook.  Where does she
15 practice?
16     A.   In Pine Apple, Alabama.
17     Q.   What type of doctor is
18 she?
19     A.   I think she's just a medical
20 doctor.
21     Q.   Family practice?
22     A.   Yes, sir.
23     Q.   GP.  And why or -- explain

Page 15

1 to me how the headaches you had made you
2 unable to work.
3     A.   They were just, you know,
4 pounding headaches, constantly
5 headaches.
6     Q.   Would they go away or --
7     A.   Sometimes.  Sometimes it
8 wouldn't.
9     Q.   Has that problem resolved?
10     A.   As far as I know, yes.
11     Q.   Were you ever taken off of
12 disability?
13     A.   At one time.
14     Q.   When were you taken off of
15 disability?
16     A.   It been a while back.
17     Q.   Was it sometime after
18 1975?
19     A.   Yes, sir.
20     Q.   About how long were you on
21 disability before you came off of
22 disability?
23     A.   Maybe -- I think it was

Page 16

1 about three years.
2     Q.   I'm not going to hold you to
3 a precise date --
4     A.   Yes, sir.
5     Q.   -- because I know we're
6 going on memory.  But after this period,
7 how long were you not on disability?
8     A.   For about seven months.
9     Q.   And did you go back onto
10 disability after approximately seven
11 months?
12     A.   Yes, sir.
13     Q.   What was the reason on that
14 occasion that you were declared to be
15 disabled?
16     A.   Same thing, headaches.
17     Q.   And whenever that occurred,
18 probably sometime in the '70s, have you
19 been disabled ever since?
20     A.   Yes, sir.
21     Q.   Have you ever been taken off
22 disability since the second time you
23 went on?

Page 17

1     A.   No, sir.
2     Q.   Did you attempt to work
3 during the period of time that you were
4 not receiving disability payments?
5     A.   No, sir.
6     Q.   Who, if you know, testified
7 as a medical person or gave a letter or
8 report to Social Security to say that
9 Ms. Price is not able to work because of
10 these headaches?
11     A.   I really don't know.
12     Q.   Do you recall being
13 evaluated by some doctor who represented
14 the Social Security Administration?
15     A.   I sure don't.  I don't know.
16 But there was some doctors involved but
17 I don't know their names.
18     Q.   Did you have to have an
19 attorney during that process to help you
20 get approved for disability?
21     A.   No, sir.  Yes.  I'm sorry.
22 I'm so sorry.
23     Q.   That's okay.  Listen, if you

5 (Pages 14 to 17)

FREEDOM COURT REPORTING

Page 18

1  make a mistake and you correct it on the
2  record then I won't use it against you,
3  okay?
4      A.  Okay.  Yes, sir.  Through
5  legal service.  I don't know her name.
6      Q.  Legal Services of Alabama
7  helped you get disability back in the
8  '70s?
9      A.  Yes, sir.
10     Q.  Now, as part of your
11  disability benefits, do you get some
12  type of medical benefit?
13     A.  What you mean medical?
14     Q.  I mean does the government
15  pay if you have to go see a doctor?
16     A.  Yes.
17     Q.  Is that called Medicaid or
18  Medicare?  I never can keep --
19     A.  I think it's Medicare.  The
20  blue, white, and red card.
21     Q.  You've got a card for the
22  government?
23     A.  Yes, sir.

Page 19

1      Q.  And if you need to go see a
2  doctor, that's what you show them?
3      A.  Yes, sir.
4      Q.  And do they make you pay
5  anything when you go see a doctor?
6      A.  Sometime.
7      Q.  A copay of some type?
8      A.  Yes, sir.
9      Q.  What's the most you ever had
10  to pay when you went to see a doctor?
11     A.  Well, I think $150 when I
12  got ready to have this knee surgery.
13     Q.  Before this bike, this
14  exercise equipment issue, had you ever
15  fallen?
16     A.  No, sir.
17     Q.  Had you ever hurt your
18  knees?
19     A.  No, sir.
20     Q.  Had you ever gone to a
21  doctor and complain that your knees
22  hurt?
23     A.  No, sir.

Page 20

1      Q.  What about your neck, had
2  you hurt your neck before the incident
3  we're here about today?
4      A.  No, sir.
5      Q.  Had you been involved in any
6  accidents?
7      A.  Nothing but this right --
8  no, this was the left one.  I had
9  dropped a -- a girl in a store dropped a
10  hammer and some more stuff on my feet,
11  yeah.
12     Q.  When did that happen?
13     A.  About -- about eight years,
14  I think.  Something like that.
15     Q.  Was that while you were
16  working or while you were just at the
17  store?
18     A.  I was just at the store.
19     Q.  You were just a customer?
20     A.  Yes, sir.
21     Q.  What store were you at?
22     A.  At Bill's Dollar.
23     Q.  What fell on your body?

Page 21

1      A.  Hammer and tacks and dish
2  detergent, stuff like that, and a big
3  old, you know, big candles.
4      Q.  What part of your body did
5  these things fall on?
6      A.  On -- on my left, across the
7  top of my left foot.
8      Q.  The top of your left foot?
9      A.  Uh-huh (affirmative
10  response).
11     Q.  Did it cause injury?
12     A.  Yes, sir.
13     Q.  Did it break your foot?
14     A.  No, sir.
15     Q.  What kind of injury did it
16  cause, just bruising?
17     A.  Just bruises.  My ligament,
18  you know, had problems with my
19  ligament.
20     Q.  What doctor, if you recall,
21  would have helped you the most or known
22  the most about that injury?
23     A.  Dr. Roseanne Cook and Dr.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 22

1  Bryant here in Montgomery but I don't
2  know her name, you know, all of her name
3  right now.
4       Q.   Did you file any claim or
5  case or lawsuit against the Bill's
6  Dollar store over that incident?
7       A.   I did.
8       Q.   Where did you file that
9  suit?
10      A.   In Wilcox County.
11      Q.   Is that where it happened?
12      A.   Yes, sir.
13      Q.   Where in Wilcox County did
14  it happen?
15      A.   Bill Dollar's.
16      Q.   Where is Bill's Dollar in
17  Wilcox County?
18      A.   Downtown.
19      Q.   Camden?
20      A.   Yes, sir.
21      Q.   Who represented you in that
22  suit?
23      A.   He's up here now.  I went --

Page 23

1  I went blank, but I can get it and give
2  it to you.
3       Q.   Somebody that's here in
4  Montgomery now?
5       A.   Well, he was in Wilcox
6  County then.
7            MR. STRENGTH:  Stewart
8  Vance.
9       A.   Stewart Vance.  Yeah, that's
10  it.  Stewart Vance.
11      Q.   Did that case go to trial or
12  was it settled?
13      A.   It was settled.
14      Q.   Was the term of the
15  settlement confidential?
16      A.   I'm assuming it was.  I
17  don't know.  I really don't.
18      Q.   Did you file that suit in
19  your name, Deloise G. Price?
20      A.   Yes, sir.
21      Q.   Have you filed any other
22  lawsuits at any time other than the one
23  in Wilcox County and the one that we're

Page 24

1  here today about?
2       A.   That's it.
3       Q.   Two cases?
4       A.   Yes, sir.
5       Q.   Have you ever been sued?
6       A.   No, sir.
7       Q.   Describe for me your
8  physical condition before this incident
9  happened.
10      A.   Oh, before this happened, I
11  was -- I was playing ball and doing my
12  household, you know, and going anywhere
13  that I wanted, you know, to go and do,
14  driving, playing with the grandchildren
15  24/7 and having sex with my husband when
16  I wanted.
17           MR. STRENGTH:  Off the
18  record.
19
20      (A discussion was held off the
21       record.)
22
23      Q.   (By Mr. Bailey)  What was

Page 25

1  your height and weight?
2       A.   Five-two and about 201 or 2,
3  something like that.
4            MR. STRENGTH:  I'm sorry.
5  Did you say what is or what was?
6       Q.   What was.  That would have
7  been your weight at the time this
8  happened?
9       A.   Yes, sir.
10      Q.   You said you would be
11  playing ball.  What kind of ball do you
12  mean?
13      A.   We was playing volleyball,
14  baseball, like that.
15      Q.   Are you talking about in the
16  backyard --
17      A.   In the backyard.
18      Q.   -- or on a team?
19      A.   No, in the backyard, stuff
20  like that.
21      Q.   You mentioned you could do
22  your household work.
23      A.   Yes.

7 (Pages 22 to 25)

Page 26

1    Q.   What do you do -- what did
2  you do as part of the household chores
3  before the accident?
4    A.   Cleaning, cooking, caring
5  for my husband, you know, washing and
6  ironing, say if my house something need
7  paint or something, I would paint, paint
8  walls, hang wallpaper, mop, all that
9  kind of stuff.
10    Q.   Were there any household
11  duties that you couldn't do or wouldn't
12  do or that you can think of before you
13  were hurt?
14    A.   No, sir.  I changed my
15  furniture, everything around.
16    Q.   Were you under any
17  restrictions at all that you remember in
18  terms of your ability to move or do
19  things before this accident?
20    A.   No, sir.
21    Q.   You mentioned that you could
22  just go anywhere you wanted to go to.
23  Give me an example of places you could

Page 27

1  visit or had visited within five years
2  of this incident.
3    A.   Boston, Massachusetts;
4  Detroit; Greenwood, Mississippi;
5  Florida.
6    Q.   What part of Florida?
7    A.   Gulf Shores.  Went to
8  Tennessee in the mountains.
9    Q.   Would you have driven to all
10  these places or flown to any of them?
11    A.   Drive, just drive.
12    Q.   And so were you able to
13  drive long -- three hours at a time in a
14  car?
15    A.   Oh, yes.
16    Q.   And you drove yourself?
17    A.   Yes.
18    Q.   Did you drive anything other
19  than a car such as any other --
20    A.   An SUV?
21    Q.   Uh-huh (affirmative
22  response).
23    A.   RV.  We had an RV.

Page 28

1    Q.   What kind of RV did y'all
2  have?
3    A.   A Dodge.
4    Q.   How big an RV was it?
5    A.   It's the biggest one I think
6  that they made.  The big one with big
7  queen size bed and a bed that comes down
8  from the (indicated).
9    Q.   So you've been able to drive
10  a fairly large recreational vehicle?
11    A.   Yes, sir.
12    Q.   An SUV and an automobile?
13    A.   Yes, sir.
14    Q.   So you play with the
15  grandchildren.  You would play with the
16  grandchildren 24/7.  How many
17  grandchildren?
18    A.   Ten.
19    Q.   Wow.  Do any of them -- none
20  of them live there though?
21    A.   Oh, no.
22    Q.   But they would visit?
23    A.   Yes, sir.

Page 29

1    Q.   Do you take care of them
2  during the day?
3    A.   Sometime I did, yes, sir.
4  And I used to pick my granddaughter up
5  from school all the time.
6    Q.   Now, you mentioned your sex
7  life.  I know your husband's got a claim
8  here so we need to get into that.  Give
9  me an idea of what your sex life was
10  before the incident.
11    A.   It's kind of hard to
12  describe.
13    Q.   If you need to take a break,
14  we can do that.
15    MR. STRENGTH:  I'll get you
16  a little water.  If you need to take a
17  break, we can.
18    A.   My husband had left me since
19  I've been sick and stuff.  My husband
20  had walk out on me.  He have came back
21  and I know there are other women he was
22  going with.  And during the time before
23  then, I never had any problems with him.

8 (Pages 26 to 29)

FREEDOM COURT REPORTING

Page 30

1  And just like sometimes we want to have
2  sex and stuff, you know, he understand
3  that I can't have, you know, sex because
4  we tried it one time and it hurt me so
5  bad so he had to stop.  It's pitiful.
6      Q.   Before the incident -- tell
7  me -- tell me about your sex life or --
8  before the accident.
9      A.   Me and my husband used to
10  have sex just about every night that it
11  was and then sometimes two and three
12  times, you know.  We was really sexual.
13  We always, you know, would love one
14  another and stuff like that.
15      Q.   Were there any marital
16  difficulties prior to this accident?
17      A.   What you mean by that?
18      Q.   I mean, incidents where; for
19  example, you thought he was not being
20  faithful to you, other women?
21      A.   Talking about involved now?
22      Q.   No.  Talking about before
23  the accident.

Page 31

1      A.   Oh, no.  No.  No.  I had
2  no -- no.  No.
3      Q.   So before the accident, you
4  had -- your husband was faithful to you
5  as you know -- as far as you know?
6      A.   Yes, sir.
7      Q.   You had -- you were having
8  sex almost every night and sometimes
9  more than once or twice?
10      A.   Yes, sir.
11      Q.   And after the accident, it's
12  my understanding that your husband has
13  left you at least on one occasion?
14      A.   Two occasions.
15      Q.   All right.  Two occasions.
16  How long did he leave you on each
17  occasion?
18      A.   I know one time it was
19  something like just about two months.
20      Q.   Where did he go during the
21  two months?
22      A.   With a woman.
23      Q.   Local woman?

Page 32

1      A.   Well, some woman here in
2  Montgomery.
3      Q.   And then he came back and he
4  left again?
5      A.   Yes, sir.
6      Q.   How long did he leave the
7  second time?
8      A.   I would say about a week or
9  two.
10      Q.   Did he go live with some
11  other woman or the same woman?
12      A.   He won't tell me.
13      Q.   Did you have him followed or
14  have anybody check on where he was
15  during that period of time?
16      A.   I knew he was going with
17  somebody.
18      Q.   How long ago was it that he
19  came back after the second time he
20  left?
21      A.   Probably about a week or
22  so.
23      Q.   So he's been back about a

Page 33

1  week?
2      A.   Talking about he's been back
3  in the house now about a week?
4      Q.   Yes.
5      A.   It been -- oh, no.  He been
6  back at home now probably about seven or
7  eight months, something like that.
8      Q.   And how are things now?
9      A.   It ain't like it should
10  be.
11      Q.   What does your husband do
12  for a living?
13      A.   Work for Newell.
14      Q.   W.S. Newell road builder?
15      A.   (Nodded head affirmatively.)
16      Q.   What does he do for them?
17      A.   He's a pipe layer.
18      Q.   How long he been working
19  there?
20      A.   I think it's six or seven
21  years.
22      Q.   Ms. Price, I forgot to ask
23  you about your educational background.

9 (Pages 30 to 33)

FREEDOM COURT REPORTING

Page 34

1  How far have you gone in school?
2      A.   Ninth grade.
3      Q.   Where did you finish the
4  ninth grade?
5      A.   Camden Academy.
6      Q.   Why did you leave school in
7  the ninth grade?
8      A.   Because I was pregnant.
9      Q.   How many children do you
10  have?
11      A.   Three.
12      Q.   How many of those children
13  are Willie Price's children?
14      A.   Not any.
15      Q.   So all these children were
16  before y'all got married?
17      A.   My first husband.
18      Q.   So you were married to one
19  other man?
20      A.   Yes, sir.
21      Q.   What was his name?
22      A.   Willie Lee Beverly.
23      Q.   Beverly?

Page 35

1      A.   Yes, sir.
2      Q.   And during that period of
3  time, you would have gone by the name of
4  Deloise Beverly?
5      A.   Beverly, yes, sir.
6      Q.   Would you have lived in
7  Camden?
8      A.   Yes, sir.
9      Q.   Tell me about your husband's
10  educational background.  Where did he go
11  to school and how far in school has he
12  gone?
13      A.   I think -- I'm not sure.  I
14  think about the 10th grade.
15      Q.   Where did he grow up?
16      A.   In a little place they call
17  Red Creek.
18      Q.   What county is that in?
19      A.   I think it's Thomasville.
20      Q.   Near Thomasville, Alabama?
21      A.   Yes, sir, I think so.
22      Q.   Where did you last work,
23  Bell South -- South Central Bell?

Page 36

1      A.   No, sir.  It was a shirt
2  factory.
3      Q.   What did you do?
4      A.   I was a seamstress.
5      Q.   Where was that factory?
6      A.   In Camden, Alabama.
7      Q.   Where has your husband work
8  before W. S. Newell?
9      A.   MacMillan Bloedel.
10      Q.   What did he do for them?
11      A.   He did, I don't know,
12  operate a machine or something like
13  that.
14      Q.   Machine operator.  Do you
15  know of any lawsuits that your husband
16  has filed other than this one?
17      A.   Nothing that I -- no, sir,
18  that I know of.
19      Q.   Did Willie Beverly and you
20  file any lawsuits in Camden?
21      A.   No, sir.
22      Q.   Before this incident, when
23  was the last time you had been to a

Page 37

1  doctor, if you can remember?
2      A.   Oh, probably about two or
3  three months or something.
4      Q.   Who would have been the
5  doctor you went to on that occasion?
6      A.   Roseanne Cook.
7      Q.   Would Dr. Cook know the most
8  about your medical condition before the
9  accident?
10      A.   Yes, sir.
11      Q.   You said she's in Camden?
12      A.   In Pine Apple.
13      Q.   Is that in Wilcox County --
14      A.   Yes, sir.
15      Q.   -- or is that Montgomery?
16      A.   Wilcox County.
17      Q.   Let's talk about this
18  machine.  When was it purchased?
19      A.   December, around December.
20  I don't remember exactly the date.
21      Q.   I found a little piece of
22  paper that said something about purchase
23  11 December '03.

10 (Pages 34 to 37)

FREEDOM COURT REPORTING

Page 38

1    A.   Hold it up and let me see if
2  that's it.
3    Q.   (Complied.)
4    A.   That's it.  Yes, sir.
5    Q.   Let's mark this as
6  Defendants' Exhibit 1 to your
7  deposition.
8        MR. STRENGTH:  You want both
9  pages to be --
10   Q.   Yes.  There's two pages.
11  They're marked PR27 and 28.  I'm going
12  to mark them Defendants' Exhibit 1.
13
14   (Defendants' Exhibit No. 1 was
15    marked for identification.)
16
17   Q.   Who wrote on Defendants'
18  Exhibit 1, whose writing is that?
19   A.   The guy that's over the, you
20  know, that assembly, that assemble the
21  bikes.  He was a cashier in the back
22  back there where they assemble in the
23  back.

Page 39

1    Q.   Cashier where?
2    A.   At Wal-Mart.
3    Q.   Which one?
4    A.   On the Eastern -- Eastern
5  Boulevard.
6    Q.   Do you know the name of this
7  person?
8    A.   Oh, no, I don't know his
9  name.
10   Q.   Did Exhibit 1, the first
11  page PR27, who wrote Ms. Deloise
12  Price?
13   A.   He did.
14   Q.   Who wrote TR 02812?
15   A.   He did.
16   Q.   What is this telephone
17  number, 396-6479?
18   A.   Mines.  He wrote it to call
19  me when the bike was ready.
20   Q.   That's your cell number?
21   A.   No, sir.  That's -- yes,
22  sir.  396-6479.  No.  No.  That's my
23  house number.

Page 40

1    Q.   So --
2    A.   House number.
3    Q.   -- that's your land line at
4  the house?
5    A.   Yes, sir.
6    Q.   Who wrote this purchase 11
7  December '03?
8    A.   He did.
9    Q.   That Thursday -- it was a
10  Thursday that it was purchased?
11   A.   I can't recall what day but
12  he did.
13   Q.   And says, Please assemble,
14  who wrote that?
15   A.   He did.
16   Q.   Thanks something, and then I
17  can't read the name.
18   A.   He did.
19   Q.   He wrote that?
20   A.   Yes, sir.
21   Q.   On Page 2 of this exhibit,
22  there's a production code and then some
23  writing.  Where did you get that piece

Page 41

1  of paper?
2    A.   Off the bike.
3    Q.   Is that your writing
4  underneath that?
5    A.   That's my grandson's
6  writing.
7    Q.   What does that say?
8    A.   The name.  That's for -- I
9  don't know what it is.  Like Perform
10  something, Performance.  Yes, sir.
11   Q.   It's hard to read.
12  Performance Series EE120.  Are you able
13  to read and understand the English
14  language?
15   A.   I'm not able -- I don't read
16  and spell, you know, correct.
17   Q.   I don't spell correct.
18   A.   Well --
19   Q.   If I show you a document and
20  you can't read it, you just tell me,
21  okay.
22   A.   Yes, sir.
23   Q.   I'm going to ask if you can

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 42

1 read some of this stuff.
2     A.   Okay.
3     Q.   Getting back to this, who
4 went to the Wal-Mart on the Eastern
5 Boulevard in Montgomery on December the
6 3rd -- excuse me, December 11, 2003 to
7 purchase this product?
8     A.   Myself and my husband.
9     Q.   What was the reason y'all
10 went to the Wal-Mart that day?
11     A.   Well, he's buying me
12 something for Christmas and every year
13 lately that I would get a piece of
14 equipment, you know, for a gym and
15 that's what I wanted that I didn't
16 have.
17     Q.   What did you already have?
18     A.   Oh, I had a lounge chair.
19     Q.   A lounge chair.  How's that
20 a piece of exercise equipment?
21     A.   That's exercise.  That what
22 you talking about?
23     Q.   Yes.

Page 43

1     A.   Treadmill.
2     Q.   Is that the treadmill I saw
3 behind on the back porch?
4     A.   Yes, sir.
5     Q.   Okay.
6     A.   And the weight thing that
7 you twist, you know, spin around.  I
8 don't know what you call it.
9     Q.   I don't either.  Describe it
10 for me.
11     A.   You know, it's for your
12 sides, you swivel.
13     Q.   Swivel?
14     A.   I guess.  I have to ask my
15 sister that.
16     Q.   Where did you get that
17 product?
18     A.   I think in Birmingham is
19 somewhere.
20     Q.   Some kind of swivel thing?
21     A.   It's a little thing that you
22 (indicated) and weights.
23     Q.   You had weights?

Page 44

1     A.   Little weights.  They were
2 like 5 pounds.
3     Q.   Where did you have your gym
4 set up?
5     A.   Out on the back.
6     Q.   Where I was today is a patio
7 behind the house.
8     A.   Yes, sir.
9     Q.   And I'll show you.  I think
10 I have a picture of it already.  But
11 that's where you had this stuff?
12     A.   Yes, sir.
13     Q.   And this -- when you went to
14 the Wal-Mart, did you know what you were
15 going to buy or were y'all just shopping
16 for a new piece of equipment that you
17 didn't already have?
18     A.   I knew what I was going to
19 buy.
20     Q.   How did you come to know
21 what you wanted?
22     A.   Because I had been to a gym
23 and used it, you know, before.

Page 45

1     Q.   Used what?
2     A.   The exercise bike like that
3 with the long handles.
4
5         (Defendants' Exhibit No. 2 was
6          marked for identification.)
7
8     Q.   Let me show you what I'll
9 mark as Exhibit 2 which are just pages
10 from the exercise bike manual.  It's not
11 all the pages.  It's just the ones I
12 want to ask you about.  But on Page 1 of
13 Defendants' Exhibit 2 there's a drawing
14 of the product.
15     A.   Yes, sir.
16     Q.   Tell me what you call that
17 device.
18     A.   An exercise bike.
19     Q.   Had you used an exercise
20 bike like this one depicted in
21 Defendants' Exhibit 2?  And I don't mean
22 the same manufacturer.  I just mean it
23 has handles and you walk and the pedals

12 (Pages 42 to 45)

Page 46

1  move and you row with the handles while
2  you walk.
3      A.   Yes, sir.
4      Q.   Where had you used a machine
5  like that?
6      A.   My sister.
7      Q.   Your sister --
8      A.   Martha Mack.
9      Q.   -- Martha Mack had one at
10 her home?
11     A.   Yes, sir.  She have a whole
12 gym room too.
13     Q.   Had you used one anywhere
14 else, one that worked like that?
15     A.   Yes, sir.  Yeah.  Several
16 times.
17     Q.   Had you used one at any like
18 commercial gymnasium or health club?
19     A.   No, sir.
20     Q.   Just at people's houses that
21 had them?
22     A.   Yes, sir.
23     Q.   Other than Ms. Mack, who

Page 47

1  else had one at their house that you had
2  used?
3      A.   Regina, my
4  ex-daughter-in-law, Regina Beverly.
5      Q.   You say ex-daughter-in-law,
6  that was Mr. Beverly's daughter by
7  another woman?
8      A.   No.  That's Mr. Beverly's
9  wife.  My son -- my son's ex-wife.
10     Q.   Oh, I see.  So you have --
11 one of your sons by Mr. Beverly married
12 Regina Beverly?
13     A.   Yes, sir.
14     Q.   And while they were married,
15 you visited them and they had one of
16 these machines?
17     A.   Yes, sir.
18     Q.   And you got on it and used
19 it?
20     A.   Yes, sir.
21     Q.   So you wanted one of these
22 type of exercise bikes for your
23 Christmas present --

Page 48

1      A.   Yes, sir.
2      Q.   -- for 2003?
3      A.   Yes, sir.  I was excited.
4      Q.   Had you been shopping around
5  to see how much they were and who had
6  them and what the price ranges were or
7  did you just let's go to Wal-Mart and
8  find it?
9      A.   It's my favorite -- was my
10 favorite store Wal-Mart.  Still is.
11     Q.   When you went to the
12 Wal-Mart -- well, had you been to the
13 Wal-Mart before that day to look at the
14 product?
15     A.   Yes, sir.
16     Q.   So you had -- did they have
17 one set up?
18     A.   Yes, sir.
19     Q.   Where you could look at
20 it?
21     A.   Yes, sir.
22     Q.   Was that one for sale?  Do
23 you know whether the one they had on the

Page 49

1  floor was for sale?
2      A.   No, it wasn't for sale.
3  No.
4      Q.   Do you recall who you talked
5  to at the Wal-Mart about buying the
6  equipment?
7      A.   No, sir.
8      Q.   Can you describe to me what
9  they looked like whether they're man or
10 women?
11     A.   Yes, sir.  It was a man.
12     Q.   A man.  Age range?
13     A.   I don't know.  I know he was
14 a black person.
15     Q.   A black man.  Was he --
16     A.   Older.
17     Q.   Older than you and me?
18     A.   I would say he looked it.
19     Q.   Was he nice and helpful?
20     A.   Very nice.
21     Q.   Did you get on the machine
22 on the floor of the store and try it out
23 there?

13 (Pages 46 to 49)

Page 50

1    A.  No, sir.
2    Q.  Can you recall what you and
3  this person discussed about the machine
4  in the presence of your husband or was
5  there anything -- any questions you had
6  about it that you remember asking,
7  anything he told you about it that you
8  remember?
9    A.  No, sir.
10    Q.  Now, the machine you wanted,
11  was it in a box?
12    A.  Yes, sir.
13    Q.  Now, was there any
14  discussion about putting the machine
15  together?
16    A.  Yes, sir.
17    Q.  Tell me what that amounted
18  to.
19    A.  I asked them do they
20  assemble bikes together, the exercise
21  bike and he said, yeah, for a fee.
22    Q.  What fee did he tell you?
23    A.  I think it was 10 or $15,

Page 51

1  somewhere up in there.
2    Q.  Do you remember how much the
3  machine cost without assembly?
4    A.  It was 140 some odd dollars,
5  I think. I'm not definitely sure but it
6  was up in the hundred.
7    Q.  Was it on sale or was
8  anything --
9    A.  No, sir.
10    Q.  Do you remember anything
11  about the purchase along those lines?
12    A.  No, it was not on sale.
13    Q.  How did you pay for it, did
14  you use credit card, cash?
15    A.  Check.
16    Q.  Have you found the check you
17  used to pay for it?
18    A.  Yes, sir.
19    Q.  So you have that?
20    A.  Yes, sir.
21    Q.  Do you have the receipt?
22    A.  No, I don't have the
23  receipt.

Page 52

1    Q.  But you have the check?
2    A.  Yes, sir.
3    Q.  And did the check include
4  the assembly fee?
5    A.  No, sir. No, sir.
6    Q.  It was just for the --
7    A.  For the bike.
8    Q.  -- for the bike. So the day
9  you bought it was December 3rd --
10  December 11, '03. That's when you wrote
11  the check?
12    A.  Yes, sir.
13    Q.  And when was it delivered or
14  when was it fixed or ready for you to
15  come get or when was it assembled?
16    A.  I left it there and he
17  called me about -- I say about a week
18  and some odd days.
19    Q.  And did you have to go get
20  it?
21    A.  Yes, sir.
22    Q.  So they had it assembled
23  there at the store?

Page 53

1    A.  Yes.
2    Q.  And you had to go back
3  there. Who went with you to get it?
4    A.  Willie Price, my husband.
5    Q.  And what vehicle did y'all
6  use to go get it?
7    A.  Lumina Chevrolet van.
8    Q.  A van?
9    A.  Yes, sir. Took the seat out
10  of the van and used --
11    Q.  It was already fully
12  assembled?
13    A.  Fully assembled as far as I
14  know.
15    Q.  There were no pieces that
16  they handed you and said put this on
17  when you get back to the house?
18    A.  No, sir.
19    Q.  Did they give you the
20  literature, the manual, the book?
21    A.  Yes, sir. Yes, sir.
22    Q.  Were there any tags hanging
23  from the handlebars that said anything

14 (Pages 50 to 53)

FREEDOM COURT REPORTING

Page 54

1  about how to use the equipment or how to
2  turn it on, how to set the, you know,
3  any of the --
4      A.   In the manual, I'm pretty
5  sure it was.
6      Q.   I'm talking about any
7  tags?
8      A.   Oh, no.
9      Q.   Hanging tags?
10     A.   No, sir.  No, sir.
11     Q.   Did Willie get any help
12 getting the machine into the van?
13     A.   No, sir.
14     Q.   He was able to do it by
15 himself?
16     A.   Me and him.
17     Q.   So you were actually
18 physically able to help him pick it up
19 and put it in the van?
20     A.   Yes, sir.
21     Q.   And you took it to the
22 residence at Carriage Brook Road?
23     A.   Yes, sir.

Page 55

1      Q.   Where was it -- who took it
2  out of the van when it got there?
3      A.   Willie and I.
4      Q.   And where did you put it?
5      A.   We put it -- unlock the gate
6  and carried it around and put it on the
7  patio and had some thick -- that thick,
8  thick plastic.  We double wrapped it
9  about five or six times and taped it
10 with duct tape.
11     Q.   Why did you do that?
12     A.   'Cause we were waiting
13 until -- every year around June or July
14 all my younger family, we get together
15 and start putting like $5 a week in a
16 jar till Thanksgiving and whoever lose
17 the most weight that's who get the jar.
18     Q.   Oh, okay.  Why would you --
19 could you not start before then?
20     A.   We couldn't start.  No, we
21 couldn't start.  We always --
22     Q.   So the rules are you can't
23 start exercising until the money is put

Page 56

1  in the jar?
2      A.   Until -- you can walk and
3  do, you know, but you got to weigh in.
4  You got to weigh in.
5      Q.   So you don't want to be thin
6  then?
7      A.   I would say no.
8          MR. STRENGTH:  Not if you
9  want the money.
10     A.   If you want the money, you
11 ain't going to get in it.
12     Q.   How much money is involved
13 in this?
14     A.   Oh, sir, that thing go as
15 high sometimes 5- and $600.
16     Q.   Wow.
17     A.   Yes, sir.
18     Q.   So you got it home sometime
19 in mid December 2003 before Christmas?
20     A.   Yes, sir.
21     Q.   But you immediately wrapped
22 it to protect it from the weather?
23     A.   Yes, sir, protect it from

Page 57

1  the weather.  Yes, sir.
2      Q.   Because the place where you
3  put it is not protected from the
4  weather?
5      A.   Yeah, under the shed part,
6  you know.
7      Q.   Under the eaves of the
8  roof?
9      A.   Yes, sir.  Yes, sir.
10     Q.   There is no awning?
11     A.   Huh-uh (negative
12 response).
13     Q.   It's not a covered patio?
14     A.   Right.  Another reason I put
15 it there, I didn't want nobody to come,
16 you know, and steal it for one thing.
17 And that's why I put a padlock, you
18 know, on the gate and everything because
19 I had more, you know, equipment out
20 there.  So that's where all it be.
21     Q.   Could this equipment be seen
22 from the road?
23     A.   No, sir.

FREEDOM COURT REPORTING

Page 58

1    Q.   Who wrapped it up?
2    A.   Me and Willie.
3    Q.   And is it your testimony it
4  just sat there until June when this
5  family bet starts?
6    A.   Yes, sir.
7    Q.   What date in June does
8  the -- did y'all get together in 2004?
9    A.   Around the -- it was around
10  the 23rd or 24th.
11    Q.   What's special about that
12  date in your family?
13    A.   We have a -- we have a big
14  dinner and it's my son's birthday and my
15  sister's birthday in that month.  And we
16  had barbecue throw down.
17    Q.   So the family gets together
18  to celebrate those birthdays and that's
19  when y'all start your weight loss
20  bets?
21    A.   Yes, sir.
22    Q.   Had you ever won it before
23  2004?

Page 59

1    A.   Well, not really except one,
2  but I didn't always be last.
3    Q.   Had you ever won the money
4  before 2004?
5    A.   Yeah, but it don't go too
6  long.  Yes, sir.
7    Q.   And the bet is from that
8  point everybody weighs at that party?
9    A.   Weighs, yes, sir.
10    Q.   And somebody writes it
11  down?
12    A.   Write it down.
13    Q.   And what did they write down
14  your weight to be?
15    A.   I just say 202 or something
16  like that.
17    Q.   Something like that?
18    A.   Uh-huh (affirmative
19  response).
20    Q.   And then what's the date
21  that you weigh again to see who wins?
22    A.   Thanksgiving.
23    Q.   And the winner is the person

Page 60

1  who loses the most number of pounds?
2    A.   Yes, sir.
3    Q.   And y'all have been doing
4  that how many years?
5    A.   Oh, about three years or
6  longer.  I don't know.
7    Q.   What's the most you had
8  lost?
9        MR. STRENGTH:  Money or
10  weight?
11    Q.   Well, weight.
12    A.   I say about 20, 22 pounds.
13    Q.   So you had gotten your
14  weight down to what at one time?
15    A.   At one time, I got my weight
16  down to say like one -- I think about
17  180, something like that.  Something in
18  the 80s.
19    Q.   So the equipment had not
20  been unwrapped and used by anybody from
21  the date it was brought home in December
22  2003 to sometime in June 2004?
23    A.   Nobody.

Page 61

1    Q.   And that's why, the reason
2  is you didn't want to start losing
3  weight early?
4    A.   Well, that was the new --
5  that was the new bike.  That was the
6  bike.  That's what we was going to, you
7  know, focus on, that particular bike,
8  you know.
9        MR. STRENGTH:  Before we
10  move on, there's something in here I
11  don't think is supposed to be.  But
12  Defendants' 2 is a composite exhibit of
13  2, 3, 4, 5, 11, 12 and 13.  There's an
14  e-mail or something in there that's
15  probably not supposed to be.  I don't
16  think it has anything to do with this
17  case mainly because I read it in detail
18  and I don't think it has anything to do
19  with this case.
20    Q.   Thank you.  I appreciate
21  that.
22        MR. STRENGTH:  You have a
23  network printer.  That happens to me all

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 62

1  the time.
2      Q.  Anyway, let me show you
3  Defendants' Exhibit 2 which is as Brian
4  said is an excerpt.  It's some of the
5  pages from the manual, not the whole
6  thing.  On page -- the first page of
7  Defendants' Exhibit 2 which I've marked
8  PR2, there is a caution up at the top,
9  do you see that?
10     A.  Yes, sir.
11     Q.  Can you read the third thing
12 on the list of things to do?
13     A.  Tie all -- what is that,
14 that's tight all securely before using
15 equipment.
16     Q.  Do you understand that?
17     A.  Well, that's what I paid
18 them to do.
19     Q.  What do you understand that
20 to mean?
21     A.  It says tighten all
22 equipment, but what equipment I don't
23 know.

Page 63

1      Q.  So you're not sure you
2  understand what that means?
3      A.  Right.
4      Q.  Did you understand yourself
5  based on just your own commonsense that
6  the bolts ought to be tight on the
7  equipment before you use it?
8      A.  That's why I paid them to do
9  it.
10     Q.  Right.  I understand --
11     A.  No, sir.
12     Q.  -- that's what you paid them
13 to do.
14     A.  No, sir.
15     Q.  But did you understand just
16 from commonsense if the bolts were loose
17 you shouldn't use the equipment?
18     A.  I didn't know the bolts were
19 loose.
20     Q.  If you had known the bolts
21 were loose, would you have used the
22 equipment?
23     A.  No.

Page 64

1      Q.  Why not?
2      A.  Because I knew that would be
3  some danger.
4      Q.  How long had you used the
5  equipment before you fell off of it?
6      A.  Probably about five -- maybe
7  five or ten minutes if it was that
8  long.
9      Q.  Is that the first -- did you
10 fall the first time you used it?
11     A.  Yes, sir.
12     Q.  Were you the first person to
13 get on the equipment and use it?
14     A.  Yes, sir.
15     Q.  Had anybody -- has anybody
16 else been on that equipment?
17     A.  No, sir.  Nobody.
18     Q.  Has anybody used it since
19 you fell?
20     A.  No, sir.
21     Q.  Where has it been since you
22 fell?
23     A.  In the house.

Page 65

1      Q.  Where I saw it today?
2      A.  Yes.  Not right there but
3  there by the dining room table.
4      Q.  It's been kept in doors
5  since the accident?
6      A.  Yes, sir.
7      Q.  But the accident happened
8  out on the patio?
9      A.  Yes, sir.
10     Q.  What was the day that this
11 happened, what day?
12     A.  June the -- like I said
13 23rd, 24th, 2004.
14     Q.  Was this at the party where
15 you celebrate the birthdays of your son
16 and sister?
17     A.  First of all, it wasn't a
18 party.  It was a dinner.  And after
19 dinner, we all went outside to, you
20 know, start the little going and that's
21 when it happened.
22     Q.  What time was the dinner?
23     A.  I would say around

17 (Pages 62 to 65)

FREEDOM COURT REPORTING

Page 66

1   between -- I say around three.
2       Q.   Three in the afternoon?
3       A.   Around three and sit around
4   the table and lollygag.
5       Q.   And how many people were
6   there?
7       A.   Let's see.  My sister, my
8   son, him, his wife, my daughter, my
9   other daughter, and my husband, and you
10  know, the grandkids.
11      Q.   Tell me about the adults.
12  That would be Ms. Mack, your sister, was
13  there?
14      A.   Uh-huh (affirmative
15  response).
16      Q.   Your son and his wife were
17  there?
18      A.   Uh-huh (affirmative
19  response).
20      Q.   What are their names?
21      A.   Willie Lee Beverly and her
22  name is Latora.  I think Latora is her
23  real name or something like that.

Page 67

1       Q.   What do y'all call her?
2       A.   Daughter-in-law.  Leyokie.
3   That's it, Leyokie.
4       Q.   Where do they live?
5       A.   Greenwood, Mississippi.
6       Q.   And your daughter was there,
7   what's her name?
8       A.   Want both --
9       Q.   Yeah, both.  You said your
10  daughter and your other daughter.
11      A.   Michelle Jackson.
12      Q.   Where does she live?
13      A.   29 -- 2910 Peabody Road,
14  Montgomery, Alabama.
15      Q.   Your other daughter?
16      A.   Ella Frazer.
17      Q.   Where does she live?
18      A.   Red Barn, Montgomery,
19  Alabama.
20      Q.   Of course your husband was
21  there?
22      A.   Right.
23      Q.   So the adults that were

Page 68

1   there were you, your sister, Ms. Mack?
2       A.   Uh-huh (affirmative
3   response).
4       Q.   Willie Beverly and his
5   wife?
6       A.   Uh-huh (affirmative
7   response).
8       Q.   Michelle Jackson?
9       A.   Uh-huh (affirmative
10  response).
11      Q.   And Ella Frazer?
12      A.   Uh-huh (affirmative
13  response).  But Ella left after we ate.
14      Q.   So Ella did not see this
15  accident?
16      A.   Oh, no.  And Leyokie didn't
17  see it.  His wife didn't see it.  We
18  just had the dinner.
19      Q.   Who was outside when this
20  incident happened?
21      A.   Willie Beverly, Jr.,
22  Michelle Jackson, Martha Mack, and
23  Willie Price and myself.

Page 69

1       Q.   You need to take a break?
2           MR. STRENGTH:  Need to
3   stretch?
4       A.   Yeah, I think so.
5
6       (A brief recess was taken.)
7
8       Q.   (By Mr. Bailey)  We were
9   talking about who was there.  And you've
10  given me the names.
11      A.   Yes, sir.
12      Q.   Which one of those
13  individuals said -- has told you that
14  they saw it happen even though they were
15  in the back?  Excuse me.  I know they're
16  all in the backyard when this happened.
17      A.   Right.
18      Q.   Which ones said they have
19  actually saw it happened?
20      A.   All of them.
21      Q.   Those four?
22      A.   Yes.  Yes.  Yes.
23      Q.   Was there any other exercise

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 70

1  equipment outside on the back patio
2  other than this equipment we're talking
3  about?
4      A.   Yes, sir.
5      Q.   What other equipment was out
6  there?
7      A.   The treadmill and the ab.
8      Q.   Ab lounger?
9      A.   Right. And the weights,
10 little weights you hold in your hand.
11     Q.   About what time was this?
12     A.   About five or a little after
13 five.
14     Q.   And why were y'all in the
15 backyard right then, what was going
16 on?
17     A.   It was a beautiful day. And
18 that was the day that we were going to
19 start our exercise, weight, you know,
20 weight loss from that last dinner up
21 until that afternoon and we was all
22 going to then start competing to lose
23 weight. That's why.

Page 71

1      Q.   Was anybody using any of the
2  equipment but you -- other than you?
3      A.   Yes, sir.
4      Q.   Who was using what?
5      A.   I know it all was being
6  used. I think my daughter. I believe
7  she was on the treadmill.
8      Q.   That would be Michelle?
9      A.   Michelle. And I'm not sure
10 about that ab lounger, whose using it,
11 but they was all there. The benches --
12 them little benches, they was sitting
13 out there too.
14     Q.   I'm going to try to draw a
15 little map here and we're going to try
16 to figure out where everything was and
17 I'll put it on there as you tell me.
18 Let's mark as Exhibit 3 this little
19 rough not to scale drawing.
20
21     (Defendants' Exhibit No. 3 was
22      marked for identification.)
23

Page 72

1      Q.   Where was the exercise bike
2  when you were using it?
3      A.   This the porch; right?
4      Q.   Yes, ma'am.
5      A.   Let me see. Right there
6  (indicated).
7      Q.   The back door is where in
8  relation to where that was?
9      A.   Back door (indicated).
10     Q.   Okay.
11     A.   It wasn't that close to the
12 door.
13     Q.   This is not to scale. I
14 just want to get --
15     A.   Okay.
16     Q.   The equipment was there.
17 I'm going to have a picture of it. You
18 can show me a little better. Where was
19 the treadmill?
20     A.   (Indicated.)
21     Q.   Where was the ab lounger?
22     A.   Somewhere right in here
23 (indicated).

Page 73

1      Q.   And was there any other
2  equipment out there?
3      A.   The little weights.
4      Q.   Where were the little
5  weights?
6      A.   I would say they was just
7  about somewhere (indicated).
8      Q.   Now, as you were using the
9  machine that you fell off of, was your
10 back to the house?
11     A.   Yes.
12     Q.   So you were facing toward --
13 I'm going to put -- you were facing in
14 the direction of that arrow that I've
15 drawn on the Extreme Performance
16 equipment?
17     A.   Yes, sir.
18     Q.   So let's try to figure out
19 where everybody was just before you
20 fell. You of course were on the Extreme
21 Performance exercise bike.
22     A.   Uh-huh (affirmative
23 response).

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 74

1    Q.   You said Michelle Jackson
2  was walking on the treadmill.
3    A.   I'm pretty sure that it was.
4    Q.   And do you know where Willie
5  Beverly, Jr. was?
6    A.   (Indicated).
7    Q.   He was out in the yard?
8    A.   Yeah, he was out in the
9  yard.  And my husband.
10    Q.   The two guys were out
11  there?
12    A.   Yeah.
13    Q.   Where was Martha Mack?
14    A.   She was out there too
15  standing right there.  You know where
16  that bar on my patio?
17    Q.   Uh-huh (affirmative
18  response).
19    A.   Right there, that's where
20  they were.
21    Q.   The bar is on the patio when
22  I was out there today.
23    A.   Yeah.

Page 75

1    Q.   Was the bar in the yard?
2    A.   No.  It was on the patio,
3  the porch --
4    Q.   Okay.
5    A.   -- what I'm trying to say.
6    Q.   So everybody was on the
7  patio?
8    A.   Yes, sir, sitting up to the
9  bar.
10    Q.   Was anybody drinking beer or
11  wine or whiskey or anything like that?
12    A.   No, sir.
13    Q.   I know you don't drink but
14  does anybody else drink?
15    A.   No, sir.
16    Q.   Nobody was drinking?
17    A.   Nobody was drinking.  We had
18  been to church, came back home, ate
19  dinner.  Don't drink.
20    Q.   And your family doesn't
21  drink?
22    A.   My husband might take a beer
23  or two every now and then but we're no

Page 76

1  drinkers.
2    Q.   When was the last time you
3  had a beer?
4    A.   I had a beer when I was
5  about -- I say about 16, a Colt 45.
6    Q.   So it's been a long time.
7        MR. STRENGTH:  16 years old?
8    A.   Right.  Don't smoke.  Don't
9  drink.
10
11    (Defendants' Exhibit No. 4 was
12    marked for identification.)
13
14    Q.   Let me show you what I'll
15  mark as Defendants' Exhibit 4 which is
16  just a couple of pictures taken today.
17    A.   I don't know where that.
18    Q.   That's kind of behind --
19  that's behind your house near the patio.
20    A.   This the patio right here;
21  right (indicated)?
22    Q.   Yes, ma'am.
23    A.   Uh-huh (affirmative

Page 77

1  response).
2    Q.   And look at the pictures
3  behind that.  There's two pictures
4  attached there.
5    A.   Oh --
6    Q.   What do those pictures
7  show?
8    A.   The chair, the bench,
9  treadmill.
10    Q.   Was the treadmill where it
11  is in this photograph at the time this
12  happened?
13    A.   No, sir.
14    Q.   It was on the other side of
15  the black cord --
16    A.   It was on the other side,
17  yeah.
18    Q.   How about that bench?
19    A.   No.
20    Q.   It wasn't there?
21    A.   None of that.
22    Q.   What about that little metal
23  chair?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 78

1    A.   No, sir.
2    Q.   How about that little
3  wagon?
4    A.   No, sir.
5    Q.   None of that was there?
6    A.   It was out in the yard by
7  the tree, up under the tree.
8    Q.   Does this second photograph
9  on Defendants' Exhibit 4 show about
10  where the exercise bike, as you call it,
11  was?
12    A.   Almost, yes, sir.
13    Q.   Where would it have been in
14  this photograph?
15    A.   Somewhere like that
16  (indicated).
17    Q.   Now, tell me do either one
18  of these photographs show where you fell
19  after the handlebar came loose?
20    A.   Yes, sir.  Back -- this the
21  door and these bricks right here
22  (indicated).
23    Q.   You're looking at Page 2 of

Page 79

1  Exhibit 4 which shows kind of where you
2  fell too?
3    A.   Uh-huh (affirmative
4  response).
5    Q.   Both of these areas show
6  generally where you fell?
7    A.   Yes, sir.
8    Q.   When you fell, what did you
9  land on?  Did you land on the concrete
10  porch or did you land on the grass or
11  did you hit a piece of equipment or
12  piece of furniture, what did you hit?
13    A.   I hit the back of the bike
14  and down to the ground.
15    Q.   The back of the bike?
16    A.   That high thing on that bike
17  and I was on my leg.
18    Q.   What you talking about
19  hitting?
20    A.   That right there
21  (indicated).
22    Q.   Let me mark as Exhibit 5
23  what she just pointed at.

Page 80

1
2    (Defendants' Exhibit No. 5 was
3    marked for identification.)
4
5    Q.   Five is three black and
6  white photographs.  The second
7  photograph is a picture of the machine
8  from behind and you just pointed to, I
9  want to put an X, which is the back of
10  the equipment?
11    A.   Yes, sir.
12    Q.   You fell against that?
13    A.   I fell backwards on, you
14  know, like you fall back, straight back
15  from the bike and onto the concrete.
16    Q.   What part of your body hit
17  the concrete first?
18    A.   Oh, Jesus.  I think it was
19  my back, my lower back 'cause I was on
20  my leg.  This right leg was up
21  underneath me bent.
22    Q.   You said you'd been using
23  this equipment for five or ten minutes

Page 81

1  before this happened?
2    A.   Uh-huh (affirmative
3  response).  Maybe.
4    Q.   Maybe.  Did you notice
5  anything loose?
6    A.   No, sir.
7    Q.   Did you have it on where the
8  little screen was on showing numbers and
9  things?
10    A.   No, sir.  I didn't even
11  notice.  No, sir.
12    Q.   What I'm talking about, the
13  machine has a little computer that keeps
14  up with stuff like your blood pressure
15  and other stuff.  I don't have a picture
16  of it.  But it's --
17    MR. STRENGTH:  In that
18  picture.
19    Q.   It's the screen right here
20  (indicated), you see that --
21    A.   Uh-huh (affirmative
22  response).
23    Q.   -- on the second photograph?

21 (Pages 78 to 81)

Page 82

1  I'm going to put a dot on that.  Was
2  that screen lit up with numbers?
3      A.  No.
4      Q.  And you were pedaling it and
5  pulling on the handlebars?
6      A.  Yes, sir.
7      Q.  Just like you're supposed
8  to?
9      A.  Yes, sir.
10     Q.  And describe for me what
11 happened that would have caused you to
12 go backwards?
13     A.  The handle broke loose.
14     Q.  The left handle, right
15 handle?
16     A.  The -- I think the left
17 handle, whichever one it is.
18     Q.  The one that was on the
19 ground today when I saw it was the left
20 handlebar?
21     A.  Okay.  That's it.
22     Q.  Did it break loose when you
23 were going -- when you were pushing

Page 83

1  forward or when you were pulling it back
2  or do you remember?
3      A.  Honest, I really don't know
4  what it was.  When I come back -- I
5  think when I pulled the handle back, I
6  believe that's when it -- no.  I really
7  can't be sure.
8      Q.  When it came loose, did it
9  come -- when you got up or when they got
10 you up, where was the broken handle, was
11 it laying in front of the machine like
12 it is shown in this picture in
13 Defendants' Exhibit 5 laying forward or
14 was it laying backwards?
15     A.  It was on me.
16     Q.  So the left handlebar was
17 laying on you?
18     A.  Yes, sir.
19     Q.  And you were laying behind
20 the machine?
21     A.  Right.
22     Q.  And as I understand, you --
23 did you fall straight back or did you

Page 84

1  fall to your right or did you fall to
2  the left --
3      A.  All I remember --
4      Q.  -- of the machine?
5      A.  All I remember is falling
6  and back.  I would say it was on -- let
7  me see the bike.  It was on my right
8  what I'm saying, next to right in here
9  (indicated).  Right in here (indicated).
10     Q.  You're pointing to the edge
11 of the patio --
12     A.  Yes, sir.
13     Q.  -- shown in Defendants'
14 Exhibit 4.  I'm going to try to do
15 something here and see how this works.
16
17     (Defendant's Exhibit No. 6 was
18      marked for identification.)
19
20     Q.  Look at what I've drawn as
21 Exhibit 6.  I'm trying to draw the
22 machine looking down from above.  You
23 see the big part, the end, the back of

Page 85

1  it?
2      A.  Where, right here
3  (indicated)?
4      Q.  Yeah.  You understand?
5      A.  Uh-huh (affirmative
6  response).  Yeah.
7      Q.  And the front is up here
8  where that little screen is.
9      A.  Right.
10     Q.  You see the steps and
11 everything?
12     A.  Yes, sir.
13     Q.  Tell me where you ended up
14 after you fell.
15     A.  Somewhere I would say -- no,
16 not that far down, but right along in
17 here (indicated).
18     Q.  So you fell kind of to the
19 right side of the machine?
20     A.  Yes, sir.
21     Q.  What happened after you
22 fell, who came to your rescue, what did
23 they do with you, were'd they move

FREEDOM COURT REPORTING

Page 86

1  you?
2       A.   First they laugh because
3  they didn't really know I had hurt
4  myself.  My husband, my husband and my
5  son, they picked me up, and they went to
6  hollering saying -- screaming she hurt,
7  she hurt, that handlebar -- that
8  handlebar done broke.
9       Q.   Where did they take you?
10      A.   In there on the sofa.
11      Q.   What were you wearing?
12      A.   I was wearing Nikes, white
13  sneakers with the little silver around
14  and a blue jogging set and a white
15  blouse up underneath it.
16      Q.   Were there any cuts or
17  scrapes?
18      A.   Yes, sir.
19      Q.   Where were they located?
20      A.   On my elbow (indicated).
21      Q.   You just picked up your
22  right elbow?
23      A.   On my elbow, yes.  My right

Page 87

1  elbow was scraped and really my -- right
2  along up in here (indicated).  They had
3  a lot of scrapes on them.
4       Q.   And you were talking about
5  underneath your left hand along your
6  wrist area?
7       A.   Yes, sir.
8       Q.   Were there any other scrapes
9  or cuts that you remember?
10      A.   No, sir, not that I
11  remember.
12      Q.   When they took you to the
13  sofa, what did they do for you, if
14  anything?
15      A.   Well, I told them I was all
16  right, and you know, just let me lay
17  there for a while.
18      Q.   What happened next?
19      A.   They cleaned -- my sister
20  cleaned the grit and blood off my arm,
21  my elbow.  And --
22      Q.   Is she a nurse or LP or
23  something?

Page 88

1       A.   No, she's not.  They try to
2  make me go to the doctor and I wouldn't
3  go.
4       Q.   Why not?
5       A.   'Cause I just wouldn't go.
6  I didn't know I was injured that bad.
7       Q.   What does Willie Beverly do
8  for a living?
9       A.   Certified welder,
10  Mississippi.
11      Q.   Michelle?
12      A.   Michelle doesn't work.
13      Q.   She on disability?
14      A.   Yes, sir.
15      Q.   What's the nature of her
16  disability?
17      A.   She can't see like a 20/20,
18  you know, can't see.
19      Q.   It's a vision thing?
20      A.   Yes, sir.
21      Q.   What about Martha Mack,
22  where does she work?
23      A.   MacMillan Bloedel,

Page 89

1  superintendent.
2       Q.   In what department?
3       A.   The paper mill.
4       Q.   And you told me about your
5  husband.  Did you take any aspirin or
6  pain --
7       A.   (Nodded head affirmatively.)
8       Q.   They gave you some
9  aspirin?
10      A.   Yes, sir.
11      Q.   They cleaned up your cuts?
12      A.   Yes, sir.
13      Q.   Gave you some aspirin.  Put
14  ice on anything?
15      A.   Yes, sir.
16      Q.   Where did they put the
17  ice?
18      A.   On my -- it was on my back
19  in a sock.  On my back and my neck back
20  there and on my knee.
21      Q.   So they put ice in a sock
22  and put it on your neck and your --
23      A.   My knee.

23 (Pages 86 to 89)

FREEDOM COURT REPORTING

Page 90

1    Q.    Which knee?
2    A.    My right knee.
3    Q.    Were your clothes torn or
4    cut?
5    A.    No, sir.
6    Q.    Did your head ever hit the
7    ground?
8    A.    My head hit up against the
9    brick and the door below neck down here.
10   I was in like a ball, balled up, you
11   know.
12   Q.    Did you cut your face or
13   anything?
14   A.    No.
15   Q.    I notice you have a scar on
16   the side of your head.  How did you get
17   that?
18   A.    That's where I had surgery
19   for that fluid I was telling you
20   about.
21   Q.    Did you have any scars as a
22   result of this incident?
23   A.    Yes, sir.

Page 91

1    Q.    Where are they?
2    A.    I probably need some help.
3    MR. STRENGTH:  On your
4    shoulder?
5    A.    On my shoulder, I just had
6    surgery.
7    MR. STRENGTH:  This cross
8    right here (indicated)?
9    A.    Yeah, I just -- I just had
10   surgery.
11   Q.    On your left shoulder?
12   A.    Yes, sir.
13   Q.    As a result of this?
14   A.    Yes, sir.  And on my knee
15   (indicated).
16   Q.    You got a scar on your
17   knee?
18   A.    I got scars on my knee.
19   I'll show --
20   Q.    I'll get there.  Do you have
21   any scars from the scrapes or the cuts
22   that happened that day?
23   A.    No, I don't think so.

Page 92

1    Q.    The scars you have as a
2    result of this are result of surgeries
3    you had --
4    A.    Yes, sir.
5    Q.    -- since the accident --
6    A.    Yes, sir.
7    Q.    -- is that right?
8    A.    Yes, sir.
9    Q.    I'm curious why you didn't
10   go see a doctor right after this
11   happened?
12   A.    'Cause I was not hurting as
13   bad, you know, to go to a doctor.  I was
14   not hurting bad.  I can stand some pain
15   and as I would take Aleve and whatnot,
16   you know, it would bate it down.  And it
17   got so that it wasn't helping me and I
18   was swelling big with my leg, was still
19   swelling.
20   Q.    Which part of your leg was
21   swelling?
22   A.    The kneecap.
23   Q.    The kneecap of your right

Page 93

1    leg?
2    A.    Yes, sir.  And I couldn't
3    turn -- the next morning I couldn't even
4    pick my neck up off the pillow and
5    back.
6    Q.    Did you sleep in your bed
7    that night?
8    A.    Yes, sir.
9    Q.    And the next morning you
10   woke up sore?
11   A.    All through the night I was
12   hurting, but I didn't want to go to the
13   doctor.
14   Q.    Did you have any visible
15   bruises the next day?
16   A.    What you mean?
17   Q.    Bruises?
18   A.    Oh, the bruises, yeah.  On
19   the back of my neck back there, yes,
20   sir.
21   Q.    Would that be below your
22   hairline?
23   A.    Yes, sir, right there on

24 (Pages 90 to 93)

FREEDOM COURT REPORTING

Page 94

1 that bone that cross.
2    Q.    Any other bruises?
3    A.    No, sir, not that I know
4 of.
5    Q.    When did you first seek
6 medical attention?
7    A.    I think that Tuesday I
8 believe. It was that Monday or that
9 Tuesday my husband took me to the
10 doctor. He literally made me go.
11    Q.    You still didn't want to
12 go?
13    A.    No.
14    Q.    Why not?
15    A.    'Cause I just didn't want to
16 go. I didn't know I was hurt like I was
17 hurt.
18    Q.    Now, looking back at Exhibit
19 5, am I correct that this machine shown
20 in this picture has not been used since
21 the date this happened?
22    A.    No, sir.
23    Q.    It has not?

Page 95

1    A.    No, sir. It won't be
2 used.
3    Q.    And the reason you fell was
4 what happened, what caused you to
5 fall?
6    A.    The handlebar broke.
7    Q.    And what we see in these
8 photographs is that the left handlebar
9 is disconnected --
10    A.    Came loose.
11    Q.    -- and came loose while you
12 were using the machine?
13    A.    Yes, sir.
14    Q.    Did you ever find any pieces
15 or bolts or nuts or things that were in
16 there that came out?
17    A.    Nothing but that little
18 black -- that little black piece.
19    Q.    Right. There's a little
20 black piece sitting there on the table
21 of Exhibit 5. I'll just put a circle
22 around it. It's the third page. That's
23 what you're talking about when you say

Page 96

1 that little black piece?
2    A.    Black piece, yes.
3    Q.    And that handlebar coming
4 loose is what caused you to fall?
5    A.    Yes, sir.
6    Q.    Do you know why it came
7 loose?
8    A.    'Cause it broke.
9    Q.    Did it happen all of a
10 sudden?
11    A.    I assume so 'cause I didn't
12 know that it was broken.
13    Q.    Did anyone read this manual
14 to you, Defendants' Exhibit 2, any
15 portions of it to you before you got on
16 the machine?
17    A.    My daughter went over, yes,
18 she did.
19    Q.    What did she tell you that
20 you remember?
21    A.    Really what she was telling
22 me that it was a nice bike. That's all
23 I know.

Page 97

1    Q.    Did anybody check it over to
2 see if all the screws were tight and
3 knobs were turned and things like
4 that?
5    A.    No, sir.
6    Q.    Did it seem loose when you
7 were using it?
8    A.    No, sir. I wouldn't have
9 used it.
10    Q.    Did anyone adjust it for you
11 or your height before you used it?
12    A.    No, sir.
13    Q.    Some of these --
14    A.    Nobody touched it.
15    Q.    Some of these things can be
16 raised and lower --
17    A.    No.
18    Q.    -- depending on how big you
19 are.
20    A.    Nobody touched. Nobody.
21    Q.    Did you have any problems
22 using it up until the time the handlebar
23 came loose?

25 (Pages 94 to 97)

FREEDOM COURT REPORTING

1    A.    No, I didn't have no problem
2  using it.
3    Q.    Had you worked up a sweat?
4    A.    No, not really, really but I
5  was going.
6
7        (Defendants' Exhibit No. 7 was
8        marked for identification.)
9
10    Q.    I have marked as Defendants'
11  Exhibit 7 portions of medical records
12  that were provided to me.  They have
13  page numbers PR and they're supposed to
14  be in some kind of order.  Let me go
15  over these with you and ask you some
16  questions.  Did you first seek attention
17  at a place called Pri-Med?
18    A.    Yes, sir.
19    Q.    And in looking at PR117 --
20  Page PR117 of Exhibit 7, is that a copy
21  of your driver's license and your
22  Medicare health insurance card?
23    A.    Yes, sir.

1    Q.    Now, do you still have a
2  driver's license?
3    A.    Yes, sir.
4    Q.    Do you drive now?
5    A.    No, I haven't been driving,
6  no.
7    Q.    Have you gotten any tickets
8  in your car since this happened?
9    A.    No, sir.
10    Q.    'Cause you haven't been
11  driving?
12    A.    Haven't been driving.
13    Q.    Is the information here
14  correct as to your information?
15    A.    Yes, sir.
16    Q.    This says 7/10/03 down at
17  the bottom.  Do you know whether you
18  sought medical attention any time before
19  then for this?
20    A.    June.  In June.
21    Q.    You did in June?
22    A.    Yes, sir.
23    Q.    How many days after the

1  accident did you seek attention?
2    A.    It was one -- one day, one
3  day.  I had to go then.
4    Q.    Look at Page PR125.  It
5  appears to be dated 6/29/04.  Time in is
6  7:30.  And somebody wrote, Patient
7  states her exercise bike something.  Do
8  you know whether you went to see a
9  doctor before 6/29/04?
10    A.    I went to Pri-Med.
11    Q.    Which Pri-Med?
12    A.    The one on Vaughn -- the
13  Boulevard.
14    Q.    East Boulevard?
15    A.    Right.  That's where I live,
16  it's right -- behind my house.
17    Q.    Vaughn Plaza.  Patient says
18  her exercise bike came apart.  She fell
19  and right knee, neck, lower back.
20    A.    Yes, sir.
21    Q.    Are those the complaints you
22  had when you first went to see
23  somebody?

1    A.    And my shoulder, yes.
2    Q.    The pain was listed as --
3    A.    Yes, sir.
4    Q.    -- throbbing and constant
5  for two days is what they wrote, you see
6  that?
7    A.    That was Sunday and Monday,
8  yeah.
9    Q.    The pain has gotten worse.
10    A.    Yes, sir.
11    Q.    They list the knee, the neck
12  and the back.  It says you were on some
13  Clonidine?
14    A.    Uh-huh (affirmative
15  response).
16    Q.    Lasix?
17    A.    Uh-huh (affirmative
18  response).
19    Q.    Depression med?
20    A.    Uh-huh (affirmative
21  response).
22    Q.    And Humulin?
23    A.    That's insulin.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 102

1    Q.   Insulin.  So you have
2  diabetes?
3    A.   Uh-huh (affirmative
4  response).
5    Q.   What was the depression med
6  you were on?
7    A.   I really don't know what it
8  was.  I really don't know the name of
9  it.
10    Q.   How long you been on
11  depression medicine?
12    A.   Probably, maybe about a
13  good -- I say about a good six months,
14  something like that.
15    Q.   Before the accident?
16    A.   Before the accident, yeah.
17    Q.   Why were you taking -- what
18  was causing you to be depressed before
19  the accident?
20    A.   We had a lot of death in our
21  family.
22    Q.   Who specifically?
23    A.   My nephew, he killed hisself

Page 103

1  and I was very close, very close, very
2  close.
3    Q.   Now, up near here -- they
4  weighed you when you went in I take it.
5  They wrote 229 was your weight.  Is that
6  just wrong or is that -- could you have
7  been wrong about what you thought you
8  weighed when this happened?
9    A.   Maybe my sale was wrong.
10  I'm not going to argue about it.
11    Q.   I'm sure they weighed you
12  with your clothes on.
13    A.   Yeah.
14    Q.   When y'all weigh for this
15  contest, do y'all weigh with your
16  clothes on?
17    A.   Yes, sir.
18    Q.   The rest of this I can't
19  even read.  Let's look at Page PR53
20  which is -- looks like the same thing,
21  just a little better copy.  Can you tell
22  me what you remember the doctor telling
23  you the first time you went to Pri-Med

Page 104

1  after they checked you over, what the
2  doctor said they thought was wrong with
3  you and what you should do and what you
4  should take to try to get better?
5    A.   They said I had something
6  about had spasms in my back and a lot of
7  soreness.  Give it time.
8    Q.   And they gave you some
9  medicine?
10    A.   Some kind of medicine,
11  yes.
12    Q.   Keflex, is that what they
13  gave you?
14    A.   I think so.  I don't know
15  what they got down there.
16    Q.   Wait.  On PR120, somebody
17  wrote Lorcet Plus and Soma.
18    A.   Whatever it was, that's what
19  I was on.
20    Q.   Do those ring a bell?
21    A.   Yes, sir.
22    Q.   Do you know what they're
23  for?

Page 105

1    A.   I thought it was for
2  muscles, for the muscles.
3    Q.   PR123 of Exhibit 7 is a
4  seven -- July 1, '04 Pri-Med entry.
5  Again they've got your weight at 229,
6  height five-two.  You need to take a
7  break?
8    A.   No.  I'm okay.  It ain't
9  going to stop it.
10    Q.   Again, we'll take one if you
11  want to.
12    A.   No, it won't stop it.
13    Q.   It's just another copy of
14  the same thing.
15    A.   Constantly stay in pain.
16    Q.   Page PR121 is 7/12/04.  You
17  went back to Pri-Med at least three
18  times, didn't you?
19    A.   Yes, sir.
20    Q.   And somebody finally
21  referred you to pain management.
22    A.   Yes, sir.
23    Q.   Do you remember going to see

27 (Pages 102 to 105)

Page 106

1  somebody for pain management?
2      A.   Yes, sir.
3      Q.   I'm looking at Page PR82.
4  It looks like just a radiology report
5  for 7/22/04, about a month after the
6  accident.  Do you recall being told that
7  they did a MRI on you or some kind of
8  MRI on your spine?
9      A.   Yes, sir.
10     Q.   And what do you recall them
11 telling you they had found when they did
12 the MRI?
13     A.   I don't remember.
14     Q.   It says what it says.  I'm
15 looking at Page PR83 which is another MR
16 joint radiology report.  Somebody wrote,
17 Probable sprain of a mild degree in the
18 medial collateral ligament complex, so
19 this was a knee MRI.  Do you recall them
20 telling you sometime in September of '04
21 that they thought your knee was
22 sprained?
23     A.   Uh-huh (affirmative

Page 107

1  response).  Yes, sir.
2      Q.   And then did you go see a
3  Tucker Mattox --
4      A.   Yes, sir.
5      Q.   -- to do an arthroscopy on
6  the right knee?
7      A.   I went there and that's
8  what, you know, he told me I had to
9  have.
10     Q.   So they did a scope, they
11 scoped your knee?
12     A.   Whatever they did, they
13 operated on it.
14     Q.   Did they put you to sleep
15 while they did that?
16     A.   Yes, sir.
17     Q.   What did Dr. Mattox tell you
18 he found when he went into your knee, if
19 anything?
20     A.   A torn ligament and
21 something.  And he said I needed a
22 really -- I needed a knee replacement.
23     Q.   A knee replacement?

Page 108

1      A.   Yeah.
2      Q.   Did he tell you why you
3  would need a knee replacement.
4      A.   It was due to the accident.
5  I kept going back to him hurt.  Still
6  hurts.
7      Q.   Did that help, that
8  procedure?
9      A.   Somewhat, yes, sir.
10     Q.   Have you had a second
11 surgery on your knee?
12     A.   No, sir.
13     Q.   That's the only one?
14     A.   Uh-huh (affirmative
15 response).
16     Q.   Do you remember going to see
17 a Dr. Pirofsky, a Jeffry Pirofsky?
18     A.   Yeah, probably so.  I saw so
19 many.
20     Q.   He says he discussed this
21 treatment plan with you after he met
22 with you.  He wrote -- well, do you
23 remember talking to this Dr. Pirofsky, a

Page 109

1  DO at East South Boulevard Neurosurgery
2  Associates?
3      A.   Kind of ring a bell.  I
4  don't really --
5      Q.   What do you remember that
6  doctor telling you?
7      A.   I really don't know.  I
8  really don't.
9      Q.   Did some of the doctors say
10 things like they didn't see how you
11 were -- they couldn't understand why you
12 were in so much pain?
13     A.   No.  A lot of them told me
14 they don't find the problem.
15     Q.   Did you go to HealthSouth
16 for some type of rehabilitation or
17 exercises --
18     A.   Yes, sir.
19     Q.   -- to try help you get
20 better?
21     A.   Yes, sir.
22     Q.   Did doing that help?
23     A.   No, sir.

28 (Pages 106 to 109)

FREEDOM COURT REPORTING

Page 110

1    Q.   Just looking at Page PR85.
2  It's a HealthSouth report.  The visit
3  date is February 23, 2005.  Under the
4  daily comments this person wrote, The
5  patient complains of severe low back
6  pain that almost sent her to the ER
7  today.  She states her neck pain is
8  dramatically better.
9    A.   Probably so.
10    Q.   Has your neck --
11    A.   Worse.
12    Q.   Your neck is worse?
13    A.   Yes, sir.  My neck and my
14  back is killing me.
15    Q.   And your right knee?
16    A.   My right knee, yes, and the
17  shoulder.
18    Q.   And your left shoulder?
19    A.   Yes, sir.
20    Q.   Who did the surgery on your
21  left shoulder?
22    A.   Dr. Hartzog.
23    Q.   You went to the Center for

Page 111

1  Pain here in Montgomery and saw this Dr.
2  Herrick and some other folks, do you
3  remember that?
4    A.   Yes, sir.  Yes, sir.
5    Q.   They did some epidurals?
6    A.   Oh, yeah.
7    Q.   Did they help you any?
8    A.   No, sir.  Liked to kill
9  me.
10    Q.   Do you recall any doctor
11  telling you like this Zenko -- I can't
12  even pronounce it --
13    THE REPORTER:  Hrynkiw.
14    Q.   Yeah.  -- PR0O47 that they
15  really couldn't help you because they
16  didn't know what was causing the
17  problem?
18    A.   Now, he didn't tell me that,
19  but you know.
20    Q.   Did he say that
21  neurosurgically he had nothing further
22  to offer you?
23    A.   Right.

Page 112

1    Q.   Since this fall from the
2  bike, did you have -- have you fallen
3  again, any other falls?
4    A.   No, sir.
5    Q.   Any other -- have you been
6  in a car that'd been hit by another
7  car?
8    A.   No, sir.
9    Q.   Has anything happened to you
10  that's aggravated the problem?
11    A.   No, sir.
12    Q.   Who recommended that you go
13  see the Chestnut Clinic of
14  Chiropractic?
15    A.   Myself.
16    Q.   This says you first went
17  there 1/3/2006 this year -- I mean last
18  year.
19    A.   Yes, sir.
20    Q.   About a year ago.
21    A.   Yes, sir.
22    Q.   Has the chiropractic helped
23  you any?

Page 113

1    A.   A little bit, yes.
2    Q.   How often do you go see the
3  chiropractor?
4    A.   I don't go because now my
5  insurance is not paying for it and
6  you-all wouldn't pay for it.
7    Q.   When did the insurance stop
8  paying for it?
9    A.   When I stopped going.  When
10  I stopped going.
11    Q.   Why won't Medicare pay for
12  you to see a doctor?
13    A.   Because you have certain --
14  you can't go but so many times with
15  Medicare, so many times.  I ain't had no
16  cash money.
17    Q.   So right as we sit here
18  today, what are your major medical
19  problems?
20    A.   Start in my neck, my
21  shoulder, and my back and my knee and
22  other places too; sex.  Yes.
23    Q.   How long have you been using

29 (Pages 110 to 113)

Page 114

1  a wheelchair?
2      A.   Oh, it been about a year or
3  a little bit more.
4      Q.   Who provides the
5  wheelchair?
6      A.   They ordered me a brand new
7  one and I sent the papers to you.  Dr.
8  Roseanne Cook, yes.
9      Q.   Let me ask you some
10 questions from these interrogatory
11 answers.  Who was the last doctor that
12 you've seen prior to today for any of
13 these problems?
14     A.   Dr. Hartzog.
15     Q.   Hartzog?
16     A.   Yeah.  And Dr. Ryan.
17     Q.   Dr. Patrick Ryan.  When did
18 you last see either of them?
19     A.   I just saw -- I'm still
20 under him, Dr. Hartzog.  Two weeks, I go
21 back to him on the 30th.
22     Q.   What has he told you -- what
23 does he treat you for, your neck, your

Page 115

1  back?
2      A.   Shoulder, this shoulder
3  (indicated).
4      Q.   Has he told you that your
5  shoulder was injured in this accident?
6      A.   Yes, sir.
7      Q.   What happened to your
8  shoulder?
9      A.   I had a torn ligament.
10     Q.   Rotator cuff or --
11     A.   No.  I know it was a torn
12 ligament and something else.  I don't
13 know what the other word is he used.
14     Q.   What kind of doctor is he,
15 Dr. Hartzog?
16     A.   He's a specialist
17 specializing in whatever.  Dr. Ryan sent
18 me to him.
19     Q.   And what has Dr. Ryan
20 treated you for?
21     A.   My back and my neck.  And
22 I'll be going back to him on the 14th.
23     Q.   Has any doctor given you any

Page 116

1  indication that there's anything they
2  can do to end the pain that you are in
3  every day?
4      A.   Well, possibility surgery
5  and I'm not taking that.  No more.
6      Q.   Who has recommended
7  surgery?
8      A.   Well, Dr. Cook and Dr. Ryan
9  have talked about surgery and Dr.
10 Hartzog.
11     Q.   What type of surgery are
12 they talking about?
13     A.   Whatever is wrong with my
14 neck.
15     Q.   So neck surgery?
16     A.   You know, yeah.
17     Q.   Why did you not want neck
18 surgery but you had knee and shoulder
19 surgery?
20     A.   You really want to know?
21     Q.   Yeah.
22     A.   It liked to kill me.
23     Q.   Which one?

Page 117

1      A.   The shoulder.
2      Q.   The shoulder.
3      A.   That shoulder.  I will never
4  as long as I live unless it's a liver or
5  something that I got to have.  That
6  thing liked to kill me and it still hurt
7  me.  I don't sleep at night no time, no.
8      Q.   Because of that shoulder
9  surgery?
10     A.   The shoulder hurt me so bad
11 and my neck.
12     Q.   Who did that shoulder
13 surgery?
14     A.   Dr. Hart -- same one.
15     Q.   Hartzog.
16     A.   And Dr. Cook put me in a
17 back brace because I said I'm not having
18 no surgery and a "T" pump.
19     Q.   A "T" pump?
20     A.   Yes, sir.
21     Q.   Who gave you the "T" pump?
22     A.   Dr. Cook, Roseanne Cook.  I
23 have a body length.

30 (Pages 114 to 117)

FREEDOM COURT REPORTING

Page 118

1    Q.   Had a what?
2    A.   I have a body length "T"
3  pump.
4    Q.   What is that?
5    A.   The one from the neck down
6  to your feet, foot; a special one.
7    Q.   Based on what you've told me
8  about how you were able to get around
9  before the accident, why were you not
10  able to work before the accident?
11    A.   I guess that I don't know.
12  I didn't go back -- nobody told me to go
13  back and be evaluated or anything like
14  that so.
15    Q.   This has nothing -- off the
16  record.
17
18    (A discussion was held off the
19     record.)
20
21    A.   Excuse me.  Lortab.  That's
22  what I'm on.
23    Q.   (By Mr. Bailey)  What -- do

Page 119

1  you know what dosage you get, like a
2  whole pill, half a pill?
3    A.   Whole pill.
4    Q.   How many times you take
5  it?
6    A.   About four, five times a
7  day.  And Naprosyn, yeah, Naprosyn.  It
8  will come to me.
9    Q.   How often do you take
10  Naprosyn?
11    A.   As often as I need it.
12    Q.   Did you continue to take the
13  depression pills after the accident or
14  have you stopped taking those?
15    A.   No.  The depression got
16  worse so I'm on different ones.
17    Q.   What are you taking for
18  depression now?
19    A.   I'm taking -- I thought I
20  sent a medical list.  I can't -- I can't
21  recall all that, you know what I'm
22  saying.
23    Q.   I'm looking.

Page 120

1    A.   And I'm on a morning
2  depression tablet too.
3    Q.   So you take a pill for
4  depression in the morning?
5    A.   And at night.  It's the
6  newest -- I think the newest one.  My
7  sister, she know what it is.  They read
8  my medicine and stuff for me.
9    Q.   In one of the responses to
10  interrogatories, I asked for every
11  doctor who has treated you in the last
12  ten years.  One of them says Dr. Cole,
13  Pine Apple Health Clinic.  Is that
14  Cook?
15    A.   Dr. Cook.
16    Q.   That's what that is.
17    MR. STRENGTH:  Might be my
18  fault.
19    Q.   That's okay.  I just want to
20  make sure there wasn't another doctor.
21    A.   Dr. Cook.
22    Q.   When did you last see Dr.
23  Greg Waller?

Page 121

1    A.   Oh --
2    Q.   He's an OB/GYN.
3    A.   I fixing to tell you.  About
4  16 years, something like that.
5    Q.   What is your weight today?
6    A.   Two -- almost 250.
7    Q.   Do you have trouble going to
8  the bathroom?
9    A.   Yes, sir.
10    Q.   Have any doctors given you
11  anything for that or help to try to
12  treat that?
13    A.   No, sir.
14    Q.   Have any doctors told you
15  why you think you have that problem?
16    A.   They say that when I had the
17  accident that it started my bladder to
18  having spasms.
19    Q.   Do you recall talking to
20  anyone at Wal-Mart or about this
21  accident after it happened?
22    A.   No, sir.  No, sir.
23    Q.   Have you kept up with how

31 (Pages 118 to 121)

Page 122

1   much money you paid out of your own
2   pocket for medical bills and things
3   related to this accident?
4       A.   Kind of.  My husband,
5   yeah.
6       Q.   Can you tell me
7   approximately how much you've spent out
8   of your pocket for this?
9       A.   It's on that paper where I
10  paid -- my husband paid for two girls to
11  come in and help me every day for a
12  week, give them a hundred dollars.  And
13  my son.
14      Q.   How many weeks did they come
15  in and help?
16      A.   Every week.  I have help all
17  the time.  Some volunteer.
18      Q.   How long have you been
19  having help?
20      A.   Ever since August of 2004.
21      Q.   And what did they do for the
22  family?
23      A.   They bathe me.  They comb my

Page 123

1   hair, get my clothes, cook, clean up,
2   change my beds, you know, stuff like
3   that, grooming.  And take me, you know,
4   places, get me out of the house.
5       Q.   Are they there 24 hours a
6   day or just during the day?
7       A.   Just during the day when my
8   husband come home.  He get off at five
9   and if I'm in a lot of pain where he
10  don't want, you know, because he have to
11  go to work, then my daughter, she comes,
12  and you know, stay with me.
13      Q.   So they stay with you while
14  your husband is at work?
15      A.   Yes, sir.
16      Q.   And they usually leave after
17  your husband gets home?
18      A.   Yes, sir.  Yes, sir.
19      Q.   What about when your husband
20  was not coming home for that --
21      A.   My daughter was right there
22  with me and they still helped me.  I
23  never been left alone.

Page 124

1       Q.   Which doctor or which
2   doctors do you think are most familiar
3   with all of the medical problems you
4   have right now?
5       A.   I don't know.
6       Q.   I saw where Dr. Chestnut,
7   the chiropractor, said something about
8   you having a disability rating of 72
9   percent?
10      A.   Yes, sir.
11      Q.   Has any other doctor mention
12  anything about a disability or
13  impairment rating to you?
14      A.   Well, Dr. Cook have and
15  Sturbridge.
16      Q.   Dr. Sturbridge?
17      A.   Sturbridge Chiropractic.
18      Q.   What has Dr. Cook said about
19  your impairment or disability?
20      A.   Something about my -- the
21  strength and stuff in my, you know, from
22  my waist down is really messed up.  And
23  it's danger for me, you know, trying to

Page 125

1   walk and stuff.
2       Q.   How far are you able to walk
3   now?
4       A.   I would say not further to
5   that bathroom around there, you know,
6   without stopping and resting several
7   times.
8       Q.   You're wearing some kind of
9   a brace around your back?
10      A.   Yes, sir.  24/7.
11      Q.   And what about this "T"
12  pump, how often is that?
13      A.   That's 24/7.
14      Q.   It automatically gives you
15  medicine?
16      A.   It's a water flow.
17      Q.   What does it do for you?
18      A.   It ease the pain.
19      Q.   Moves water up and down?
20      A.   Yeah.
21      Q.   It's not a drug.  It doesn't
22  inject drugs into you?
23      A.   No.  No.  No.  And she

Page 126

1 also -- I sent it in, have ordered a
2 special mattress for me.
3       Q.   That haven't come yet?
4       A.   Oh, Medicare wouldn't pay
5 for that and y'all wouldn't pay for it.
6           MR. BAILEY: I think that's
7 all I have.  Have you understood my
8 questions?
9       A.   Yes, sir.
10       Q.   Have you given me the best
11 answers you can give?
12       A.   To the best of my ability.
13       Q.   Is there anything you would
14 like to add?  I want to give you an
15 opportunity to tell me in your own words
16 how this has affected you.
17       A.   Lord.
18       Q.   So this is your chance to
19 unload on me.
20       A.   Well, it's messed my life up
21 that's for sure.  I'm messed up and
22 messed up for my grands, my greatgrands
23 and it has, you know, interrupt with my

Page 127

1 family life, my husband and stuff like
2 that.  And I get very depressed because
3 it hurt me.  I can't go and do the
4 things I like to do.  I look at myself
5 in the mirror.  Sometime I say I'm not
6 even worth living and I have somebody
7 stay around me all the time.  I kill
8 myself because I ain't used to this kind
9 of life.  I get very depressed.  I mean,
10 very depressed.  I hurt all the time.
11 All the time.  24/7.  I be scared I'm
12 going to get to be a dope addict taking
13 all those pills, but if I don't take
14 them, I just suffer.
15           And before then, I went
16 some -- everywhere.  I was a big worker
17 in the church and everything but no
18 more.  I can't do it.  I'm the mother of
19 the church and I cannot do, help with
20 the sacrament or anything.  And I get
21 very depressed.  My pastor have to come
22 over a lot of times and pray for me
23 because it's hard.  Don't nobody know

Page 128

1 but me and the Lord what I go through.
2 It's real hard.  And every time I say I
3 be glad when I get that bike out of my
4 house.  I have flashbacks when I see it
5 a lot of time.  I think about it.  Like
6 today when you were pedaling that bike,
7 I saw myself just a go a falling.  It
8 just tears me apart, really apart.  I
9 told my son that I probably go back with
10 him for a while.  I just -- it's just
11 hard.
12           Like Christmas and things
13 that I used to enjoy with the
14 grandchildren, I couldn't do it, many
15 Christmas.  And you just don't know how
16 outgoing, you know, I was.  I had a
17 garden.  I had all kinds of fruit trees
18 and pecans and stuff.  I can't get none
19 of them.  People down there on my place
20 getting them all.  That bother me.  I
21 can't do it.  It's just been very, very
22 hard.  I mean, very hard.  I feel like
23 life ain't living for.  Honest to God, I

Page 129

1 say that I just sometime I wish I
2 wouldn't be on this earth.  That's just
3 the way I feel.
4       Q.   What church were you the
5 mother of or are you the mother of?
6       A.   Hope Ministry.
7       Q.   Hope?
8       A.   Yeah, International.
9       Q.   What denomination is that?
10       A.   Holiness.  And the Pastor
11 Abe --
12       Q.   Where is that church?
13       A.   Here in Montgomery out on,
14 oh, Lord, down there by the red lounge,
15 the apartment down there.  That church
16 that sit right off --
17       Q.   Red Line Apartment?
18       A.   Right.  That church that set
19 out in that field.
20       Q.   I know where that is.
21       A.   And also I was the cook.  We
22 have -- every second Sunday we have a
23 fellowship.  I can't do any of that.

FREEDOM COURT REPORTING

Page 130

1  It's very sad.
2      Q.   Has anything helped,
3  anything the doctors have done helped
4  you get better?
5      A.   It have calm -- calm the
6  pains down, my pain down.  And it 'cause
7  to get used to whatever it is and just
8  gradually come on back up.
9      Q.   Well, I thank you for
10  answering my questions and letting me
11  come to your home.
12      A.   Yes, sir.
13          MR. BAILEY:  And y'all are
14  very nice to let me do that.  And that's
15  all the questions I have.
16
17
18
19      FURTHER DEPONENT SAITH NOT
20
21
22
23

Page 131

1          CERTIFICATE
2
3  STATE OF ALABAMA)
4  AUTAUGA COUNTY)
5
6      I hereby certify that the above
7  and foregoing deposition was taken down
8  by me in stenotype and the questions and
9  answers thereto were transcribed by
10  means of computer-aided transcription,
11  and that the foregoing represents a true
12  and correct transcript of the testimony
13  given by said witness upon said hearing.
14      I further certify that I am
15  neither of counsel, nor of kin to the
16  parties to the action, nor am I in
17  anywise interested in the result of said
18  cause.
19
20
21      _____
22      LESLIE K. HARTSFIELD,
23      COURT REPORTER

34 (Pages 130 to 131)

APR-09-2007 MON 10:28 AM                    FAX NO.                    P. 07

P. 007

APR-09-2007-MON 12:08 PM

EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

DELOISE PRICE,                          )
                                        )
        PLAINTIFF                       )
                                        )
VS.                                     )        CASE NO. 2:06-CV-721
                                        )
WAL-MART STORES, INC.,                  )
et al.,                                 )
                                        )
        DEFENDANTS                      )

### PLAINTIFF, DELOISE PRICE'S, RESPONSES TO DEFENDANT EXTREME PERFORMANCE, INC'S SECOND SET OF INTERROGATORIES

Plaintiff, Deloise Price, hereby responds to Interrogatories propounded by the Defendant as follows:

23.    Has Plaintiff ever been convicted of a felony or crime of moral turpitude?  If so, state the crime, the conviction date, the sentence and the jurisdiction imposing the sentence.

      **RESPONSE:**      **Yes.  I pled guilty in 1992, in Wilcox County, to unlawful distribution of a controlled substance.  I never went to jail.  I was put on five years probation.**

24.    Prior to the accident, had Plaintiff experienced any back problems?  If so, describe the back problems, the cause of the back problems and the onset date of the back problems.

      **RESPONSE:**      **I had no back problems prior to the accident.**

25. Had Plaintiff ever used a cane and/or wheelchair to assist in ambulation or mobility prior to the accident? If so, state the reason or cause of the need for such assistance and the inclusive dates of use of such assistance.

**RESPONSE:** No.

26. Has the Plaintiff ever received a permit which allows her vehicle (or the vehicle in which she is riding) to park in "Handicapped" parking spaces? If so, state the date the permit was first issued, the date the permit was last issued, and the physical condition of the Plaintiff that was stated as the reason for the issuance of the permit.

**RESPONSE:** **Yes. Approximately 9 years ago. I had an accident involving my foot, and I got the "Handicapped" parking hang tag from Dr. Cook in Wilcox County, Alabama. At present, I have one from Dr. Cook because of this accident. I did not apply for it. Dr. Cook just saw that I needed it.**

27. Prior to the accident had Plaintiff and her husband Willie Price ever separated due to marital difficulties? If so, state the inclusive dates of each such separation and the reason therefore.

**RESPONSE:** No.

28. Has Willie Beverly, Jr. ever been convicted of a felony or crime of moral turpitude? If so, state the crime, the conviction date, the sentence and the jurisdiction imposing the sentence.

**RESPONSE:** No.

APR-09-2007 MON 10:28 AM                     FAX NO.                    P. 09
                                                                P. 009
APR-09-2007-MON 12:08 PM

29.    Has Willie Price ever been convicted of a felony or crime of moral turpitude?  If
so, state the crime, the conviction date, the sentence and the jurisdiction imposing the
sentence.

    **RESPONSE:**        **No.**

30.    Identify all vehicles owned in whole or in part by Plaintiff at the time of the
accident.

    **RESPONSE:**        **1999 Chevy Lumina Van**

                         **1999 Lexus LS Sedan**

                         **1999 Ford Expedition**

APR-09-2007 MON 10:28 AM                    FAX NO.                    P. 10

                                                                 P. 010

APR-09-2007-MON 12:08 PM

_Deloise Price_
**Deloise Price**

**STATE OF ALABAMA**                )
**COUNTY OF MACON**                 )

     I, the undersigned authority, a Notary Public in and for said State at Large, hereby certify that **Deloise Price**, whose name is signed to the foregoing instrument, and who is known to me acknowledged before me on this day, that, being informed of the contents thereof, she executed the same voluntarily on the day the same bears date.

_Brenda S. Pinkard_

(SEAL)                      NOTARY PUBLIC
                            My Commission Expires: _9-12-2008_

**BRIAN P. STRENGTH (STR052)**
Attorney for Plaintiffs

OF COUNSEL:
**Brian P. Strength**
COCHRAN, CHERRY, GIVENS
& SMITH
Post Office Box 830419
Tuskegee, Alabama 36083
Tel: (334) 727-0060
Fax: (334) 727-7197

APR-09-2007 MON 10:28 AM                          FAX NO.                          P. 11
                                                                      P. 011

APR-09-2007-MON 12:08 PM

## CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing discovery on the following counsel of record on this the _7th_ day of ___April___, 2007, by placing a copy of same in the United States Mail, postage prepaid.

Dennis R. Bailey
Rushton, Stakely, Johnston & Garrett, P.A.
184 Commerce Street
Post Office Box 270
Montgomery, Alabama 36101-0270

Of counsel

APR-09-2007 MON 10:27 AM              FAX NO.            P. 02

P. 002

APR-09-2007-MON 12:08 PM

EXHIBIT C

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

DELOISE PRICE,               \*

    PLAINTIFF,            \*

                        \*

VS.                    \*     CIVIL ACTION NO.: 2:06–CV-721

                        \*

WAL-MART STORES, INC., et al.   \*

    DEFENDANTS         \*

## PLAINTIFF, DELOISE PRICE'S, RESPONSES TO DEFENDANT WAL-MART STORES, INC.'S SECOND INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

Plaintiff, Deloise Price, hereby responds to Interrogatories and Request for Production of Documents propounded by the Defendant as follows:

25.    Prior to the accident, had Plaintiff experienced any leg or hip problems? If so, describe the leg or hip problems, the cause of the leg or hip problems and the onset date of the leg or hip problems.

**RESPONSE:**    **I do not recall any problems with my legs or hips prior to the accident.**

26.    When and why did Plaintiff move to Montgomery from Camden?

**RESPONSE:**    **My house burned in Camden, so I moved to Montgomery to be closer to my family. I believe it occurred in 2001.**

APR-09-2007 MON 10:28 AM                    FAX NO.                    P. 03

P. 003

APR-09-2007-MON 12:08 PM

27.    Has Plaintiff ever required assistance in daily living activities due to injuries sustained prior to the accident? If so, state the reason or cause of the need for such assistance and the inclusive dates of use of such assistance.

**RESPONSE:**        **No.**

28.    Identify Plaintiff's bank at which she had the checking account upon which she drew a check to Wal-Mart to pay for the exercise equipment involved in the accident and/or pay for the assembly thereof.

**RESPONSE:**        **Compass Bank on Vaughn Road.**

29.    How much did Plaintiff pay Wal-Mart for the exercise equipment involved in the accident?

**RESPONSE:**        **It was approximately $150.00 plus $15.00 for assembly.**

30.    How much did Plaintiff pay Wal-Mart to assemble the exercise equipment involved in the accident?

**RESPONSE:**        **$15.00**

## REQUEST FOR PRODUCTION

15.   Produce a copy of the cancelled check tendered to Wal-Mart to pay for the exercise equipment involved in the accident.

   **RESPONSE:**     **See attached.**

16.   Produce a copy of the cancelled check tendered to Wal-Mart to pay for the assembly of exercise equipment involved in the accident.

   **RESPONSE:**     **See attached.**

17.   Produce Plaintiff's bank statement for the checking account used to pay for the exercise equipment showing all checks drawn during the month of December 2003.

   **RESPONSE:**     **See attached.**

APR-09-2007 MON 10:28 AM                    FAX NO.                    P. 05
                                                                 P. 005
APR-09-2007-MON 12:08 PM


_Deloise Price_
**Deloise Price**

**STATE OF ALABAMA**          )
**COUNTY OF MACON**           )

    I, the undersigned authority, a Notary Public in and for said State at Large, hereby certify that **Deloise Price**, whose name is signed to the foregoing instrument, and who is known to me acknowledged before me on this day, that, being informed of the contents thereof, she executed the same voluntarily on the day the same bears date.

_Brenda S. Pinkard_

(SEAL)                       NOTARY PUBLIC
                             My Commission Expires: _9-12-2008_



**BRIAN P. STRENGTH (STR052)**
Attorney for Plaintiffs


OF COUNSEL:
**Brian P. Strength**
COCHRAN, CHERRY, GIVENS
& SMITH
Post Office Box 830419
Tuskegee, Alabama 36083
Tel: (334) 727-0060
Fax: (334) 727-7197

APR-09-2007 MON 10:28 AM                              FAX NO.                     P. 06
                                                                        P. 006
APR-09-2007-MON 12:08 PM

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon counsel listed below by placing a copy same in the U. S. Mail, properly addressed and postage prepaid, on this the 9th day of ____April____, 2007.

Dennis R. Bailey
Rushton, Stakely, Johnston & Garrett, P.A.
184 Commerce Street
Post Office Box 270
Montgomery, Alabama 36101-0270

OF COUNSEL



APR-09-2007-MON 12:09 PM    P. 013



APR-09-2007 MON 10:29 AM                      FAX NO.                        P. 14

APR-09-2007-MON 12:09 PM                                                     P. 014

Printable Statement

Primary Account: 0014287175

Page    1 of    2
Enclosures      0                    42
Nov 19, 2003 to Dec 18, 2003


030    DELOISE PRICE
       ELLA MCDANIEL FRAZIER
       5850 CARRIAGE BROOK RD
       MONTGOMERY AL   36116-1010


       NOTICE ANYTHING DIFFERENT?
       WE ASKED OUR CUSTOMERS HOW TO MAKE OUR STATEMENT MORE HELPFUL AND EASIER
       TO READ.  YOU GAVE US SOME GREAT IDEAS.  AND WE LISTENED.  THIS IS OUR
       FIRST STATEMENT FEATURING OUR NEW IMPROVED LOOK.  WE HOPE YOU LIKE IT.

       WE ALWAYS WELCOME YOUR THOUGHTS ON HOW WE CAN SERVE YOU BETTER, SO THANKS
       FOR YOUR SUGGESTIONS.  IF YOU HAVE OTHER IDEAS FOR HOW WE CAN MAKE YOUR
       BANKING BETTER, CALL 1-800-COMPASS OR VISIT US AT WWW.COMPASSWEB.COM/CONTACT
       IF YOU HAVE QUESTIONS ABOUT YOUR STATEMENT, CALL CUSTOMER SERVICE AT
       251-409-7432.

BASIC50 CHECKING            DELOISE PRICE
0014287175                  ELLA MCDANIEL FRAZIER


Deposit Account Recap
   Beginning Balance as of November  19, 2003              588.23
     4 Deposits                   (Plus)                 5,194.00
    34 Withdrawals                (Minus)                3,544.92
   Ending Balance as of    December  18, 2003            2,237.31

Account Checks by Serial Number
 Serial    Date      Amount    Serial    Date      Amount    Serial    Date      Amount
                                  614    Nov 24    100.00      623    Dec 09    250.00
          Nov 24    100.00        615    Nov 25     83.24      624    Dec 11    170.79
          Dec 10    320.00        616    Nov 25    122.32      625    Dec 12     52.35
   603  * Nov 26    195.30        617    Nov 23    168.40      627  * Dec 15    157.76
   604    Nov 20     40.00        618    Dec 01     39.91      629  * Dec 15    200.00
   607  * Nov 20    156.00        619    Nov 28     57.20      630    Dec 17    200.00
   608    Nov 20      9.00        620    Dec 17      5.00      634  * Dec 18     57.97
   609    Dec 15     32.08        621    Dec 17     40.00      638  * Dec 18     46.16
   610    Nov 20    144.00        622    Dec 09     35.13      639    Dec 18     18.03
   612  * Nov 28     71.00
   613    Nov 25     20.00

                    * Indicates break in check sequence


Deposits and Other Credits
 Date      Serial #      Amount  Description
 Nov 24                 800.00 TRANSFER FROM 0011626314 CUSTOMER SERVICE TRANSFER
 Dec 08               1,444.00 DEPOSIT
 Dec 08                 350.00 DEPOSIT
 Dec 15               2,600.00 DEPOSIT


Primary Account: 0014287175

Page    2 of    2
Enclosures      0                    42
Nov 19, 2003 to Dec 18, 2003

                                                        Aug 28 06 08:16p

   p. 2

APR-09-2007 MON 10:29 AM                          FAX NO.                          P. 15

P. 015

APR-09-2007-MON 12:09 PM

Page 2 of 2

Printable Statement

010  DELOISE PRICE
     ELLA MCDANIEL FRAZIER
     5050 CARRIAGE BROOK RD
     MONTGOMERY AL  36116-1010

Withdrawals and Other Debits
Date                    Amount Description
Dec 01                  210.11 DEBIT FOR NATIONWIDE INS PREM CO REF- WS7700030029
Dec 02                   35.00 * NSF CHARGE - ELECT TRANS OR NO CK#
Dec 02                   35.00 * NSF CHARGE FOR CHECK #          618
Dec 16                  200.00 TRANSFER TO 0075702647 CUSTOMER SERVICE TRANSFER
Dec 17                  153.96 DEBIT FOR STYLE SETTER 427 EFT CHK NO- 622 MONTAL
Dec 17                   18.69 DEBIT FOR STYLE SETTER 927 EFT CHK NO- 633 MONTAL

Daily Balance Summary
Date        Balance      Date         Balance        Date        Balance
Nov 18       588.23      Dec 01        128.75-       Dec 12       766.98
Nov 20       339.23      Dec 02        198.75-       Dec 15     2,977.12
Nov 24       839.23      Dec 08      1,595.25        Dec 16     2,777.12
Nov 25       445.27      Dec 09      1,910.12        Dec 17     2,359.47
Nov 26       249.47      Dec 10        990.12        Dec 18     2,237.31
Nov 28       121.27      Dec 11        819.33

AUG 28 06 08:16P

P. 3

Deloise G. Price - 12/18/2001      EXHIBIT D

```
 1          IN THE CIRCUIT COURT FOR

 2            SUMTER COUNTY, ALABAMA

 3

 4  DELOISE G. PRICE,

 5              Plaintiff,

 6

 7  vs.                        CIVIL ACTION NO.

 8                             CV-2000-147

 9

10  BILL'S DOLLAR STORE,

11  etc., et al.,

12              Defendants.

13

14      *     *     *     *     *     *

15

16      DEPOSITION OF DELOISE G. PRICE,

17  taken pursuant to notice and stipulation on

18  behalf of the Defendants, in the law offices

19  of Vance & Bozeman, 319 Broad Street, Camden

20  Alabama, before Cindy M. Mincey, Court

21  Reporter and Notary Public in and for the

22  State of Alabama at Large, on December 18,

23  2001, commencing at approximately 10:05 a.m.
```

Deloise G. Price - 12/18/2001

```
1                    APPEARANCES

2

3

4   FOR THE PLAINTIFF:

5            STEWART E. VANCE, ESQUIRE

6            Vance & Bozeman, LLP

7            319 Broad Street

8            Camden, Alabama   36726

9

10

11  FOR THE DEFENDANTS:

12           JOSEPH T. CARPENTER, ESQUIRE

13           Law Office of Joseph T. Carpenter

14           4121 Carmichael Road, Suite 303

15           Montgomery, Alabama   36106

16

17

18        *     *     *     *     *

19

20

21

22

23
```

Deloise G. Price - 12/18/2001

```
 1              STIPULATIONS

 2              It is hereby stipulated and agreed

 3   by and between counsel representing the

 4   parties that the deposition of DELOISE G.

 5   PRICE is taken pursuant to notice and

 6   stipulation on behalf of the Defendants; that

 7   all formalities with respect to procedural

 8   requirements are waived; that said deposition

 9   may be taken before Cindy M. Mincey, Court

10   Reporter and Notary Public in and for the

11   State of Alabama at Large, without the

12   formality of a commission; that objections to

13   questions, other than objections as to the

14   form of the questions, need not be made at

15   this time, but may be reserved for a ruling at

16   such time as the deposition may be offered in

17   evidence or used for any other purpose as

18   provided for by the Civil Rules of Procedure

19   for the State of Alabama.

20              It is further stipulated and

21   agreed by and between counsel representing the

22   parties in this case that the filing of the

23   deposition of DELOISE G. PRICE is hereby
```

Deloise G. Price - 12/18/2001

1   waived and that said deposition may be

2   introduced at the trial of this case or used

3   in any other manner by either party hereto

4   provided for by the Statute, regardless of the

5   waiving of the filing of same.

6                   It is further stipulated and

7   agreed by and between the parties hereto and

8   the witness that the signature of the witness

9   to this deposition is hereby waived.

10

11              *      *      *      *      *

12

13                      INDEX

14  EXAMINATION:                        Page

15  By Mr. Carpenter  .   .    .    .    .    .     5

16

17

18  EXHIBITS:                           Page

19  DX-1         Handwritten Diagram by

20               Deloise Price               43

21

22

23

Deloise G. Price - 12/18/2001

```
 1                    DELOISE G. PRICE, of lawful age,
 2          having first been duly sworn, testified as
 3          follows:
 4                         EXAMINATION
 5          BY MR. CARPENTER:
 6    Q.    State your name, please, ma'am.
 7    A.    Deloise G. Price.
 8    Q.    Ms. Price, my name is Joe Carpenter.  I'm a
 9          lawyer from Montgomery, and I'm here for
10          Bill's Dollar Store, the defendant in the
11          lawsuit that you've filed this case against.
12          My purpose in being here today is to ask you
13          some questions so that I will know what your
14          testimony would be if we go to trial.
15    A.    Yes, sir.
16    Q.    And based upon that, I can, you know, plan and
17          evaluate the case and advise my client what
18          they should do about it.
19    A.    Okay.
20    Q.    So one reason for being here is to find out
21          more about what happened.
22    A.    Yes, sir.
23    Q.    Another reason for being here is to make a
```

Deloise G. Price - 12/18/2001

|    |    |                                                    |
|----|----|----------------------------------------------------|
| 1  |    | record of your testimony so we would have it       |
| 2  |    | at trial should we need it for any purpose;        |
| 3  |    | and therefore, what you say here today is very     |
| 4  |    | important not only to my case, but to yours.       |
| 5  | A. | Yes, sir.                                          |
| 6  | Q. | And this lady is making a record of it as a        |
| 7  |    | court reporter, and we want to be sure when        |
| 8  |    | she's through with it, that she has a good         |
| 9  |    | record of what we say.  So a couple of things      |
| 10 |    | I'd like to review with you before we get          |
| 11 |    | started that will be in your interest and in       |
| 12 |    | mine.  Number one, if you would, always give a     |
| 13 |    | verbal answer to my questions so there won't       |
| 14 |    | be any doubt whether you're saying yes or no.      |
| 15 |    | In fact, if the question calls for a yes and       |
| 16 |    | no answer, if you'll just say yes and no, it       |
| 17 |    | will be easier for her, rather than just           |
| 18 |    | saying uh-huh or huh-uh or nod your head, that     |
| 19 |    | kind of thing.                                     |
| 20 | A. | Yes, sir.                                          |
| 21 | Q. | Also, if you have any doubt about what I'm         |
| 22 |    | asking you, if you don't understand a             |
| 23 |    | question, I'll be happy to rephrase it or          |

Deloise G. Price - 12/18/2001

```
 1        restate it, if you'll just tell me that.

 2   A.   Yes, sir.

 3   Q.   I want to be sure that your answer is

 4        responsive, so any time as we go along today

 5        that you feel unclear about what I'm asking

 6        about or have some doubt about the words I use

 7        or the meaning of my question, if you'll just

 8        say that, we'll stop and repeat the question

 9        and get it so that you do understand it.

10   A.   Yes, sir.

11   Q.   And if you don't ask me to, I will assume that

12        you have understood the question.  Does that

13        seem fair to you?

14   A.   Yes, sir.

15   Q.   Okay.  What is your present address?

16   A.   Right now I'm at 11 Spring Valley, Montgomery,

17        Alabama.

18   Q.   Oh.  So you're living in Montgomery now?

19   A.   (Nods head.)  With my children because of my

20        condition.

21   Q.   All right.  And who are your children?  Give

22        me their names and ages.

23   A.   Michelle Jackson.  I think she's 38.  And Ella
```

Deloise G. Price - 12/18/2001

| 1 | | Frazier is 27. They both have homes in |
|---|---|---|
| 2 | | Montgomery. |
| 3 | Q. | Okay. Do they live in separate homes? |
| 4 | A. | Yes. |
| 5 | Q. | Which one do you live with? |
| 6 | A. | With both. |
| 7 | Q. | You're going back and forth between the two of |
| 8 | | them? |
| 9 | A. | Right. And sometimes we comes to our house |
| 10 | | down here. |
| 11 | Q. | Okay. What is your house down here? |
| 12 | A. | In Camden, Alabama, 254 Jefferson Road. |
| 13 | Q. | Does anybody live there when you're away from |
| 14 | | that place? |
| 15 | A. | No, sir. |
| 16 | Q. | Okay. Do you have any children other than the |
| 17 | | two daughters in Montgomery? |
| 18 | A. | I have a son. He's in Mississippi, but I'm |
| 19 | | trying to think of the name. |
| 20 | Q. | Okay. So he's not in Wilcox County? |
| 21 | A. | He's not in Wilcox County. |
| 22 | Q. | And how old is your son? |
| 23 | A. | My son is 29. |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | Q. | 29? |
| 2 | A. | They're all grown. |
| 3 | Q. | Do you have any children other than those |
| 4 | | three children? |
| 5 | A. | No, I don't. |
| 6 | Q. | Okay.  Do you know your social security |
| 7 | | number? |
| 8 | A. | Not by heart, I don't. |
| 9 | Q. | What is your date of birth? |
| 10 | A. | 10th month, 24th day, '50 year. |
| 11 | Q. | October 24th of 1950? |
| 12 | A. | Yes, sir. |
| 13 | Q. | If I found your social security number on one |
| 14 | | of these medical records, would you recognize |
| 15 | | it? |
| 16 | A. | I think I would, but my purse will be back in |
| 17 | | a few minutes. |
| 18 | Q. | Okay.  I just want to verify it to make sure. |
| 19 | | We'll get that later. |
| 20 | A. | Okay. |
| 21 | | (Off-the-record discussion.) |
| 22 | Q. | I'm looking at medical records here, |
| 23 | | Ms. Price, that says your social security |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | | number is 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.  Does that sound right? |
| 2 | A. | Yes, sir. |
| 3 | Q. | Okay.  How long have you lived in Wilcox |
| 4 | | County? |
| 5 | A. | All my life. |
| 6 | Q. | All right.  Are you married? |
| 7 | A. | Yes, sir. |
| 8 | Q. | What's your husband's name? |
| 9 | A. | Willie J. Price. |
| 10 | Q. | And where is Mr. Price? |
| 11 | A. | I couldn't really tell you. |
| 12 | Q. | Are you separated? |
| 13 | A. | Yes. |
| 14 | Q. | How long have you been separated? |
| 15 | A. | Oh, I would say about eight or nine months. |
| 16 | Q. | Is he in Wilcox County, or do you know? |
| 17 | A. | He's in Wilcox County. |
| 18 | Q. | Where does he work? |
| 19 | A. | I don't know. |
| 20 | Q. | Okay.  What is your educational background? |
| 21 | | How far did you go in school? |
| 22 | A. | To the ninth grade. |
| 23 | Q. | Did you quit school in ninth grade? |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | A. | Yes, sir. |
| 2 | Q. | Where did you go to school? |
| 3 | A. | At Camden Academy. |
| 4 | Q. | Camden Academy? |
| 5 | A. | Uh-huh. |
| 6 | Q. | Is that here in Camden? |
| 7 | A. | In Camden. |
| 8 | Q. | Okay.  Have you been married to anyone other |
| 9 | | than your husband, Mr. Willie Price? |
| 10 | A. | Yes. |
| 11 | Q. | Who else have you been married to? |
| 12 | A. | Willie Lee Beverly. |
| 13 | Q. | Willie Lee Beverly? |
| 14 | A. | Willie Lee Beverly, my children father. |
| 15 | Q. | Okay.  He's the father of your three children? |
| 16 | A. | Yes, he is. |
| 17 | Q. | Does he live in Wilcox County? |
| 18 | A. | He live in Jacksonville, Florida. |
| 19 | Q. | Okay.  Do you have any other relatives that |
| 20 | | live in Wilcox County? |
| 21 | A. | Oh, yes, sir. |
| 22 | Q. | A lot of them? |
| 23 | A. | Yes, sir. |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | Q. | All right.  I think I have served some written |
| 2 | | discovery on your attorney.  If you'll just |
| 3 | | start getting that information together. |
| 4 | | Rather than spending time today, you can give |
| 5 | | that to me in writing, but I would like to |
| 6 | | have that prior to trial. |
| 7 | A. | Okay. |
| 8 | Q. | But you can get with him and do that.  Have |
| 9 | | you been married to anyone other than |
| 10 | | Mr. Price and Mr. Beverly? |
| 11 | A. | No, I haven't. |
| 12 | Q. | Are you employed? |
| 13 | A. | No, I'm not. |
| 14 | Q. | Have you ever been employed? |
| 15 | A. | Yes, I have. |
| 16 | Q. | When was the last time you were employed? |
| 17 | A. | In 1971, I believe, or '72. |
| 18 | Q. | Where were you employed then? |
| 19 | A. | Simplex Industrial. |
| 20 | | THE REPORTER:  I'm sorry.  Where? |
| 21 | | THE DEPONENT:  Simplex, a sewing |
| 22 | | factory. |
| 23 | Q. | Simplex? |

Deloise G. Price - 12/18/2001

```
1   A.   Yes.

2   Q.   S-I-M-P-L-E-X?

3   A.   Right.  And J. Paul Jones Hospital.

4   Q.   And what did you do at J. Paul Jones Hospital?

5   A.   I was a nurse's aid.

6   Q.   All right.  And what was your reason for

7        leaving those two places of employment?

8   A.   Well, I really didn't -- I didn't have to work

9        because my husband was taking care of me, and

10       I had children to raise.

11  Q.   All right.  And have you pretty much since

12       that time lived off the income of your

13       husband?  Is that how you've gotten by?

14  A.   No.  I get disability.

15  Q.   Oh, okay.  Tell me about your disability.

16  A.   I have something called pseudotumor cerebri.

17       It create pressure.

18  Q.   Let's start over with that condition.  I

19       missed that one.  It sounds like a long

20       medical term.

21  A.   Pseudotumor cerebri.  It increase cranial

22       pressure.

23  Q.   Increase cranial pressure?
```

Deloise G. Price - 12/18/2001

```
 1   A.   Right.

 2   Q.   All right.  How long have you had that

 3        condition?

 4   A.   Oh, about -- I think about maybe 20, 25 years

 5        or longer.

 6   Q.   And do you have a social security disability?

 7   A.   Yes, sir.

 8   Q.   And what are the symptoms of that condition?

 9   A.   It's a slow disease that takes away the sight.

10   Q.   So slowly you lose your sight?

11   A.   Yeah.  You can.

12   Q.   Any other symptoms other than sight problems?

13   A.   Headaches.

14   Q.   Headaches?

15   A.   Severe headaches.

16   Q.   And do you take medication for this condition?

17   A.   I'm not taking medication now.

18   Q.   Do you see a physician on a regular basis?

19   A.   Maybe three or four times a year for that.

20   Q.   And who's your doctor for that?

21   A.   Dr. Rosey Cook.

22   Q.   Rosey, R-O-S-E-Y?

23   A.   Right.
```

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | Q. | And where is Dr. Cook? |
| 2 | A. | Pine Apple, Alabama. |
| 3 | Q. | How long have you been seeing Dr. Cook for |
| 4 | | this condition? |
| 5 | A. | Oh, off and on about maybe seven years or |
| 6 | | something like that, because I was going to |
| 7 | | Birmingham. |
| 8 | Q. | Who were you seeing in Birmingham? |
| 9 | A. | Dr. Zeiger. |
| 10 | Q. | Zeiger? |
| 11 | A. | (Nods head.) |
| 12 | Q. | Do you remember the first name? |
| 13 | A. | All I know is Dr. Zeiger. |
| 14 | Q. | Was it a he or a she? |
| 15 | A. | It was a he.  He put the shunt in my back to |
| 16 | | release the pressure from it. |
| 17 | | (Off-the-record discussion.) |
| 18 | Q. | Was it Dr. Evan Zeiger? |
| 19 | A. | That is him. |
| 20 | Q. | A neurosurgeon? |
| 21 | A. | A neurosurgeon.  That's him.  That's him. |
| 22 | | THE REPORTER:  How do you spell |
| 23 | | that name? |

Deloise G. Price - 12/18/2001

```
 1              MR. CARPENTER:  It's Z-E-I-G-E-R, I

 2                   think.

 3  Q.   And he put a shunt in your back?

 4  A.   Yes, sir.

 5  Q.   How long ago?

 6  A.   In 1973, I think.

 7  Q.   And so that shunt was to relieve some of the

 8       pressure on your head?

 9  A.   Yes, sir.

10  Q.   Okay.  Is the shunt still there?

11  A.   Yes, sir.

12  Q.   Okay.

13                   (Off-the-record discussion.)

14  Q.   Have you had any other surgeries for this

15       condition of increased cranial pressure?

16  A.   Eye surgery.

17  Q.   Who did the eye surgery?

18  A.   Dr. Woernle (phonetic).  How to spell it, I

19       don't know.

20  Q.   Say it again.

21  A.   Dr. Woernle.

22  Q.   Dr. Woernle?

23  A.   Right.  He's a foreign doctor.
```

Deloise G. Price - 12/18/2001

| 1 | Q. | Where is he? |
|---|----|--------------|

1  Q.   Where is he?

2  A.   He was working at Eye Foundation.

3  Q.   In what city?

4  A.   Montgomery.

5  Q.   When did you have that surgery?

6  A.   During the same time, about 1972.

7  Q.   And when was the last time you saw that

8       doctor?

9  A.   It's been quite some time.

10  Q.   Okay.  Do you go to an eye doctor now on a

11       regular basis?

12  A.   Yes, sir.  I just had my eyes checked.

13  Q.   Who's your eye doctor now?

14  A.   I don't know his name, but it's in Montgomery.

15  Q.   What group?

16  A.   My daughter know his name.  I don't know it

17       right off.  It's right off the Eastern Bypass.

18  Q.   All right.  Would you get that information and

19       get it to your attorney so he can answer my

20       interrogatories and give me that information?

21  A.   (Nods head.)

22  Q.   I'd like to get those records just so I can

23       learn more about that condition.

Deloise G. Price - 12/18/2001

```
 1   A.   Okay.

 2   Q.   You have severe headaches, and you say you

 3        could have some loss of vision as a result of

 4        this condition.  Are there any other symptoms

 5        of the condition or problems?

 6   A.   No, sir.

 7   Q.   And do you recall what year you were awarded a

 8        social security disability?

 9   A.   In 1975.

10   Q.   And you've been on social security disability

11        continuously since that time?

12   A.   Yes, sir.

13   Q.   How much money do you presently draw?

14   A.   700 and something dollars now.

15   Q.   A month?

16   A.   Yes, sir.

17   Q.   And do you have to go back periodically for

18        examinations to confirm that you're still

19        disabled?

20   A.   Yes, sir.

21   Q.   And who does those examinations?

22   A.   Dr. Cook.

23   Q.   Okay.  Do you know what kind of doctor
```

Deloise G. Price - 12/18/2001

| 1 | | Dr. Rosey Cook is, what specialty? |
|---|---|---|
| 2 | A. | An MD, medical doctor. |
| 3 | Q. | Does she have any specialty other than medical |
| 4 | | doctor? |
| 5 | A. | Not that I know of. |
| 6 | Q. | Okay.  Now, I may want to get more into your |
| 7 | | health history in a minute, but let me move on |
| 8 | | to some of the other things that I was asking |
| 9 | | you about.  I was asking you about |
| 10 | | employment.  If I understood you correctly, |
| 11 | | because you were married and had a husband |
| 12 | | that could provide for you and because of your |
| 13 | | disability, you have not been employed since |
| 14 | | the mid '70s.  Is that correct? |
| 15 | A. | Right.  My husband owned his own business |
| 16 | | during that time. |
| 17 | Q. | Which husband was this? |
| 18 | A. | Willie Lee Beverly. |
| 19 | Q. | Were you divorced from Mr. Beverly? |
| 20 | A. | Yes, I was. |
| 21 | Q. | When were you divorced from him? |
| 22 | A. | About 15, 16 years ago. |
| 23 | Q. | And when did you marry Mr. Price? |

Deloise G. Price - 12/18/2001

```
 1   A.   It's been 13 years.

 2   Q.   All right.  So there was a three- or four-year

 3        period in between in which, I guess, you just

 4        lived off your own disability.  Is that

 5        correct?

 6   A.   Yes, sir.

 7   Q.   Do you own the house here in Camden?

 8   A.   Yes, sir.  Well, I was getting child support

 9        for my three children.

10   Q.   Okay.  From your first husband?

11   A.   Yes, sir.

12   Q.   All your children now have reached the age of

13        majority; is that correct?

14   A.   Correct.

15   Q.   Have you had any part-time or any type of

16        employment since the mid '70s?

17   A.   Yeah.  Like, you know, baby-sitting and stuff

18        like that, sure, yes, sir.

19   Q.   Anything other than baby-sitting?

20   A.   No, sir.

21   Q.   How often do you baby-sit?

22   A.   Occasionally.  Back then, it was maybe during

23        the summer, every summer when the kids was out
```

Deloise G. Price - 12/18/2001

| 1 | | of school mostly. |
|---|---|---|
| 2 | Q. | Any other part-time or casual employment other |
| 3 | | than baby-sitting? |
| 4 | A. | No, sir. |
| 5 | Q. | Do you have an Alabama driver's license? |
| 6 | A. | Yes, sir. |
| 7 | Q. | Do you drive? |
| 8 | A. | Yes, sir. |
| 9 | Q. | Do you own a car? |
| 10 | A. | Yes, sir. |
| 11 | Q. | Are there any restrictions on your driver's |
| 12 | | license? |
| 13 | A. | No, sir. |
| 14 | Q. | No glasses or anything?  Just a plain ole |
| 15 | | Alabama driver's license? |
| 16 | A. | Plain ole Alabama driver's license. |
| 17 | Q. | Have you had any traffic citations in the last |
| 18 | | four or five years? |
| 19 | A. | I had one. |
| 20 | Q. | For what? |
| 21 | A. | Speeding. |
| 22 | Q. | Where was that and when? |
| 23 | A. | It was in Montgomery -- not Montgomery, Selma |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | | about three -- I think about three years ago. |
| 2 | Q. | Okay.  And you do have your own car? |
| 3 | A. | Yes, sir. |
| 4 | Q. | What kind of car do you have? |
| 5 | A. | I have a '93 Cadillac Deville. |
| 6 | Q. | Has there been any modification of it for your |
| 7 | | driving, or is it just a standard car? |
| 8 | A. | Just a standard car. |
| 9 | Q. | All right.  I'm asking you some questions now |
| 10 | | that I'd ask any witness, so don't be offended |
| 11 | | by it. |
| 12 | A. | Okay. |
| 13 | Q. | Have you ever served in the military? |
| 14 | A. | No, sir. |
| 15 | Q. | Have you ever been convicted of a crime, a |
| 16 | | felony? |
| 17 | A. | Yes, sir. |
| 18 | Q. | And how long ago? |
| 19 | A. | About 10 or 11 years ago. |
| 20 | Q. | What kind of crime was it? |
| 21 | A. | Drugs. |
| 22 | Q. | Drug possession? |
| 23 | A. | No.   My son was -- had came from Lansing, |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | | Michigan.  It was something that I didn't |
| 2 | | know.  He was slipping, during the time he was |
| 3 | | here during the holidays, out of the house, |
| 4 | | you know?  And by it being my house, they came |
| 5 | | after me. |
| 6 | Q. | So he was selling drugs out of your house? |
| 7 | A. | During the time he was here for, like, three |
| 8 | | days. |
| 9 | Q. | All right.  What does he do in Mississippi? |
| 10 | A. | My son is a certified welder. |
| 11 | Q. | Was he convicted also? |
| 12 | A. | He's been convicted, yes, sir. |
| 13 | Q. | At the same time you were? |
| 14 | A. | No, sir. |
| 15 | Q. | For the same crime that you were? |
| 16 | A. | Yes, sir. |
| 17 | Q. | Did he serve any time? |
| 18 | A. | Yes, sir. |
| 19 | Q. | How long did he serve? |
| 20 | A. | 10 months. |
| 21 | Q. | Did you serve any time? |
| 22 | A. | No, sir. |
| 23 | Q. | What was your sentence? |

Deloise G. Price - 12/18/2001

| 1 | A. | Five years' probation. |
| 2 | Q. | And what kind of drugs were you accused of |
| 3 | | selling? |
| 4 | A. | Crack cocaine. |
| 5 | Q. | So is your probation period over? |
| 6 | A. | Oh, yes, sir. |
| 7 | Q. | Do you have any other convictions other than |
| 8 | | that conviction? |
| 9 | A. | No, sir. |
| 10 | Q. | And that was a felony? |
| 11 | A. | No, sir. |
| 12 | Q. | Was it a felony, the one you were convicted |
| 13 | | of? |
| 14 | A. | Oh, yes, sir. |
| 15 | Q. | Okay.  Do you remember the year of the |
| 16 | | conviction? |
| 17 | A. | It was in the late -- I don't know, but it |
| 18 | | been at least about 11 years ago. |
| 19 | Q. | Okay.  Did that conviction cause any |
| 20 | | consequences for your disability income? |
| 21 | A. | No, sir. |
| 22 | Q. | All right.  Have you ever sued anyone before |
| 23 | | this lawsuit? |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | A. | Yes, sir. |
| 2 | Q. | Tell me about previous suits. |
| 3 | A. | Heilig and Meyer. |
| 4 | Q. | Heilig and Meyer? |
| 5 | A. | Right. |
| 6 | Q. | And what did you sue them for? |
| 7 | | MR. VANCE:  I believe that's Heilig |
| 8 | | Meyers, the furniture company. |
| 9 | | THE DEPONENT:  Yeah. |
| 10 | | MR. CARPENTER:  Okay. |
| 11 | Q. | How long ago did you sue them? |
| 12 | A. | It's been about four or five years ago. |
| 13 | Q. | And what did you sue them for? |
| 14 | A. | They added insurance on my account when they |
| 15 | | didn't supposed to. |
| 16 | Q. | What kind of insurance? |
| 17 | A. | Life. |
| 18 | Q. | And did that one go to trial? |
| 19 | A. | No, sir. |
| 20 | Q. | You settled it? |
| 21 | A. | Yes, sir. |
| 22 | Q. | Who was your attorney in that case? |
| 23 | A. | Bob Methvin. |

Deloise G. Price - 12/18/2001

```
1   Q.    In Montgomery?

2   A.    In Montgomery.

3               MR. VANCE:  Actually, it's in

4                    Birmingham.

5               THE DEPONENT:  Yeah, Birmingham.

6                    I'm sorry.

7               MR. CARPENTER:  It's not Tom

8                    Methvin?

9               MR. VANCE:  It's his brother.

10              MR. CARPENTER:  Okay.

11  Q.    Was it a confidential settlement, or can you

12        tell me the terms of how much you were

13        covered?

14  A.    It was, like, 5,000 and something.

15  Q.    And was that in Wilcox County Circuit Court?

16  A.    We didn't go to court.

17  Q.    Well, I mean --

18  A.    Where was it filed?

19  Q.    Yeah.

20  A.    Here.

21  Q.    Okay.  Your conviction for selling cocaine,

22        was that in Wilcox County?

23  A.    Yes, sir.
```

Deloise G. Price - 12/18/2001

| | |
|---|---|
| 1 | Q.   Okay.  Any other lawsuits other than this one |
| 2 | and the one against Heilig Meyers? |
| 3 | A.   No, sir. |
| 4 | Q.   Have you ever been sued by anybody, except |
| 5 | maybe for divorce or that kind of thing? |
| 6 | A.   No, sir. |
| 7 | Q.   All right.  Have you had any accidents, other |
| 8 | than the one that we're here on today, where |
| 9 | you sustained a personal injury? |
| 10 | A.   No, sir. |
| 11 | Q.   Okay.  I've been getting some background |
| 12 | information.  I'm going to ask you some |
| 13 | specific questions about the incident that |
| 14 | occurred at Bill's Dollar Store.  First of |
| 15 | all, let's start with the date that the |
| 16 | accident happened.  Do you remember the date? |
| 17 | A.   I think it was November 28th. |
| 18 | Q.   Of what year? |
| 19 | A.   I don't recall the exact year. |
| 20 | Q.   Let's refresh your recollection on that.  The |
| 21 | complaint says it was November 28th of 1998. |
| 22 | Does that sound right? |
| 23 | A.   That's it.  Yes, sir. |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | Q. | Do you remember what day of the week it was? |
| 2 | A. | It was on a Saturday. |
| 3 | Q. | And where is Bill's Dollar Store?  Where was |
| 4 | | it?  Was it here in Camden? |
| 5 | A. | Yes. |
| 6 | Q. | Is the store still open? |
| 7 | A. | Yes, sir. |
| 8 | Q. | What time of day did the accident happen? |
| 9 | A. | Between 4:30 and five o'clock. |
| 10 | Q. | What was your purpose in going there? |
| 11 | A. | Shopping. |
| 12 | Q. | Was anyone with you when you went? |
| 13 | A. | Yes, sir. |
| 14 | Q. | Who was with you? |
| 15 | A. | All my children and my son-in-law and my |
| 16 | | daughter-in-law and some grandchildren. |
| 17 | Q. | Okay.  So a group of you went; is that |
| 18 | | correct? |
| 19 | A. | Yes, sir. |
| 20 | Q. | I don't want you to be upset.  I didn't mean |
| 21 | | to upset you.  I hope I didn't.  Do you need |
| 22 | | to take a little break right now? |
| 23 | A. | I'm all right. |

Deloise G. Price - 12/18/2001

```
 1                    MR. VANCE:  Do you want to take a
 2                    break and get a glass of water?
 3                    THE DEPONENT:  I'm all right.
 4   Q.   Well, you just tell me when you're ready to
 5        answer the questions, and I'll go forward.
 6   A.   I'm okay.
 7   Q.   So you say both your daughters were with you?
 8   A.   Yes, sir.
 9   Q.   And your daughter-in-law?
10   A.   My daughter-in-law, my son-in-law.
11   Q.   What's your daughter-in-law's name?
12   A.   Regina Beverly.
13   Q.   Okay.  She's your son's wife?
14   A.   Right.
15   Q.   Which one of your son-in-laws were with you?
16   A.   Dennis Blackman.
17                    THE REPORTER:  I'm sorry?
18                    THE DEPONENT:  Dennis Blackman.
19   Q.   And your two daughters, tell me their names
20        again.
21   A.   Ella Frazier and Michelle Jackson.
22   Q.   Okay.  And you said some grandchildren?
23   A.   Pamela Jackson and Darrel Jackson.
```

Deloise G. Price - 12/18/2001

```
 1   Q.   Darrel?

 2   A.   Darrel.

 3   Q.   Darren?

 4   A.   D-A-R-R-E-L.

 5   Q.   Okay.

 6   A.   And Larry Meeks.

 7   Q.   Larry Meeks?

 8   A.   Yes, sir.

 9   Q.   Who is Larry Meeks' parents?

10   A.   Regina Beverly and my son.  And Shorty

11        Beverly, Jr.

12   Q.   All right.  So there was a group of you?

13   A.   Yes, sir.

14   Q.   Was anybody else there?

15   A.   No, sir.

16   Q.   Were all of them except your grandchildren

17        adults over the age of 19?

18   A.   Yes, sir.

19   Q.   And how about your grandchildren?  How old

20        were they then approximately?  Were they under

21        15?

22   A.   Oh, they was under 15.

23   Q.   Okay.
```

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | A. | Santa Claus shopping. |
| 2 | Q. | Okay.  And how long were you in the store? |
| 3 | A. | Approximately maybe two hours or longer. |
| 4 | Q. | All of these other people, were they in there |
| 5 | | for two hours with you? |
| 6 | A. | Yes, sir. |
| 7 | Q. | Did they purchase some things separate from |
| 8 | | you? |
| 9 | A. | Yes, sir. |
| 10 | Q. | And you purchased some things? |
| 11 | A. | Yes, sir. |
| 12 | Q. | Did you pay by cash, or do you remember? |
| 13 | A. | Cash. |
| 14 | Q. | What all did you purchase? |
| 15 | A. | I purchased one of these big cans of house |
| 16 | | Indian spray. |
| 17 | Q. | House what? |
| 18 | A. | Indian spray.  You know, the scent. |
| 19 | Q. | Okay. |
| 20 | A. | And two double packs of Pine Sol.  They the |
| 21 | | double pack. |
| 22 | Q. | So you got two of these double packs?  You had |
| 23 | | four bottles of Pine Sol? |

Deloise G. Price - 12/18/2001

```
 1   A.   Right.

 2   Q.   Okay.

 3   A.   And a can of ravioli and a hammer, and I think

 4        that's about all.  Let me see.  I know it was

 5        ravioli, house spray, a big, large candle, and

 6        a big incense and four -- you know, the double

 7        pack --

 8   Q.   Of Pine Sol?

 9   A.   Pine Sol.

10   Q.   You purchased a candle and some incense?

11   A.   Incense.

12   Q.   Okay.  Incense?

13   A.   And a hammer.  Oh, and I think there might

14        have been some tacks in there too.

15   Q.   Some what?

16   A.   Tacks.

17   Q.   Tacks?

18   A.   Tacks.

19   Q.   Like, small nails?

20   A.   Small nails for Christmas decorations.  That's

21        what I purchased that for.

22   Q.   And do you have your cash register receipt for

23        that purchase somewhere?
```

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | A. | No, sir. |
| 2 | Q. | Were your other family members still in the |
| 3 | | store when the accident happened? |
| 4 | A. | Yes, sir.  Some of them was. |
| 5 | Q. | Who all was in the store? |
| 6 | A. | Regina. |
| 7 | Q. | Well, let me start it this way.  Did any of |
| 8 | | those family members see this accident? |
| 9 | A. | Yes, sir. |
| 10 | Q. | Tell me the ones that saw it. |
| 11 | A. | Regina Beverly and my son, Willie Beverly. |
| 12 | Q. | All right.  Regina's your daughter-in-law? |
| 13 | A. | Yes, sir. |
| 14 | Q. | And they're in Mississippi now? |
| 15 | A. | Yes, sir. |
| 16 | Q. | Okay.  Did anybody else see it? |
| 17 | A. | No, sir.  But the oldest was at the -- you |
| 18 | | know, right at the door to -- you know, they |
| 19 | | didn't see it just when it happened, but they |
| 20 | | was right at the door. |
| 21 | Q. | They were there shortly afterwards? |
| 22 | A. | They was already at the door.  You know, like, |
| 23 | | here's the cash register and the door to go |

Deloise G. Price - 12/18/2001

```
 1       out, and immediately when it happened, you

 2       know, they was right there.

 3  Q.   Okay.  They were where they could have seen it

 4       if they had been looking, but they weren't

 5       actually looking when it happened?

 6  A.   Right, right.

 7  Q.   And who would be in that group of people?

 8  A.   Dennis Blackman, Michelle Jackson, and Pamela

 9       Jackson, Darrel Jackson, and Shorty, Jr.

10  Q.   Shorty is your grandson by your son?

11  A.   Right, yes, sir.

12  Q.   All right.  Now, who was the cashier on duty

13       that you checked out with?

14  A.   Anita Rich Pilkerton.

15  Q.   Anita Rich Pinkerton?

16  A.   Pilkerton.

17  Q.   Pilkerton?

18  A.   Right.

19  Q.   P-I-L-K-E-R-T-O-N?

20  A.   Right.  But she's married now.

21  Q.   What's her name now?

22  A.   Cole.

23  Q.   C-O-L-E?
```

Deloise G. Price - 12/18/2001

```
 1   A.    Right.

 2   Q.    Are you related to Ms. Pilkerton?

 3   A.    Yes, I am.

 4   Q.    And how are you related?

 5   A.    She's my first cousin.

 6   Q.    So her father or mother and your father or

 7         mother are brothers and sisters?

 8   A.    Two sisters' children.  Her mother is my

 9         mother's sister.

10   Q.    Okay.  Now, tell me in your own words how this

11         accident happened.

12   A.    Okay.  My daughter-in-law, Regina Beverly, and

13         Willie Beverly, they was ahead of me.  They

14         had purchased and paid for what they had got,

15         and it was -- they had put their stuff in the

16         buggy, and the buggy was still, you know,

17         right in front of me.  And after I paid -- you

18         know, she rung my stuff up, and she -- I paid

19         for it.  And the girl packed it all, you know,

20         into the double sacks, and she picked it up to

21         put it over in the buggy.  The whole bag

22         burst, and all that stuff hit me on my feet.

23   Q.    All right.  Did she put everything that you
```

1     purchased into one bag, or was there more than

2     one bag?

3  A.   One bag.

4  Q.   And you say it was a double bag?

5  A.   It was a double bag.

6  Q.   So if I understood you, she took one bag, put

7     another bag inside that bag, and then put all

8     the goods that you purchased in those two

9     bags?

10  A.   Right.

11  Q.   And then she reached with those two bags to

12     put this double bag into the buggy that was in

13     front of you?

14  A.   She picked it up like this, you know, off the

15     counter and got ready to put it in the bag --

16     you know, the buggy -- back of the buggy, and

17     before she got to the back of the buggy, it

18     burst.

19  Q.   Okay.  So she was lifting the bag to put it in

20     the buggy, and the bag burst?

21  A.   Yes, sir.

22  Q.   And what happened when the bag burst?

23  A.   Everything just fell down on my feet.  It

Deloise G. Price - 12/18/2001

1     just, you know, hit me on my feet.

2  Q.  Did the stuff that hit you roll off the

3     counter?

4  A.  Some of it might have rolled off the counter,

5     but I know the Indian spray I'm talking about

6     -- the Indian spray, you know, I saw it when

7     it, you know, fell to the thing and hit my

8     foot.

9  Q.  So the Indian spray is what hit your foot?

10 A.  I can't say exactly.  More than the spray hit

11    my feet, but --

12 Q.  Oh.  Other things hit your foot?

13 A.  Yes, sir.

14 Q.  All right.  I'm having a little trouble.  And

15    I'm not disputing what you're saying.  I'm

16    just trying to understand it, because I

17    haven't been there, and I haven't seen this

18    counter.  You're on one side of the counter,

19    and she's on the other side of the counter; is

20    that correct?  The counter's between the two

21    of you?

22 A.  Yes, sir.

23 Q.  You said the buggy was right in front of you?

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | A. | You know, this the counter.  Say this the |
| 2 | | counter right here. |
| 3 | Q. | Can you draw me a little layout of it? |
| 4 | A. | Yes, I can. |
| 5 | Q. | Why don't you just draw us a little drawing? |
| 6 | A. | Okay.  The cash register -- the counter is |
| 7 | | made long-wise.  Say this the counter, okay? |
| 8 | Q. | All right.  Is it a rectangular counter? |
| 9 | A. | The cash register -- say the cash register is |
| 10 | | up to the head part. |
| 11 | Q. | Okay. |
| 12 | A. | Just say that. |
| 13 | Q. | All right. |
| 14 | A. | And the buggy, I would say, is somewhere about |
| 15 | | right along in here. |
| 16 | Q. | All right. |
| 17 | A. | This is the front of it. |
| 18 | Q. | Okay. |
| 19 | A. | This is the back of the buggy. |
| 20 | Q. | All right. |
| 21 | A. | And this here, like, she lifting it up to put, |
| 22 | | you know, over -- |
| 23 | Q. | In the buggy? |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | A. | Right. |
| 2 | Q. | Where are you standing? |
| 3 | A. | I'm standing -- |
| 4 | Q. | Draw you. |
| 5 | A. | I'm standing, say, like, right here, in |
| 6 | | between the buggy and the -- |
| 7 | Q. | Did any of your goods in the sacks fall into |
| 8 | | the buggy? |
| 9 | A. | No, sir. |
| 10 | Q. | Did any of the goods in your sack fall on her |
| 11 | | side of the counter? |
| 12 | A. | I really don't know that.  I couldn't tell you |
| 13 | | that, because I don't know. |
| 14 | Q. | But some fell on your side and fell on your |
| 15 | | foot? |
| 16 | A. | A lot of it fell on my side. |
| 17 | Q. | Okay.  What all do you know fell on your side? |
| 18 | A. | I saw the -- I know the Lysol, that hammer. |
| 19 | Q. | Pine Sol?  Was it Pine Sol or Lysol? |
| 20 | A. | You know what I'm trying to say, the Indian |
| 21 | | -- |
| 22 | Q. | Oh.  The Indian spray? |
| 23 | A. | Yes, sir.  I saw that and the hammer and a can |

Deloise G. Price - 12/18/2001

```
 1        of ravioli, because it rolled, you know, right

 2        down -- you know how a can will roll.

 3   Q.   Yes.  Am I saying that right?  Indian scent,

 4        like, Indian, I-N-D-I-A-N?

 5   A.   Right.  It's blessed spray, but it's an

 6        incense, you know, for your house.

 7   Q.   It's, like, just a scent for your house?

 8   A.   Yes, sir.

 9   Q.   And it's called Indian spray?

10   A.   Yes, sir.

11   Q.   And so that can fell on your feet?

12   A.   Yes, sir.

13   Q.   The hammer fell on your feet?

14   A.   I would say yes, sir, because it was down

15        there.

16   Q.   You don't know whether it hit your foot, but

17        it was down there?

18   A.   It was down there, yes, sir.

19   Q.   And the can of ravioli?

20   A.   Yes, sir.

21   Q.   Anything else that you know of?

22   A.   And that big -- that candle.

23   Q.   The what?
```

Deloise G. Price - 12/18/2001

| 1 | A. | The candle, wax candle. |
|---|---|---|
| 2 | Q. | The wax -- |
| 3 | A. | Candle. |
| 4 | Q. | Oh, okay.  The candle fell on you? |
| 5 | A. | Yes, sir. |
| 6 | Q. | What about the Pine Sol? |
| 7 | A. | Now, I really don't know. |
| 8 | Q. | Where it was? |
| 9 | A. | I don't really know where it was. |
| 10 | Q. | All right.  Let me go back to your drawing, if |
| 11 | | I could.  You said Anita Rich Pilkerton, your |
| 12 | | cousin, was the cash register worker? |
| 13 | A. | Yes, sir. |
| 14 | Q. | She was an employee of Bill's Dollar Store; is |
| 15 | | that right? |
| 16 | A. | Yes, sir. |
| 17 | Q. | Write Anita right by what you've identified as |
| 18 | | Anita, if you will. |
| 19 | A. | A-U -- |
| 20 | Q. | A-N-I-T-A is what I thought you -- |
| 21 | A. | A-N-I-T-A.  You're right.  I'm not a good |
| 22 | | speller. |
| 23 | Q. | That's all right.  Now, right here on this |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | | line that you said was the buggy, can you put |
| 2 | | right below it B-U-G-G-Y? |
| 3 | A. | Okay. |
| 4 | Q. | All right.  And put Deloise right here by |
| 5 | | you. |
| 6 | A. | (Complies.) |
| 7 | Q. | And if you will, on this line, put counter. |
| 8 | A. | C-O -- |
| 9 | Q. | C-O-U-N-T-E-R. |
| 10 | A. | Okay. |
| 11 | Q. | And this over here was the cash register? |
| 12 | A. | No.  The cash register (indicating.) |
| 13 | Q. | Okay. |
| 14 | A. | You know, it got the little block -- little |
| 15 | | board that go across, and then the cash |
| 16 | | register sit out, say, about like that. |
| 17 | Q. | All right.  Now, can you write in that little |
| 18 | | square there, cash register, C-A-S-H -- |
| 19 | A. | Okay. |
| 20 | Q. | Put an R underneath it and put a period by the |
| 21 | | R.  That'll do. |
| 22 | A. | (Complies.) |
| 23 | Q. | All right. |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | | MR.   CARPENTER:   Let's mark that as |
| 2 | | Defendants' Exhibit 1 and |
| 3 | | attach it as an exhibit to the |
| 4 | | deposition so that'll make it a |
| 5 | | little clearer. |
| 6 | | (The referred-to document was |
| 7 | | marked for identification as |
| 8 | | Defendants' Exhibit No. 1.) |
| 9 | Q. | All right.  Now, do you know specifically what |
| 10 | | it was that hit your foot? |
| 11 | A. | I know one of the items specific that hit my |
| 12 | | foot. |
| 13 | Q. | What was that? |
| 14 | A. | That Indian spray. |
| 15 | Q. | Do you still have that can? |
| 16 | A. | No, sir. |
| 17 | Q. | You used it up? |
| 18 | A. | (Nods head.)  And more than that too. |
| 19 | Q. | You've used some since then? |
| 20 | A. | I continue to use it. |
| 21 | Q. | How many ounces in that can?  Do you know? |
| 22 | A. | I think it's something like 24. |
| 23 | Q. | Okay.  Is it a metal can? |

Deloise G. Price - 12/18/2001

```
 1   A.   Yes, sir.

 2   Q.   It's an aerosol spray can?

 3   A.   Yes, sir.

 4   Q.   If we needed a can like the one that fell on

 5        your foot, you could find another one, since

 6        you use it all the time; is that correct?

 7   A.   Yes, sir.

 8   Q.   Okay.

 9   A.   The Pine Sol too.  All that stuff is still

10        there.

11   Q.   But the Pine Sol didn't fall down on your

12        feet.  It was somewhere else; right?

13   A.   I didn't see that.  I can't say it didn't, but

14        I did not see that, because, you know, once --

15        you know, stuff's going to splatter.

16   Q.   Yeah.

17   A.   But I'm telling you what I seen.

18   Q.   Yeah.  You know that the ravioli, the hammer,

19        and the Indian scent was there?

20   A.   Yes, sir, and the candle.

21   Q.   And the candle?

22   A.   Yes, sir.

23   Q.   So one or more of those items caused your
```

Deloise G. Price - 12/18/2001

| 1 | | injury; is that correct? |
|---|---|---|
| 2 | A. | Yes, sir. |
| 3 | Q. | Now, did it fall on one of your feet? |
| 4 | A. | Yes, sir. |
| 5 | Q. | Which foot? |
| 6 | A. | My left one. |
| 7 | Q. | And what kind of shoes were you wearing? |
| 8 | A. | I was dressed up that day.  I had on some |
| 9 | | little soft green shoes.  It was sort of made |
| 10 | | like a house shoe, but it was a soft-bottom |
| 11 | | shoe that you would wear; you know, a casual |
| 12 | | Christmas shoe with a Christmas tree on it. |
| 13 | Q. | But it was a soft material? |
| 14 | A. | Real soft. |
| 15 | Q. | Cloth material? |
| 16 | A. | Yes, sir.  You could ball it up.  You know how |
| 17 | | you can ball it up with your hand. |
| 18 | Q. | Right.  What part of your foot was struck by |
| 19 | | one or more of these objects? |
| 20 | A. | Right across the -- right across the low -- |
| 21 | | where it's swollen.  It's swollen in there. |
| 22 | | Right across the -- |
| 23 | Q. | All right.  You're indicating the top of your |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | | foot about two or three inches behind your |
| 2 | | toes; is that correct? |
| 3 | A. | Yes, sir. |
| 4 | Q. | Okay.  On your left foot? |
| 5 | A. | Yes, sir. |
| 6 | Q. | All right.  Now, immediately after the |
| 7 | | accident, did you have any bleeding, cuts, or |
| 8 | | broken skin on your foot? |
| 9 | A. | I had broken skin, yes, sir. |
| 10 | Q. | Was it bleeding? |
| 11 | A. | You could see a little blood on it, just a |
| 12 | | little. |
| 13 | Q. | What happened when this object or objects |
| 14 | | struck you on the foot?  What happened next? |
| 15 | A. | I couldn't move.  I was hollering. |
| 16 | Q. | You were hollering? |
| 17 | A. | I was hollering, yes, sir.  And it was so |
| 18 | | severe, I peed on myself. |
| 19 | Q. | I'm sorry?  Did you say what I thought you |
| 20 | | said? |
| 21 | A. | Yes, sir. |
| 22 | Q. | Okay.  It was so severe that you peed on |
| 23 | | yourself? |

Deloise G. Price - 12/18/2001

```
 1   A.    I peed on myself.

 2   Q.    And you were hollering?

 3   A.    Yes, sir.

 4   Q.    All right.

 5   A.    Loud.

 6   Q.    Okay.  What were you hollering?  Do you

 7         remember?

 8   A.    Ow, ow.

 9   Q.    Just screaming out?

10   A.    Yes, sir.

11   Q.    All right.  What happened next?

12   A.    And I kind of --

13   Q.    Let me ask you this.  Was anyone else other

14         than yourself aware that you peed on yourself?

15   A.    Yes, sir.

16   Q.    Who was aware of that?

17   A.    Willie Molton, the guy that was behind me.

18              THE REPORTER:  Willie who?

19              THE DEPONENT:  Willie Molton.

20   Q.    So he was a witness that was not with your

21         family?

22   A.    That's not my family.

23   Q.    Willie Molton, is he from Camden?
```

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | A. | He's from Camden, yes, sir. |
| 2 | Q. | Is he still around here, as far as you know? |
| 3 | A. | Yes, sir. |
| 4 | Q. | Were there any other witnesses other than |
| 5 | | Anita and your family and Willie Molton? |
| 6 | A. | And the guy that picked me up and carried me |
| 7 | | to the car, one of the workers there, because |
| 8 | | his arm got, you know, wet from the urine. |
| 9 | Q. | All right.  His name is what? |
| 10 | A. | Oh, he's -- his last name is Nettles.  I can't |
| 11 | | call his name.  He was working at the store. |
| 12 | Q. | What's his last name? |
| 13 | A. | Nettles. |
| 14 | | MR. VANCE:  Nettles. |
| 15 | Q. | Nettles? |
| 16 | A. | Yes, sir. |
| 17 | Q. | Okay.  Does he still work at the store? |
| 18 | A. | No, sir.  I don't think so. |
| 19 | Q. | So Mr. Nettles would have been aware that you |
| 20 | | peed on yourself, and so would Mr. -- what was |
| 21 | | his name behind you? |
| 22 | A. | Molton. |
| 23 | Q. | Mr. Molton? |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | A. | Mr. Molton.  And I'm sure it probably was |
| 2 | | somebody else, but, you know, I didn't -- |
| 3 | Q. | Okay. |
| 4 | A. | The store was full of people, so I can't -- |
| 5 | | but I know that, because when I come to myself |
| 6 | | from -- like, it hit me, and you know how you |
| 7 | | fall, you know, on the -- like, the other cash |
| 8 | | register, you know, it's right in between |
| 9 | | that.  They was holding me. |
| 10 | Q. | Okay.  Did you ever fall to the floor? |
| 11 | A. | No, sir. |
| 12 | Q. | Just leaned on the other counter? |
| 13 | A. | I fell to the other cash counter, whatever you |
| 14 | | want to call it. |
| 15 | Q. | All right.  And so Mr. Nettles, an employee of |
| 16 | | Bill's Dollar Store, carried you to the car? |
| 17 | A. | Him and my son-in-law. |
| 18 | Q. | How did they do that? |
| 19 | A. | They picked me up. |
| 20 | Q. | And where did you go from there? |
| 21 | A. | To the emergency room. |
| 22 | Q. | Liberty emergency room? |
| 23 | A. | Camden emergency room. |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | Q. | So you went to Camden emergency room |
| 2 | | immediately after this incident happened? |
| 3 | A. | Yes, sir.  They sit me in the chair to try to, |
| 4 | | you know, calm me down, and it was swelling so |
| 5 | | fast. |
| 6 | Q. | Did you see a doctor there? |
| 7 | A. | Yes, sir, I did. |
| 8 | | (Off-the-record discussion.) |
| 9 | Q. | All right.  I'm looking at the emergency room |
| 10 | | record, and it says you were carrying |
| 11 | | groceries out of the dollar store when a |
| 12 | | bottle of bleach fell on the top of your |
| 13 | | foot. |
| 14 | A. | No, sir.  I wasn't carrying anything.  I |
| 15 | | didn't even purchase bleach.  I wasn't |
| 16 | | carrying anything. |
| 17 | Q. | And you weren't carrying it?  She was putting |
| 18 | | it in your basket? |
| 19 | A. | In my basket. |
| 20 | Q. | And she had it in a double thickness bag, |
| 21 | | plastic bag? |
| 22 | A. | Yes, sir.  I wasn't carrying anything.  I |
| 23 | | didn't even purchase bleach that day, no, |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | | sir.  I don't know where they get the bleach |
| 2 | | from, but I ain't -- and I wasn't carrying |
| 3 | | nothing but my purse, and somebody got -- |
| 4 | | somebody picked it up.  I don't know who |
| 5 | | picked it up or what. |
| 6 | Q. | And they x-rayed your foot there? |
| 7 | A. | Yes, sir. |
| 8 | Q. | And there were no fractures, according to the |
| 9 | | x-rays? |
| 10 | A. | Right.  They said no fractures that they knew |
| 11 | | of.  It had swollen so bad -- you know, so |
| 12 | | bad, they had to put the ice pack and stuff in |
| 13 | | it.  It had sent my blood pressure up. |
| 14 | Q. | All right.  The emergency room records says |
| 15 | | mild edema.  Edema, I think, means swelling. |
| 16 | | So there was some mild swelling over the first |
| 17 | | and second metatarsals of the left foot and |
| 18 | | tenderness, and the x-ray said no obvious |
| 19 | | fracture.  When did you next go to a doctor |
| 20 | | after going to the emergency room on that day? |
| 21 | | First of all, let me ask you this.  Did the |
| 22 | | people at Bill's Dollar Store tell you to go |
| 23 | | to the doctor? |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | A. | They didn't tell me to go to the doctor, |
| 2 | | because I was hollering, and one of the other |
| 3 | | workers that was there was calling the |
| 4 | | supervisor telling her that I was hurt -- that |
| 5 | | I had got hurt.  She was over there on the |
| 6 | | telephone, and it took her about five minutes |
| 7 | | before she got off the telephone. |
| 8 | Q. | Okay. |
| 9 | A. | And then she brought me a chair to sit down. |
| 10 | Q. | Okay.  Did you sit in the chair? |
| 11 | A. | They sit me down in the chair. |
| 12 | Q. | How long did you stay in the chair? |
| 13 | A. | Possibly about maybe five to six minutes. |
| 14 | Q. | All right.  Can you remember any conversations |
| 15 | | that you had while you were still in the store |
| 16 | | with any of the workers of Bill's Dollar |
| 17 | | Store? |
| 18 | A. | I didn't have no conversation.  I had a |
| 19 | | conversation crying and hollering. |
| 20 | Q. | So you didn't carry on any conversations with |
| 21 | | them? |
| 22 | A. | No, sir. |
| 23 | Q. | Do you remember anything any of them said to |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | | you? |
| 2 | A. | No, sir. |
| 3 | Q. | They didn't have to ask you if you were hurt. |
| 4 | | They could see that, couldn't they? |
| 5 | A. | They could see that I was hurt. They didn't |
| 6 | | ask me was I hurt. It wasn't really -- the |
| 7 | | manager wasn't really concerned was I hurt. |
| 8 | | I'll be honest. |
| 9 | Q. | How do you know that the manager wasn't |
| 10 | | concerned? |
| 11 | A. | Because she was over there on the telephone |
| 12 | | when they was hollering, telling her that I |
| 13 | | was hurt. |
| 14 | Q. | Okay. Because she took five minutes to get |
| 15 | | off the phone; that's what you're saying? |
| 16 | A. | Yes, sir. |
| 17 | Q. | All right. Do you remember anything else that |
| 18 | | anybody from Bill's Dollar Store said to you |
| 19 | | after the accident while you were on their |
| 20 | | premises? |
| 21 | A. | No, sir. |
| 22 | Q. | Okay. Now -- |
| 23 | A. | Oh, yes, I -- excuse me. I apologize for |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | | that. |
| 2 | Q. | Okay. |
| 3 | A. | When Cindy -- I think her name was Cindy. |
| 4 | | When she did -- |
| 5 | Q. | Was Cindy an employee of the store? |
| 6 | A. | The manager, whoever the manager was. |
| 7 | Q. | Okay. |
| 8 | A. | She told me to go ahead on to the doctor and |
| 9 | | tell them to call Bill's Dollar Store and that |
| 10 | | they was responsible for the bill.  That's |
| 11 | | it. |
| 12 | Q. | Okay.  Anything else you remember? |
| 13 | A. | That's it.  That's all I remember. |
| 14 | Q. | All right.  After this accident happened and |
| 15 | | up until now, have you had any conversations |
| 16 | | or discussions with any employee of Bill's |
| 17 | | Dollar Store about this incident? |
| 18 | A. | Not employee, no, sir. |
| 19 | Q. | Have you talked to Anita Pilkerton about it? |
| 20 | A. | No, sir, because we are not that close. |
| 21 | Q. | Okay.  So after the accident, when you left |
| 22 | | there up until now, that's all the talking |
| 23 | | you've had with anybody from Bill's Dollar |

```
 1        Store about this incident; is that true?
 2   A.   Employees at the Bill's Dollar Store, no,
 3        sir.
 4   Q.   Okay.
 5   A.   I haven't talked to them, because they --
 6        every time I went back in the store, they
 7        acted like I was a piece of trash or
 8        something, like they was afraid that -- they
 9        was afraid to come around me or anything.
10   Q.   Let me ask you this.  You have been back in
11        the store after the accident?
12   A.   I still go in the store.
13   Q.   You shop there still?
14   A.   Yes, sir.  I'm not angry with the store or
15        nothing.
16   Q.   But you say when you go in there, the
17        employees act like they're afraid of you?
18   A.   They used to, yes, sir.
19   Q.   They don't anymore?
20   A.   They don't now.
21   Q.   All right.  Are you aware that your suit was
22        filed less than a month after this accident
23        happened?  Did you know that?
```

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | A. | I'm pretty sure that it was. |
| 2 | Q. | When did you first go to see an attorney?  Do |
| 3 | | you remember? |
| 4 | A. | Oh, it was maybe three -- maybe three to four |
| 5 | | weeks or something like that.  Why did I go to |
| 6 | | see a doctor? |
| 7 | Q. | No.  Just when. |
| 8 | A. | Well, let me explain this. |
| 9 | Q. | Okay.  You can tell me why. |
| 10 | A. | I was trying to get them -- I needed medical |
| 11 | | treatment, and I was trying to get them to |
| 12 | | give me something to go -- you know, a paper |
| 13 | | or something to go back and forth to the |
| 14 | | doctor, and they wouldn't do it. |
| 15 | Q. | Who did you talk to?  I thought you didn't |
| 16 | | have any other conversations with them. |
| 17 | A. | I called the main office, the main office.  I |
| 18 | | got in touch with the main office to ask them |
| 19 | | were they aware that I had had an accident. |
| 20 | Q. | Were they aware? |
| 21 | A. | They was not aware.  The girl hadn't never |
| 22 | | even filed it or told them anything about it. |
| 23 | Q. | So what did the main office tell you? |

Deloise G. Price - 12/18/2001

```
 1  A.   The main office told me that they was fixing

 2       to call Cindy and see because they was not

 3       aware of it.

 4  Q.   Where was this main office?  Do you remember

 5       what town?

 6  A.   It's in Mississippi.

 7  Q.   Okay.  Do you remember who you talked to

 8       there?

 9  A.   No, sir, I don't remember who I talked to.

10  Q.   This was before you went to the lawyer?

11  A.   Yes, sir.  Yes, sir.  Yes, sir.  And I did not

12       consider that as being any of the peoples at

13       the Bill's Dollar Store, because they was in

14       Mississippi.

15  Q.   Did they ever find out over in Mississippi

16       about this incident happening here in Camden?

17  A.   They said that Cindy said that she had it

18       laying on her desk, that she was going to send

19       it to them.

20  Q.   Okay.  Well, did they give you any authority

21       to go see a doctor?

22  A.   Yes, sir.  They told me I could to go to see a

23       doctor, yes, sir.
```

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | Q. | And did you go see a doctor? |
| 2 | A. | Yes, I did. |
| 3 | Q. | All right.  And then sometime shortly after |
| 4 | | that, you went to see your lawyer, and you |
| 5 | | filed a lawsuit; is that correct? |
| 6 | A. | (Nods head.)  Because they never did, you |
| 7 | | know, respond to paying the bill, and I needed |
| 8 | | the medication.  They said that they were |
| 9 | | going to, you know, take care of it.  But I |
| 10 | | called and told them, you know, about my |
| 11 | | medicine and everything, and they told me that |
| 12 | | they was not going to take care of it, so I |
| 13 | | had no other choice. |
| 14 | Q. | Okay.  So they let you go to the doctor, but |
| 15 | | they were not going to pay for the medicine |
| 16 | | that the doctor prescribed? |
| 17 | A. | They didn't even pay for the medical bill. |
| 18 | Q. | They didn't pay the doctor bill? |
| 19 | A. | No, sir, they didn't. |
| 20 | Q. | So that's why you went to see a lawyer? |
| 21 | A. | Yes, sir. |
| 22 | Q. | Okay. |
| 23 | A. | Because I felt like I was being mistreated. |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | Q. | Because they wouldn't pay your medical bills? |
| 2 | A. | Yes, sir. |
| 3 | Q. | Now, how often do you shop in the store? |
| 4 | A. | When I'm here, you know, a lot, you know? |
| 5 | Q. | More than once a month? |
| 6 | A. | Yes, sir. |
| 7 | Q. | Okay.  Do the employees still act like they're |
| 8 | | afraid of you? |
| 9 | A. | No, sir. |
| 10 | Q. | When did that change? |
| 11 | A. | I would say maybe about a year, year and a |
| 12 | | half. |
| 13 | Q. | Do you know why it changed? |
| 14 | A. | No, sir. |
| 15 | Q. | Just the attitude got better? |
| 16 | A. | Got much better. |
| 17 | Q. | Okay. |
| 18 | A. | See, they had got some different workers in |
| 19 | | there too. |
| 20 | Q. | Okay.  Does Anita still work in there? |
| 21 | A. | No, sir.  She's not working there. |
| 22 | Q. | Did Anita have a bad attitude towards you or |
| 23 | | act like she was afraid of you too when you |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | | went in there after the accident? |
| 2 | A. | She wouldn't say nothing.  She wouldn't say |
| 3 | | nothing. |
| 4 | Q. | Other than not saying anything to you, how did |
| 5 | | they treat you? |
| 6 | A. | It just wasn't good -- wasn't a good feeling, |
| 7 | | you know? |
| 8 | Q. | You felt awkward? |
| 9 | A. | Yes, I did. |
| 10 | Q. | Do you know of any other witnesses other than |
| 11 | | the ones we've talked about today? |
| 12 | A. | That know about this? |
| 13 | Q. | That saw it. |
| 14 | A. | Jesus, I had Liz.  She the one that called the |
| 15 | | supervisor. |
| 16 | Q. | Liz? |
| 17 | A. | I don't know her last name, now.  All I know -- |
| 18 | | I know her face. |
| 19 | Q. | Was she an employee of the store also? |
| 20 | A. | Yes, sir, she was. |
| 21 | Q. | Did he see the accident? |
| 22 | A. | I think she did.  She was right there.  She |
| 23 | | knew I was hurt, because she called -- I heard |

Deloise G. Price - 12/18/2001

| 1 | | her voice, and I looked up, and I saw her. |
|---|---|---|
| 2 | Q. | All right. Now, do you have any kind of a |
| 3 | | bladder problem? Have you ever had this |
| 4 | | problem before? |
| 5 | A. | Sir? |
| 6 | Q. | Do you have any kind of bladder problem or any |
| 7 | | problem controlling urination? |
| 8 | A. | No, sir. No, sir. |
| 9 | Q. | That's the only time that's ever happened to |
| 10 | | you? |
| 11 | A. | The only time. The only time, you know, out |
| 12 | | in the public like that, yeah. |
| 13 | Q. | How about in private? |
| 14 | A. | No, sir. |
| 15 | Q. | All right. Now, you went to the emergency |
| 16 | | room on the day of the accident. When did you |
| 17 | | next go see a doctor? |
| 18 | A. | I think it was about maybe three weeks to a |
| 19 | | month or something. |
| 20 | Q. | That was after you had called the main office |
| 21 | | in Mississippi and asked them to let you see a |
| 22 | | doctor? |
| 23 | A. | Yes, sir. You need something on paper, and I |

Deloise G. Price - 12/18/2001

| 1 | | asked them to do that, send it to me on paper |
|---|---|---|
| 2 | | so that I could take it to the. . . |
| 3 | Q. | And they didn't send you anything? |
| 4 | A. | They didn't send me anything. |
| 5 | Q. | So you didn't go to your own personal |
| 6 | | physician or anything in between either, did |
| 7 | | you? |
| 8 | A. | No, sir. |
| 9 | Q. | And when you did finally go to a doctor, who |
| 10 | | did you go see? |
| 11 | A. | Dr. Rosey Cook. |
| 12 | Q. | And Dr. Cook was your physician for your other |
| 13 | | condition? |
| 14 | A. | Yes, sir. |
| 15 | Q. | And so you knew her? |
| 16 | A. | Yes, sir. |
| 17 | Q. | And this was about three or four weeks after |
| 18 | | the accident that you first went to see her? |
| 19 | A. | Yes, sir.  I was getting worse.  My feet was |
| 20 | | getting worse by that time. |
| 21 | Q. | What was happening to your foot? |
| 22 | A. | Pain and real blue up on top, numbness down -- |
| 23 | | running down the toes. |

Deloise G. Price - 12/18/2001

1   Q.   Do you have any photographs of your foot when

2        it was swelled like that?

3   A.   No, sir.

4   Q.   Was any part of your body injured other than

5        your left foot?

6   A.   During that particular time, you know, all I

7        know is my feet, and the feet was causing

8        pains to radiate up and down my hip.

9   Q.   All right.  Now, is it both feet or just your

10       left foot?

11  A.   Just my left one.

12  Q.   Okay.  So the only injury you sustained was to

13       your left foot?

14  A.   Yes, sir.

15  Q.   And you went to the emergency room, and then

16       you saw Dr. Rosey Jones (sic) about three or

17       four weeks later?

18  A.   Rosey Cook.

19  Q.   Rosey Cook.  I'm sorry.  And then what else

20       after that?  Who else did you see?

21  A.   She sent me to Dr. Izetta (phonetic) Brown.

22  Q.   Izetta Brown?

23  A.   Yes, sir.  I think that's her name, Izetta

Deloise G. Price - 12/18/2001

```
 1      Brown.

 2  Q.  Where's Dr. Brown?

 3  A.  Montgomery.

 4  Q.  Is she the podiatrist?

 5  A.  Yes, sir.

 6  Q.  All right.  Any other doctors that you've seen

 7      for this foot?

 8  A.  Yes, sir.

 9  Q.  Who else?

10  A.  Dr. Brown treated it for a while, injecting

11      it, cast it, put it in a boot, and it still

12      wasn't getting any better.  She sent me to

13      physical therapy over in Thomasville,

14      whirlpool and all.

15  Q.  So with Dr. Brown, you had injections, a cast

16      boot, and she sent you for some physical

17      therapy?

18  A.  Yes, sir.

19  Q.  And that was at Thomasville?

20  A.  That was in Thomasville.

21  Q.  All right.

22  A.  And they were giving me the whirlpool

23      treatments and a TENS unit.
```

Deloise G. Price - 12/18/2001

```
 1   Q.   TENS unit?

 2   A.   Yes, sir.  And after I completed the therapy,

 3        they sent me back to Dr. Izetta Brown.

 4   Q.   Okay.

 5   A.   And I still wasn't any better.  And Dr. Brown,

 6        she gave me some medication too.

 7   Q.   Do you remember what kind of medication?

 8   A.   It was Celebrex.

 9   Q.   Okay.

10   A.   And some -- I don't know what the pain

11        medication was she gave me.  She sent me back

12        to physical therapy again.  I completed that.

13        I still wasn't getting any better.  Then she

14        called me back to her, and she told me she'd

15        done all she could do.  Then she sent me back

16        to Dr. Cook, my medical doctor, and Dr. Cook,

17        she gave me some more -- some pain medicine,

18        and she got in touch -- made me an

19        appointment, after going to her several times,

20        you know, with Dr. Freij (phonetic).

21   Q.   Where's Dr. Freij?

22   A.   In Selma.  I think I'm pronouncing his name

23        right.
```

Deloise G. Price - 12/18/2001

```
 1                    (Off-the-record discussion.)

 2    Q.    Do you know how to spell Dr. Freij?

 3    A.    I sure don't.

 4    Q.    How many times did you see Dr. Freij?

 5    A.    I saw him, I think, three times.

 6    Q.    All right.  We'll get that later.  Then what

 7          happened?

 8    A.    And at that particular time, after the three

 9          times, he told me he wanted me to see

10          Dr. Littell.

11    Q.    Can you spell Dr. Littell?

12    A.    No, sir.

13    Q.    Where's Dr. Littell?

14    A.    At Vaughan Medical Center.

15    Q.    In Selma?

16    A.    Selma.

17                    MR. VANCE:  L-I-T-T-E-L-L.

18                    MR. CARPENTER:  Okay.

19    A.    They made the appointment each time.  Each

20          doctor made their own appointment.

21    Q.    All right.  How many times did you see

22          Dr. Littell?

23    A.    I saw Dr. Littell twice.
```

Deloise G. Price - 12/18/2001

1  Q.  All right.  And then where did you go?

2  A.  And he sent me to Dr. Singh, pain management.

3  Q.  In Selma?

4  A.  In Selma.

5  Q.  Is that who you're seeing now?

6  A.  Yes, sir.

7  Q.  All right.  Do any of these doctors treat you

8      for any condition other than for your foot?

9  A.  No, sir.

10 Q.  What diagnosis have they given you, if any, to

11     your knowledge?

12 A.  Well, I know that they had said something

13     about some nerve damage.

14 Q.  Who told you that?

15 A.  I think it was Dr. Singh, because I asked him.

16 Q.  Any other diagnoses they've given you other

17     than nerve damage?

18 A.  I ain't asked no more.

19 Q.  I'm sorry?

20 A.  I ain't asked no more.  He told me that about

21     a month ago, because I told him -- I said, I'm

22     getting so tired.  I have to take these

23     epidural blocks.  I have gained something like

```
 1        maybe 25 or 27 pounds from those steroids.  I
 2        was asking him -- I said, well, can anything
 3        else really be done, and, you know, what is my
 4        outcome looking like.  He told me -- he said,
 5        this is a permanent injury you have.
 6   Q.   Singh did?
 7   A.   Dr. Singh.
 8   Q.   Said it's not going to get any better?
 9   A.   (Nods head.)  And I was telling him about the
10        rest of the part, sleeping and stuff.  You
11        know, I have --
12   Q.   I'm sorry.  I didn't hear you.
13   A.   Just like, you know, my shoes and things.  I
14        can't wear heels and things like other
15        peoples.  I have to wear flat, soft shoes all
16        the time, and I'm constantly in pain all the
17        time.  And it's caused so much conflict
18        between me and my husband, sex and whatnot.  I
19        can't even have sex and stuff like that.
20   Q.   Why can't you have sex?
21   A.   It's so painful, my hip and leg.  And I --
22   Q.   Your hip and leg are painful too?
23   A.   All the way from my toe.  The pain run from
```

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | | right here -- from the top of my feet down |
| 2 | | through my toe and up my hip constantly.  And |
| 3 | | it caused us to have to separate. |
| 4 | Q. | So you couldn't have sex with your husband, |
| 5 | | and he left you for that? |
| 6 | A. | And the anger and all, you know?  It hurt. |
| 7 | | I'm hurting all the time, and that's why I'm |
| 8 | | with my children right now.  And it's not |
| 9 | | nothing nice.  I constantly hurt all the time, |
| 10 | | constantly.  And then, you know, I'm used to |
| 11 | | wearing my heels and things to church and |
| 12 | | stuff, you know?  Like, it's coming up to the |
| 13 | | holidays.  I can't do that.  I can't.  And |
| 14 | | it's emotional, and I can't help it. |
| 15 | Q. | I understand.  Let me just go back to this |
| 16 | | thing with your husband.  I want to make sure |
| 17 | | I understand this.  Are you saying that |
| 18 | | because of the painful condition in your leg, |
| 19 | | you couldn't have sex, and because you |
| 20 | | couldn't have sex, he left you?  Is that |
| 21 | | basically what happened? |
| 22 | A. | If he couldn't get it from me, he's got to get |
| 23 | | it from somebody. |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | Q. | Is that what he said? |
| 2 | A. | That's what he told me. |
| 3 | Q. | Any other problems between you and your |
| 4 | | husband? |
| 5 | A. | No.  We didn't have no problems and stuff till |
| 6 | | all -- |
| 7 | Q. | No problems until this leg? |
| 8 | A. | Till this.  You know, I guess because I -- I |
| 9 | | can't help it, you know?  When you hurt, you |
| 10 | | just hurt. |
| 11 | Q. | All right. |
| 12 | A. | It's very hard, very, very, very stressful. |
| 13 | | And Dr. Littell want me to see Dr. Doss. |
| 14 | Q. | Who's Dr. Doss? |
| 15 | A. | She's a psychologist, whatever you call it. |
| 16 | | The pain and the pressure and stuff on me has |
| 17 | | just got so -- to me, I don't even feel like |
| 18 | | it's worth living for.  I really don't.  If I |
| 19 | | got to go through life like this, I promise |
| 20 | | you I don't feel like it's worth living for. |
| 21 | | I can't associate with peoples. |
| 22 | Q. | Why can't you associate with people? |
| 23 | A. | The pain, pain, the pain, the pain and the |

```
 1        anger that it makes me.  It's very -- it's

 2        just hard.  And I just feel myself -- just

 3        like I told him, I just don't feel like -- if

 4        I got to go on like this, it ain't worth

 5        living for, because I thought maybe surgery or

 6        something could replace it and get me, you

 7        know, back to normal.  That's what I, you

 8        know, thought, that maybe something like that

 9        could do, but he tell me that he can't do

10        nothing, no surgery ain't going to help me.

11        And it just -- I just don't even -- the

12        outcome, I just don't know.  I can't play with

13        my grandchildren, run and play with them like

14        I used to.  It's a lot.  It's just a whole lot

15        out of me, a whole lot.  Like, I'm walking

16        with this stick and stuff.  What man wants

17        somebody with a stick?  It just ain't -- it

18        just ain't -- it just ain't -- just ain't

19        life.

20   Q.   Who prescribed the walking stick?

21   A.   Dr. Cook, because I -- my leg kept giving out

22        on me.  I kept falling, and that's why they

23        was trying to give me the blocks and things,
```

Deloise G. Price - 12/18/2001

```
 1        to make it strong.
 2   Q.   When did your husband leave you?
 3   A.   Really I would say maybe into the prime of the
 4        two years of the accident.  And he kept coming
 5        back -- kept, you know, coming back and
 6        leaving, coming back and leaving.  We were
 7        fussing and fighting and going on and stuff
 8        because he wanted sex and stuff, and we'd
 9        start, and I couldn't perform like I used to.
10   Q.   Did you say he started leaving you two years
11        before the accident?
12   A.   No, sir.  Into the accident.
13   Q.   Two years after the accident?
14   A.   Yes, sir.
15   Q.   So about two years after the accident is when
16        he left you?
17   A.   Yes, sir.  Well, he came back; you know, in
18        and out, in and out.  And so finally he just
19        told me back here -- it was about six or seven
20        months.
21   Q.   Well, did he have any complaints of you other
22        than the pain that you were having in your leg
23        and not being able to have sex?
```

Deloise G. Price - 12/18/2001

```
 1  A.   Couldn't do my chores around the house and
 2       keep the house and stuff.  I was just like a
 3       woman -- he said, just like a woman -- like a
 4       baby that you got to go nurse and give the
 5       bottle to all the time.  He told me them
 6       words.  Then I called my children, and I
 7       talked to them, and I was just telling them.
 8       They said, well, Mom, you cannot stay down
 9       there by yourself, you have got to come to
10       Montgomery, and they came and got me.
11  Q.   Did Dr. Singh tell you what's wrong with the
12       nerve in your foot?
13  A.   No, sir.
14  Q.   Did he give a name to your condition?
15  A.   No, sir.  I don't know what.
16  Q.   He just said nerve problems?
17  A.   Yes, sir.
18  Q.   How often do you see Dr. Singh now?
19  A.   I see him pretty regular.  I got to go see him
20       the week -- the week after Christmas for
21       another injection.  I'm supposed to have been
22       gone.  The pain is so severe.  But I don't
23       have the money to, you know, go back up and
```

Deloise G. Price - 12/18/2001

```
 1        down the road and have somebody to take me.

 2        My granddaughter, she be in school.  She's the

 3        one, you know, that takes me, and when I have

 4        to go, I have to get her out of school.

 5   Q.   Well, can you drive?  Don't you drive?

 6   A.   Not that far, no, sir.

 7   Q.   To Montgomery?

 8   A.   No, sir.  I can't drive --

 9   Q.   You can't drive to Selma?

10   A.   No, sir.  No, sir.  I drive a little bit right

11        around here, you know, in Camden.

12   Q.   Okay.  How are you paying your bills at the

13        present time to the doctors?

14   A.   Sir?

15   Q.   How are you paying your medical bills?

16   A.   I pay some cash and some with my medicare

17        card.

18   Q.   That you get for being disabled?

19   A.   Yes, sir.  And my children, they will pitch in

20        and help me.

21   Q.   Have you asked the doctors whether or not

22        there's any connection between the condition

23        that you have, the cranial pressure for which
```

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | | you're on disability, and the pain that you |
| 2 | | have in your foot? |
| 3 | A. | Yes, sir.  That have no connection. |
| 4 | Q. | That's what they said? |
| 5 | A. | That's why they did all the MRI's and all that |
| 6 | | stuff, to find -- to get to the root of this |
| 7 | | problem. |
| 8 | Q. | And they told you that they didn't think there |
| 9 | | was any connection? |
| 10 | A. | Yes, sir.  Yes, sir.  Before this accident |
| 11 | | here, I had -- anybody in my neighborhood, if |
| 12 | | you talk to them, I had a whole half a acre of |
| 13 | | vegetables and potatoes and stuff where I |
| 14 | | could work and run my tiller plow or |
| 15 | | something, you know, if I had to, myself and |
| 16 | | gather my vegetables and stuff and sell.  I |
| 17 | | don't have any of that.  Because I love to do |
| 18 | | that type stuff. |
| 19 | Q. | Before November 28th of 1998, had you ever had |
| 20 | | any problems of any nature with your left |
| 21 | | foot? |
| 22 | A. | Never, never in my life. |
| 23 | Q. | Before November 28th of 1998, had you ever |

Deloise G. Price - 12/18/2001

```
 1       been to a doctor because of your left foot?

 2  A.   No, sir.

 3  Q.   Before November 28th of 1998, had you ever

 4       been to a podiatrist anywhere at any time?

 5  A.   No, sir.  I never had heard of one, if you

 6       want to know the truth, never.

 7  Q.   Do you know how much your medical bills have

 8       totaled to date for your foot injury?

 9  A.   No, sir.  I never added them up.

10  Q.   Are you taking any medication at the present

11       time for your left foot?

12  A.   Yes, sir, for pain.

13  Q.   What are you taking?

14  A.   Dorset (phonetic).

15  Q.   Dorset?

16  A.   Yes, sir.

17  Q.   How often do you take that?

18  A.   Three to four times a day or more if I have

19       to.

20  Q.   Is it Lorcet or Dorset?

21  A.   It's Dorset, the pink, big tablet.

22  Q.   D-O-R-S-E-T?

23  A.   I think that's what it is.
```

Deloise G. Price - 12/18/2001

```
 1   Q.   Not Lorcet?

 2   A.   No, sir.  It's Dorset.  Dr. Singh put me on

 3        it.  He wanted to prescribe me a high-powered

 4        -- another high-powered drug, and that drug

 5        costed $90.

 6   Q.   What was it?  Do you remember?

 7   A.   I don't know what it is, but I probably have --

 8        it start with a P.  I carried it to the

 9        pharmacy to have it filled.

10   Q.   Was it for pain?

11   A.   It's for pain.  And they told me $90.  I could

12        not afford it.

13   Q.   Have you ever been treated for alcohol or drug

14        addiction?

15   A.   Never smoked, never drunk in my life.

16   Q.   Never smoked or never drank?

17   A.   Never drunk.  Never did drugs.

18   Q.   How about drugs?

19   A.   Never in my life.  I'm a faithful church

20        member, if you want to go there.

21   Q.   Which church do you go to?

22   A.   Greater Faith Holiness Church.

23   Q.   Greater Faith?
```

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | A. | Greater Faith Holiness Church. |
| 2 | Q. | F-A-I-T-H? |
| 3 | A. | Right. I'm a mother at that church. |
| 4 | Q. | A mother? |
| 5 | A. | Yes, sir. |
| 6 | Q. | Is that in Camden? |
| 7 | A. | Pine Hill. |
| 8 | Q. | Who's the pastor there? |
| 9 | A. | Pastor Carrie McCall. |
| 10 | Q. | Carrie McCall? |
| 11 | A. | McCall. |
| 12 | Q. | Other than the cane, do you have any other |
| 13 | | type of appliances or braces or casts or |
| 14 | | special equipment that you use for your foot? |
| 15 | A. | I use this foot massage, you know, that you |
| 16 | | put your feet in. |
| 17 | Q. | Was that prescribed by a doctor? |
| 18 | A. | Physical therapy. |
| 19 | Q. | Has anything helped your condition? |
| 20 | A. | Well, the injections have gave me more relief |
| 21 | | than anything I have had. |
| 22 | Q. | How long do you get relief from those? |
| 23 | A. | Sometimes it could be two to three or four |

Deloise G. Price - 12/18/2001

| | | |
|---|---|---|
| 1 | | days. It all depends. And then it can go on |
| 2 | | for a month or two. |
| 3 | Q. | And you say you're living with your daughters |
| 4 | | now because of your condition? |
| 5 | A. | Yes, sir. |
| 6 | Q. | Can you not take care of yourself? |
| 7 | A. | No, sir. |
| 8 | Q. | What can you not do? You can't fix your own |
| 9 | | food? |
| 10 | A. | I can't stand on my leg, this one here, long |
| 11 | | enough to prepare a meal, get in the tub. It |
| 12 | | done gave out on me several times. Sweeping, |
| 13 | | vacuuming, I've tried all of that. That make |
| 14 | | the pain worse. I can't wear a hard shoe. I |
| 15 | | have to wear all soft shoes. |
| 16 | Q. | How long has it been since you have lived in |
| 17 | | your own house here in Camden? |
| 18 | A. | Well, it's been going -- it's a little better |
| 19 | | than a year now to really live, now. Don't |
| 20 | | get me wrong that we don't come down here and |
| 21 | | stay some nights or weekends. |
| 22 | Q. | But your daughter comes with you? |
| 23 | A. | My daughters come. My daughter out there now. |

Deloise G. Price - 12/18/2001

```
 1   Q.   What's your address here?

 2   A.   254 Jefferson Road.

 3   Q.   And you told me Montgomery, but I can't

 4        remember what --

 5   A.   11 Spring Valley.

 6   Q.   11 Spring Valley Road?

 7   A.   Yes, sir.  And my other daughter, she lives in

 8        carriage --

 9   Q.   Carriage Hills?

10   A.   Carriage Hills.  I can't --

11   Q.   Remember the name of the street?

12   A.   I'll tell you in a minute.  Red Barn.

13   Q.   Red Barn?

14   A.   Yes, sir.

15   Q.   Do you know the number?

16   A.   No, sir, I don't know the number.

17   Q.   Red Barn Street, Red Barn Road?

18   A.   Yes, sir.

19   Q.   When was the last time you went to the doctor

20        for your foot?

21   A.   It's been about -- approximately about three

22        to four weeks.

23   Q.   Dr. Singh?
```

Deloise G. Price - 12/18/2001

1  A.   Dr. Singh.  That's who I'm seeing now.  And I

2       have an appointment with Dr. Doss on the -- I

3       think it's the 12th of November -- January, I

4       think.

5  Q.   And she is a psychiatrist?

6  A.   Right.  But he says I need to take those shots

7       to where the pain come back.  It hurting so --

8       more often, but I explained to him -- I told

9       him I had to get there, you know, the best way

10      I can.  I can't drive that far.  I have to

11      wait for somebody to take me.  And I just stay

12      till I just can't take it no longer.  Tylenol,

13      all that, I takes all that stuff I can get.

14 Q.   Did any of these doctors that you have

15      mentioned other than Dr. Cook and Dr. Brown --

16      Dr. Brown's a podiatrist; right?

17 A.   Yes, sir.

18 Q.   Has Dr. Freij or Dr. Littell or Dr. Singh

19      given you any treatment for your other

20      conditions other than your foot?

21 A.   No, sir.

22 Q.   Do you have any health conditions other than

23      the one that you've described as the reason

Deloise G. Price - 12/18/2001

| 1 |  | you have the disability and your foot? |
|---|---|---|
| 2 | A. | I have diabetes. |
| 3 | Q. | All right.  Who is your diabetes doctor? |
| 4 | A. | Dr. Cook. |
| 5 | Q. | How long have you been diagnosed with |
| 6 |  | diabetes? |
| 7 | A. | Approximately -- it's been about five -- maybe |
| 8 |  | five or six years. |
| 9 | Q. | Do you take insulin? |
| 10 | A. | Yes.  I'm on insulin. |
| 11 | Q. | Do you give yourself injections? |
| 12 | A. | Yes, sir. |
| 13 | Q. | Have you ever had any problems with your right |
| 14 |  | foot or leg? |
| 15 | A. | Never.  Hands, never. |
| 16 | Q. | Have you ever heard of the term peripheral |
| 17 |  | neuropathy? |
| 18 | A. | Never in my life.  I don't know what that is. |
| 19 | Q. | Have you had any problems with any other limbs |
| 20 |  | other than the left foot? |
| 21 | A. | No, sir.  If you heal this left foot, I'll be |
| 22 |  | all right. |
| 23 | Q. | I'm sorry? |

Deloise G. Price - 12/18/2001

| 1 | A. | I said if you heal this, I'll be all right. |
| 2 | Q. | All right. |
| 3 | A. | If you'll notice down here, you can see how |
| 4 | | it's swollen -- how it's swollen across here. |
| 5 | Q. | Have you given any written or recorded |
| 6 | | statements to anyone about this accident other |
| 7 | | than your attorney? |
| 8 | A. | Peoples at Bill's over there in Thomasville -- |
| 9 | | I mean, Mississippi. |
| 10 | Q. | When you talked to them on the phone about |
| 11 | | going to the doctor, they took a statement |
| 12 | | from you? |
| 13 | A. | Yes.  They called me back and took a |
| 14 | | statement, yeah. |
| 15 | Q. | Did they record it? |
| 16 | A. | I guess they -- |
| 17 | Q. | Did they tell you they were going to record |
| 18 | | it? |
| 19 | A. | I really -- sir, I really don't think so. |
| 20 | | They asked me what happened and -- |
| 21 | Q. | They asked you what happened, and you told |
| 22 | | them? |
| 23 | A. | Yes, sir.  I told them just like I'm telling |

Deloise G. Price - 12/18/2001

| 1 | | you. |
|---|---|---|
| 2 | Q. | And you still have constant pain today; is |
| 3 | | that correct? |
| 4 | A. | Very constant. |
| 5 | Q. | From your toe to your hip? |
| 6 | A. | Yes, sir. |
| 7 | Q. | Have you been hospitalized at any time in the |
| 8 | | last 10 years? |
| 9 | A. | No, sir. |
| 10 | Q. | Do you consider Dr. Cook to be your regular |
| 11 | | family doctor? |
| 12 | A. | Yes, sir. |
| 13 | Q. | Do you see any other doctor on a regular |
| 14 | | basis? |
| 15 | A. | No, sir, but Dr. Singh. |
| 16 | Q. | Right.  Other than the ones we've talked |
| 17 | | about. |
| 18 | | Thank you very much.  I |
| 19 | | appreciate you answering the questions.  I |
| 20 | | believe that's all I have. |
| 21 | A. | Okay. |
| 22 | | MR. VANCE:  And I don't have any |
| 23 | | questions. |

Deloise G. Price - 12/18/2001

```
 1        (The deposition of DELOISE G. PRICE concluded

 2         at approximately 11:35 a.m. on December 18,

 3         2001.)

 4              *  *  *  *  *  *  *  *  *  *  *

 5              REPORTER'S CERTIFICATE

 6              *  *  *  *  *  *  *  *  *  *  *

 7

 8    STATE OF ALABAMA

 9    COUNTY OF MONTGOMERY

10

11              I, Cindy M. Mincey, Court

12    Reporter and Notary Public in and for the

13    State of Alabama at Large, do hereby certify

14    that on December 18, 2001, pursuant to notice

15    and stipulation on behalf of the Defendants, I

16    reported the deposition of DELOISE G. PRICE,

17    who was first duly sworn by me to speak the

18    truth, in the matter of Deloise G. Price,

19    Plaintiff, versus Bill's Dollar Store, etc.,

20    et al., Defendants, Case Number CV-2000-147,

21    now pending in the Circuit Court for Sumter

22    County, Alabama, that the foregoing 84

23    typewritten pages contains a true and accurate
```

Deloise G. Price - 12/18/2001

1        transcription of the examination of said

2        witness by counsel for the parties set out

3        herein; that the reading and signing of said

4        deposition was waived by witness and counsel

5        for the parties.

6                        I further certify that I am

7        neither of kin nor of counsel to the parties

8        to said cause, nor in any manner interested in

9        the results thereof.

10                       This 27th day of December,

11       2001.

12

13

14

15

16

17

18                          Cindy M. Mincey

                            Reporter and Notary Public

19                          State of Alabama at Large

20

21

22

23

EXHIBIT E

# Price Deposition Comparison

| 19-Jan-07 | | | 18-Dec-01 | | |
|---|---|---|---|---|---|
| Page | Line | Testimony | Page | Line | Testimony |
| 9 | 23 | Has lived at 5850 Carriage Brook Road about seven years. | 7 | 19 | Lives with her children "because of my condition." Michelle Jackson and Ella Frazier. |
| 11 | 13 | She and Willie have been married 20 odd years. | 10 | 13 | Married to Willie J. Price. Can't say where he is. They have been separated nine months. |
| 15 | 16 | Was taken off disability at one time. | 18 | 10 | Has been SS disability continuously since 1975. |
| 19 | 16 | Claims never to have fallen prior to exercise equipment event. | 71 | 21 | Dr. Cook prescribed the walking stick. My leg kept giving out on me. I kept falling. |
| 21 | 17 | [In Bill's Dollar Store] Suffered "Just Bruises.  Had problems with my ligament." | 68 | 23 | [Accident at Bill's Dollar Store caused pain]: "All the way from my toe. The pain run from the top of my feet down through my toe and up my hip constantly.  And it caused us to have to separate." |
| 24 | 4 | Have only filed two cases.  This one and the one in Wilcox County. | 25 | 1 | Have previously sued Helig-Meyers for adding insurance to my account when I bought furniture.  Case was settled. |
| 24 | 7 | "Before this happened I was playing ball and doing my household, you know, and going anywhere that I wanted, you know, to go and do, driving, playing with the grandchildren 24/7 and having sex with my husband when I wanted." | 68 | 13 | "I can't wear heels and things like other peoples.  I have to wear flat, soft shoes all the time, and I'm constantly in pain all the time.  And it's caused so much conflict between me and my husband, sex and whatnot.  I can't even have sex and stuff like that. It's so painful, my hip and leg." |
| 25 | 9 | At the time this happened I was 5'2" and 201 or 202 pounds. | 67 | 20 | "I'm getting so tired.  I have to take these epidural blocks.  I have gained something like maybe 25 or 27 pounds from these steriods.  He said this is a permanent injury you have." |
| 25 | 17 | Before the event I played volleyball and baseball in the backyard. | 79 | 3 | Living with daughters because of her condition.  Cannot take care of herself. |
| 26 | 4 | Before the event I did the cleaning, cooking, caring for my husband, washing and ironing, I would paint walls, hand wallpaper, mop, all that kind of stuff. | 69 | 6 | "I'm hurting all the time and that's why I am with my children right now. I constantly hurt all the time, constantly. I'm used to wearing my heels and things to church.  I can't do that.  It's emotional and I can't help it." |

| | | | | | |
|---|---|---|---|---|---|
| 26 | 14 | [Before accident] There were no household chores I could not do.  I changed my furniture around. | 79 | 10 | "I can't stand on my leg long enough to prepare a meal, get in the tub. It gave out on me several times.  Sweeping, vacuuming, I've tried all that. That make the pain worse." |
| 26 | 20 | Before this incident she was under no restrictions of any kind in my ability to move or do things. | 73 | 1 | "Couldn't do the chores around the house and keep the house and stuff.  I was just like a baby that you got to nurse and give the bottle all the time.  He [Husband] told me them words." |
| 27 | 3 | Before accident she travelled to Boston, Detroit, Greenwood MS, Florida. | 74 | 6 | I can't drive up to Montgomery [from Camden it is about 40 miles] |
| 27 | 12 | Was able to drive herself for 3 hours or more at a time. | 74 | 10 | I can't drive to Selma [about 30 miles]. I drive a little bit around Camden. |
| 27 | 20 | Drove an SUV and an RV. | | | |
| 28 | 18 | Has 10 grandchildren [before accident] she played with 24/7. | 71 | 10 | "No surgery ain't going to help me.  I can't play with my grandchildren, run and play with them like I used to.  Like, I'm walking with the stick and stuff.  What man wants somebody with a stick. It just ain't life." |
| 29 | 18 | "My husband had left me since I've been sick and stuff.  My husband had walk out on me.  He have came back and I know there are other women he was going with.  And during the time before then, I never had any problems with him." | 72 | 3 | [My husband left] "maybe into the prime of the two years of the accident.  And he kept coming back and leaving, coming back and leaving.  We were fussing and fighting and going on an stuff because he wanted to have sex and stuff, and we'd start and I couldn't perform like I used to. |
| 30 | 1 | "And just sometimes we want to have sex and stuff, he understand that I can't have sex because we tried it one time and it hurt me so bad he had to stop.  It's pitiful." | | | |
| 30 | 9 | Before the accident "Me and my husband used to have sex just about every night that it was and then sometimes two and three times.  We was really sexual.  We would love one another and stuff like that." | | | |
| 31 | 1 | We had no marital problems before the accident. | 70 | 5 | "We didn't have no problems and stuff till this. It's verry hard, very, very, very stressful." |
| 31 | 6 | Before the accident my husband was faithful to me. | 69 | 15 | [Husband left me because] "If he couldn't get it from me, he's got to get it from somebody." |
| 31 | 10 | Before the accident we were having sex almost every night and sometimes more than once or twice. | | | |
| 31 | 14 | After the accident my husband has left me twice. | | | |

| | | | | | |
|---|---|---|---|---|---|
| 31 | 18 | One time it was just about 2 months when he went with a local woman. | | | |
| 32 | 5 | He came back and then left again for about a week or two. He won't tell me where he went. | | | |
| 32 | 21 | He came back about a week or so ago. | | | |
| 33 | 4 | He has been back in the house about a week. | | | |
| 33 | 5 | No he's been back at home now probably about seven or eight months. | | | |
| 100 | 4 | First went to a Pri-Med on East Bvld. | | | |
| 101 | 4 | Mentioned throbbing and constant pain for two days. [on record dated 6/29/04]. Was taking Humulin, Clonidine, Lasix and depression medicine. | | | |
| 102 | 12 | Had been on depression medicine about six months before the accident due to a lot of death in the family. Nephew killed himself. | 70 | 13 | Dr. Littrell wanted me to see Dr. Doss. She's a psychologist. |
| 104 | 16 | Got prescription for Lorcet and Soma "for the muscles". | 76 | 14 | Currently taking "Dorcet" for the pain [probably Lorcet]. 3 to 4 times a day. |
| 106 | 23 | Remembers later having a knee MRI and being told the knew was sprained. | | | |
| 112 | 4 | Has not fallen since accident. | | | |
| 113 | 20 | Current medical problems: "Start in my nec, my shoulder, and my back and my knee and other places too; sex." | | | |
| 114 | 2 | Have been in a wheelchair about a year. Dr. Roseanne Cook ordered it for me. | | | |
| 118 | 11 | I don't know why I wasn't able to work before the accident. Nobody told me to go back and be evaluated or anything like that. | | | |
| 118 | 23 | Currently taking Lortab 4 or 5 times a day. And Naprosyn as needed. | | | |
| 119 | 15 | The depression got worse after the accident so I am on different depression medicine I take in the morning and at night. | | | |
| 121 | 9 | Currently has trouble going to the bathroom. Drs. Say that when I had accident that it started my bladder to having spasms. | 46 | 15 | [At Bill's Dollar Store] I couldn't move. I was hollaring. It was so severe I peed myself. |

| | | | | | |
|---|---|---|---|---|---|
| 122 | 20 | Ever since August of 2004 my husband has been paying two girls to come in and help me every day for $100 a week. They bathe me, comb my hair, get my clothes, cook, clean up, change my beds.  They take me places. | | | |
| 123 | 7 | They stay during the day while my husband works.  My daughter stayed with me when my husband left. | | | |
| 125 | 4 | Currently cannot walk to the bathroom without stopping to rest. | | | |
| 126 | 20 | [This has] "messed my life up that's for sure.  I'm messed up and messed up form my grands, my greatgrands and it has interrupt with my family life, my husband and stuff like that." | | | |
| 127 | 1 | "And I get very depressed because it hurt me.  I can't go and do the things I like to do. I look at myself in the mirror. Sometime I say I'm not even worth living and I have somebody stay around me all the time. I kill myself because I a'int used to this | 70 | 23 | [I can't associate with people because of] "The pain, pain, the pain, the pain and the anger that it makes me.  If I got to go on like this, it ain't worth living for because I thought maybe surgery or something could replace it and get me back to normal. |
| 128 | 12 | "Like Christman and things that I used to enjoy with the grandchildren, I couldn't do it.  And you just don't know how outgoing I was.  I had all kinds of fruit trees and pecans and stuff.  I can't get none of them.  People down there on my place getting them all. That bother me.  I can't do it.  I feel like life ain't living for." | 75 | 10 | "Before this accident…I had a whole half a acre of vegetables and potatoes and stuff where I could work and run my tiller plow and gather my vegetables and sell.  I don't have any of that. Because I love to do that type stuff." |
| 129 | 1 | "Honest to God I say sometime I wish I wouldn't be on this earth." | 70 | 16 | "The pain and the pressure and stuff on me has just go to me, I don't even feel like it's worth living for. I really don't. If I got to go through life like the, I promise you I don't feel like it's worth living for.  I can't associate with peoples." |
| 130 | 5 | Doctors have calmed pain down and it just gradually come on back up. | 84 | 2 | I am in constant pain today.  From my toe to my hip. |

EXHIBIT F

### TAI Q. CHUNG, M.D.
American Board of Orthopedic Surgery

6936 Winton Blount Blvd.
Montgomery, AL 36117

Tel: 334-2■0-2266
FAX: 334-2■0-9885

Medical Records Review

April 3, 2007

Ms. Kellie B. Schwendner
PO BOX 8
Leeds, Alabama 35094

RE:    DELOISE PRICE

Dear Ms. Schwendner:

I examined the records sent to my office with your cover letter dated March 22, 2007. The record
measured about 3 1/4 inch in thickness.

Records reviewed included the following:

1.    Notes by Iqbel J. Singh, M.D., February 12, 2001, February 16, 2001, February 23, 2001,
      March 2, 2001, March 23, 2001, April 6, 2001, April 10, 2001, April 20, 2001, May 10, 2001,
      June 27, 2001, August 31, 2001, November 1, 2001, January 28, 2002. These are records of
      multiple lumbar epidural injections.
2.    George Baker, M.D., February 12, 2001, x-rays of the lumbosacral spine showed slight loss of
      lordosis.
3.    Report by R. Glenn Chestnutt, D.C., February 14, 2006. A 72 percent impairment of the
      whole person was applied.
4.    Bibb Allen, M.D., April 5, 2005, CT scan of the lumbar spine with results, "Mild degenerative
      changes are found."
5.    Phillip Piasecki, M.D., February 11, 2005, MRI scan of the lumbar spine with contrast showed
      shunt catheter at the level of L4/5 and "Questionable minimal arachnoiditis at the level of the
      shunt."
6.    Notes by Zenko Hrynkiw, M.D., April 5, 2005, April 13, 2005. Dr. Hyrnkiw initially
      diagnosed cervical and lumbar radiculopathy. He recommended myelogram and CT scan. On
      April 13 he noted degenerative changes in the studies and that Ms. Price needs no further
      neurosurgical attention from him.
7.    Byron Machen, M.D., September 17, 2004, right knee MRI scan showed, "Large joint
      effusion, possible sprain of a mild degree in the medial collateral ligament complex."

DeLoise Price
04/03/07
Page Two

8. Notes from N. Tucker Maddox, M.D., August 20, 2004, October 8, 2004, December 15, 2004, January 17, 2005, January 31, 2005. Operative report January 10, 2005. Operation was right knee arthroscopy and debridement of chondromalacia at the medial femoral condyle and debridement of the medial meniscus tear. Dr. Maddox commented on a "Small posterior medial meniscus tear." He also noted that the articular cartilage at the medial femoral condyle was delaminated and very soft."

9. Notes by Jeffrey Profsky, M.D., February 8, 2005, February 11, 2005, March 18, 2005.

10. Note by Robert Bradley, M.D., March 28, 2005.

11. David Herrick, M.D., February 25, 2005, May 6, 2005. Dr. Herrick notes that the MRI scan of the cervical spine showed small osteophytes of C4/5 and C5/6 with no herniation. The lumbar spine MRI scan showed some arachnoiditis at the level of the shunt. There were two epidural injections done on two separate days to the lumbar spine.

12. Notes by Michael Dunning, PT, at HealthSouth, January 24, 2005, February 9, 2005, February 11, 2005, February 18, 2005, February 23, 2005, March 1, 2005, March 17, 2005, April 6, 2005, April 12, 2005, May 18, 2005, May 20, 2005, May 25, 2005, June 1, 2005, June 3, 2005, July 8, 2005, July 13, 2005.

13. David Downes, M.D., July 22, 2004, MRI scan of the lumbar spine without contrast, "Unremarkable lumbar spine."

14. PT Bills from July 1, 2005, through August 25, 2005, for a total amount of $3823 for 22 visits.

15. Notes from the Sturbridge Chiropractic, July 1, 2005, July 6, 2005, July 8, 2005, July 11, 2005, July 12, 2005, July 13, 2005, July 14, 2005, July 18, 2005, July 19, 2005, July 21, 2005, July 22, 2005, July 25, 2005, July 27, 2005, July 28, 2005, August 1, 2005, August 2, 2005, August 4, 2005, August 5, 2005, August 8, 2005, August 11, 2005, August 15, 2005, August 18, 2005, August 22, 2005, August 24, 2005.

16. Pineapple Health Center, August 12, 2005, December 2, 2005, June 2, 2005, August 2, 2005, September 15, 2005, October 20, 2005, March 25, 2004, February 19, 2004. In the note of August 12, 2005, there was complaint of back pain and knee pain after she fell off an exercise bike.

17. Joe Rose, PT, February 22, 1999, through March 16, 1999. This is therapy for a left foot injury.

18. Steven Bryan, neurology, December 14, 1999. EMG/NCV of lower extremity was normal for left foot injury.

19. Jamal Abdel-Halim, M.D., March 17, 2000. EMG/NCV studies of the upper extremity and low extremities conclusion was normal EMG/NCV, study consistent with sensory neuropathy in the lower extremities and left upper extremity and mild bilateral carpal tunnel syndrome. Also mentioned in these notes was "Pseudotumor cerebri diagnosed in 1975, status post VP shunt placed at that time."

20. Nancy Hallow, M.D., March 6, 2000, lumbar spine x-ray degenerative changes involving the left lower lumbar facet joints.

Case 2:06-cv-00721-MHT-TFM    Document 24-2    Filed 08/03/2007    Page 3 of 4

DeLoise Price
04/03/07
Page Three

21.    C. Hodnett, M.D., September 6, 2000, MRI scan of the lumbar spine, "Essentially normal MRI
       of the lumbar spine."
22.    Bone scan January 8, 2001, moderate facet abnormal uptake along the left side L5/S1 level
       consistent with arthritic changes.
23.    Bills from the Vaughan Regional Medical Center, March 20, 2000, through August 31, 2000.
24.    Reports from the Thomasville Hospital in Thomasville, Alabama, by James C. Prescott, M.D.,
       February 22, 1990, admission for contusion in the head and possible concussion.  April 15,
       1989, through April 18, 1989, admission for nausea and vomiting.  ER visit for chest pain
       January 20, 1989.
25.    Lester Littell, M.D., October 31, 2000 and January 29, 2000, visits for left foot contusion,
       January 8, 2001, bone scan was normal.
26.    Notes from J. Paul Jones Hospital in Camden, Alabama, November 28, 1998, March 3, 2000,
       July 4, 2000, there was notes of sciatica on March 3, 2000, and lumbar spine x-rays by Dr.
       Nancy Hallow, March 6, 2000.
27.    Notes from Dr. Roseanne Cook, June 26, 1998, through September 14, 2000.  A note on
       January 6, 2000, noted complaints of back and left leg pain.

**Chief Complaint:** The patient is a 56 year-old lady who complains of pain in her neck, back, right
knee and left shoulder.  She apparently claimed this happened after an accident on June 26, 2004, when
she had an accident on a bike that she was using.  She said that the handlebar broke and she injured her
various parts in the process.  She then sought treatment with multiple physicians.  She had surgery by
Dr. Maddox on January 10, 2005, for a right knee arthroscopy and debridement.  Dr. Maddox noted
small posterior medial meniscus tear and delaminated and very soft articular cartilage at the medial
femoral condyle.  Ms. Price had evaluation by Dr. Profsky, Dr. Bradley and Dr. Hrynkiw for a neck
and back problem.  Treatment was conservative.  The neurosurgeon, Dr. Hrynkiw specifically stated
that neurosurgically he had nothing to add from the treatment standpoint.  MRI scan of the cervical
spine showed, by report, osteophytes at the C4/5 and C5/6 level.  MRI scan of the lumbar spine
showed presence of a VP shunt at the lower lumbar level with possible arachnoiditis.  Ms. Price has
also had epidural injections by Dr. David Herrick.  She has had multiple visits of therapy and
chiropractics.

A review of her records shows that she had diagnosis of pseudotumor cerebri in 1975 with a VP shunt
placement.  The records also indicate that she had back pain dating back to, at least, January 6, 2000.
She had multiple epidural injections in the lumbar spine in 2001 by Dr. Singh.

The reports of the diagnostic studies of the lumbar spine including x-rays and MRI scan before and
after June 26, 2004, showed, essentially, no difference.  Essentially it was found that there were mild
degenerative changes in the lumbar spine and the presence of a VP shunt at the lower lumbar level.  A
note by Dr. Herrick on February 25, 2005, commented on the presence of small osteophytes at the
C4/5 and C5/6 levels.

Case 2:06-cv-00721-MHT-TFM    Document 24-2    Filed 08/03/2007    Page 4 of 4

DeLoise Price
04/03/07
Page Four

**Impression:** Neck pain. Low back pain. Right knee pain.

**Comments/Conclusion:** As far as the right knee is concerned, Dr. Maddox's findings showed that she had small tears at the medial meniscus, and also delaminated and very soft articular cartilage of the medial femoral condyle. These changes would seem to indicate that they were degenerative in origin and not post traumatic. The diagnostic studies of the cervical and lumbar spine showed degenerative changes with no sign of any fracture or disc herniation. It would appear that there was no objective evidence of any worsening of her lumbar spine after her reported accident of June 26, 2004. The cervical spine showed, according to a note by Dr. Herrick, small osteophyte at C4/5 and C5/6. These were degenerative in nature and not related to her reported trauma.

Overall, I think that there is no objective evidence of her sustaining any trauma to her cervical spine or lumbar spine after the reported accident of June 26, 2004. The changes in her right knee seen on arthroscopy are, I think, also degenerative in nature and not specifically related to the accident of June 26, 2004.

If I could be of further help in this matter, please feel free to contact me.

Sincerely,

Tai Q. Chung, M.D.
TQC/rpk

I spent a total of five hours reviewing the records, composing and reviewing this report.

cc: